## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>DBSI, INC., *et al.*,[1]<br><br>                         Debtors. | Chapter 11<br><br>Case No. 08-12687 (PJW)<br><br>Jointly Administered |
| JAMES R. ZAZZALI, as Trustee for the Jointly-Administered Chapter 11 Estates of the Debtors,<br><br>                Plaintiff,<br><br>        v.<br><br>STELLAR TECHNOLOGIES LLC, DBSI INVESTMENTS LIMITED PARTNERSHIP (f/k/a DBSI PROPERTIES COMPANY LIMITED PARTNERSHIP), ITERRA COMMUNICATIONS LLC, DOUGLAS L. SWENSON, CHARLES E. HASSARD, JOHN M. MAYERON, THOMAS VAR REEVE, and JOHN WASDEN,<br><br>               Defendants. | Adversary Proceeding No. _____ |

## <u>COMPLAINT</u>

       Plaintiff James R. Zazzali, as trustee (the "Trustee") for the jointly-administered chapter 11 estates of DBSI, Inc. ("DBSI"), DBSI Guaranteed Capital Corporation ("GCC"), and their affiliated debtors (collectively, the "Debtors"), through his undersigned attorneys, hereby states as and for the Trustee's Complaint against Defendants Stellar Technologies LLC ("Stellar"),

---

[1] The last four digits of DBSI Inc.'s federal tax identification number are 5037. The mailing address for DBSI Inc. is 12426 West Explorer Drive, Suite 220, Boise, Idaho 83713. Due to the large number of Debtors in these cases, for which the Debtors were granted joint administration, a complete list of the Debtors, the last four digits of their federal tax identification numbers and their addresses is not provided herein. A complete list of such information may be obtained by contacting counsel for the Trustee at rfitzgerald@gibbonslaw.com.

DBSI Investments Limited Partnership ("Investments"), iTerra Communications LLC ("iTerra"), Douglas L. Swenson, Charles E. Hassard, John M. Mayeron, Thomas Var Reeve, and John Wasden (collectively, the "Individual Defendants," and together with Stellar, Investments and iTerra, the "Defendants"):[2]

## INTRODUCTION

1.      This is an action pursuant to 28 U.S.C. § 2201 and Rules 7001(7) and (9), 7003 and 7065 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") seeking a declaratory judgment and injunctive and other relief against Defendants. The Individual Defendants have recently acted in concert in an attempt to prevent the Trustee from exercising DBSI's management and control rights over Investments, Stellar, iTerra and other Stellar subsidiaries—all of which are entities in which DBSI has a significant controlling and/or beneficial interest and which were structured to be controlled by DBSI. The Individual Defendants' wrongful conduct is evidenced by their attempt to control, pledge, and/or sell assets of the Debtors' estates in violation of the automatic stay, including but not limited to securities (i) that possess a market value of at least $5,968,610, (ii) in which DBSI has a majority beneficial interest, and (iii) that are the subject of a pre-existing security agreement between Stellar and GCC that was intended to secure what is now at least a $13,028,792 debt due and payable to GCC from Stellar. To prevent injury to the Debtors' estates, the Trustee seeks, among other relief, a judgment declaring that (i) the Trustee can exercise all of DBSI's rights and powers to manage and control Investments and Stellar as set forth in their respective partnership and operating agreements, (ii) the Individual Defendants have no authority to cause Investments and/or Stellar to act absent or in contravention of DBSI's exercise of its management and control

---

[2] Nothing herein constitutes an admission that Investments, Stellar or any other non-debtor entity has a true, independent existence. The Trustee expressly reserves all rights with respect thereto.

#1447952 v5
109401-67166

thereof, and (iii) the Individual Defendants (through Investments, Stellar or otherwise) and

Investments and Stellar (absent or in contravention of DBSI's exercise of its management and

control thereof) have no authority whatsoever over certain brokerage accounts in which the

above securities are maintained.

## PROCEDURAL HISTORY

2.     On November 6, 2008 and various dates thereafter (the "Petition Date"), certain

of the Debtors, including but not limited to DBSI and GCC, filed voluntary petitions for relief

under chapter 11, title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

Since the Petition Date, certain of the Debtors' cases have been converted to chapter 7.  The

Debtors' cases that are currently administered under chapter 11 are jointly administered pursuant

to Orders of the Court.

3.     On November 21, 2008, the Office of the United States Trustee for Region Three

(the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the

"Committee").

4.     On April 3, 2009, the U.S. Trustee filed her Notice of Appointment of Examiner

wherein she notified Joshua R. Hochberg (the "Examiner") of his appointment to serve as

Examiner, pending approval of the Court.  On April 14, 2009, the Court entered its Order

Approving Appointment of Examiner [Docket No. 3308].  The Examiner issued his First Interim

Report on August 3, 2009 [Docket No. 4159] ("Interim Report") and his Final Report on October

19, 2009 [Docket No. 4544] ("Final Report").

5.     By Order dated August 14, 2009, the Court directed the U.S. Trustee to appoint a

chapter 11 trustee in the Debtors' jointly-administered chapter 11 cases.  By Notice of

Appointment dated August 31, 2009 (the "Appointment Date"), the U.S. Trustee appointed the

#1447952 v5
109401-67166

Trustee as trustee in the Debtors' chapter 11 cases. By Order dated September 11, 2009, the

Court approved the U.S. Trustee's appointment of the Trustee [Docket No. 4375].

**PARTIES**

6.     The Trustee is the duly-appointed, qualified and acting trustee for the Debtors'

chapter 11 estates pursuant to 11 U.S.C. § 1104(a) and the Bankruptcy Court's Orders appointing

the Trustee dated August 14, 2009 and September 11, 2009.

7.     DBSI is an Idaho corporation with a principal place of business in Idaho.

8.     GCC is an Idaho corporation with a principal place of business in Idaho.

9.     Investments is an Idaho limited partnership with a principal place of business in

Idaho.

10.     Stellar is an Idaho limited liability company with a principal place of business in

Idaho.

11.     iTerra is an Idaho limited liability company with a principal place of business in

Idaho.

12.     Swenson sits on the Management Board of Stellar and is a Manager of iTerra.

Swenson holds approximately 91.38% of the shares of DBSI.

13.     Hassard sits on the Management Board of Stellar and is a Manager of iTerra.

14.     Mayeron, Reeve, and Wasden sit on the Management Board of Stellar.

15.     Swenson, Hassard, and Mayeron hold "Class A General Partner" interests in

Investments.

16.     DBSI is the "Class B General Partner" of Investments and holds, at a minimum,

54.3% of the partnership interests in Investments.

17.     Investments, in turn, holds no less than 62.26% of the membership interests in

Stellar.

4

18.     Stellar, in turn, holds no less than 80.1% of iTerra.

19.     Stellar also purports to own 64.1% of Ultra Design LLC ("Ultra Design"), 98.17% of BioReaction Industries LLC ("BioReaction"), 18.6% of GigOptix, Inc., and 62.18% of Wavetronix LLC ("Wavetronix").  Collectively, these companies will be referred to as the "Technology Companies."

20.     Accordingly, through its ownership of Stellar, Investments has an indirect beneficial ownership of at least 49.87% of iTerra, 39.91% of Ultra Design, 61.12% of BioReaction, 15.94% of GigOptix, Inc., and 38.17% of Wavetronix.

21.     And through its ownership of Investments, DBSI has an indirect beneficial ownership of at least 33.81% of Stellar, 27.08% of iTerra, 21.67% of Ultra Design, 33.19% of BioReaction, 8.65% of GigOptix, Inc., and 21.02% of Wavetronix.

22.     As stated in the Examiner's Final Report, this ownership structure rendered Stellar a mere "shell company that did not operate independently of DBSI."

## JURISDICTION AND VENUE

23.     The Court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. §§ 1334 and 157.

24.     This adversary proceeding is a core proceeding to be heard and determined by the Court pursuant to 28 U.S.C. §157(b)(2)(A) and (O).

25.     Venue is proper in the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409(a), as this adversary proceeding arises in and is related to the above-captioned jointly administered chapter 11 cases.

26.     The statutory bases for the relief requested herein are 28 U.S.C. § 2201 and §§ 105(a), 362(a) and 541(a) of the Bankruptcy Code.

5

27.     This is an adversary proceeding initiated by the Trustee pursuant to Bankruptcy Rules 7001(7) (to obtain an injunction and other equitable relief), 7001(9) (to obtain a declaratory judgment) and 7003.  Pursuant to Bankruptcy Rule 7065, the Court may issue a preliminary injunction on application of a trustee without compliance with Fed. R. Civ. P. 65(c). Accordingly, the Trustee is not required to post any security as a condition of the Court's granting of the preliminary injunction requested herein.

## FACTS

### I.     Investments' Structure and Governance

28.     On or about January 1, 1994, DBSI (then known as DBSI Housing, Inc.), Farrell J. Bennett, John D. Foster, Charles E. Hassard, John M. Mayeron, Walter E. Mott, and Douglas L. Swenson formed DBSI Properties Company as an Idaho general partnership.

29.     On or about December 3, 1994, DBSI Properties Company was converted to an Idaho limited partnership.  At that time, the name of the company was changed to DBSI Properties Company Limited Partnership.

30.     In 2000, the partnership's business purpose was expanded to include the acquisition of controlling interests in high-tech development companies.

31.     On or about March 27, 2008, the partnership changed its name to DBSI Investments Limited Partnership (*i.e.*, Investments).

32.     The agreement of the partners of Investments is set forth in the Amended and Restated Partnership Agreement of DBSI Properties Company Limited Partnership effective as of January 1, 2005, as amended by the First Amendment thereto effective as of July 1, 2006 and the Second Amendment thereto effective as of April 16, 2007 (together, the "Investments Agreement").  A copy of the Investments Agreement is attached hereto as *Exhibit A*.

#1447952 v5
109401-67166

33.     Under the Investments Agreement, DBSI is the "Class B General Partner."  The "Class A General Partners" are Swenson, Hassard, and Mayeron.  DBSI's "Capital Percentage," which the partnership generally uses for allocations and distributions, is stated as 54.3%.

34.     Under Article 10 of the Investments Agreement, virtually all of the business affairs of the partnership are to be managed by the Class B General Partner, *i.e.*, DBSI, which also has the exclusive power to bind the partnership.

35.     Under Article 10.2 of the Investments Agreement, the Class A General Partners have a right to participate only in the following decisions of the partnership:  (1) the admission of an additional partner; (2) the bankruptcy of the partnership; (3) the making of certain distributions; (4) the resignation of a general partner; and (5) the making of additional capital contributions by the general partners.

36.     Article 13.1.2 of the Investments Agreement prohibits the transfer, by operation of law, of the "Interest" of any Partner without the "Majority Approval" of the Class A General Partners and the Class B General Partner.

37.     Article 1.14 defined "Interest" to include the partner's "right to vote or grant or withhold consents with respect to Partnership matters" as well as any other "rights and privileges" provided to the partners.

## II.     Stellar's Structure and Governance

38.     Stellar was formed on or about March 1, 2000 to own, manage, and finance a variety of technology start-up companies.  It has no revenue-generating activities of its own.

39.     The agreement of the members of Stellar is set forth in the Amended and Restated Operating Agreement effective as of April 1, 2005, as amended by the First Amendment to

7

Amended and Restated Operating Agreement effective as of August 1, 2005 (together, the "Stellar Agreement").  A copy of the Stellar Agreement is attached hereto as *Exhibit B*.

40.     Stellar's voting members are identified as Investments, Var Reeve, Gary Bringhurst, John Wasden, Robert Spence, and Eric Mott.

41.     Stellar is managed by a Management Board, elected by a vote of a "Majority of the Voting Members once each year."  A "Majority of the Voting Members" can also remove a member of the Management Board, with or without cause.

42.     A "Majority of the Voting Members" means "[o]ne or more Members whose Class A Units and Preferred Units with voting rights for the matter being voted upon, taken together, exceed fifty percent (50%) of the outstanding aggregate of all the Members' Class A Units and Preferred Units with voting rights for the matter being voted upon."

43.     Under Article 7.5 of the Stellar Agreement, "only the Management Board and agents of [Stellar] authorized by the Management Board shall manage the business and affairs of [Stellar]."  The Management Board was empowered with "all of the rights and powers that may be possessed by a manager under the [Idaho Limited Liability Company Act]."  Notwithstanding the powers conferred upon the Management Board in Article 7.5, only a "Majority of the Voting Members" can dissolve Stellar, effect a merger or other business combination, or transact business with an affiliate.

44.     Because it possesses at least 62.26% of Stellar's membership units, Investments has the power to determine the make-up of Stellar's Management Board.  And because DBSI controls the business affairs of Investments as its Class B General Partner, and the exercise of Investments' power under the Stellar Agreement falls within the scope of DBSI's power as

8

Investments' general partner, the power to constitute Stellar's Management Board rests with DBSI.

45.　　On or about August 15, 2005, Paul Judge was named President and CEO of Stellar and was named to its Management Board.

46.　　Until October 12, 2009, Stellar's Management Board consisted of Swenson, Hassard, Mayeron, Reeve, Wasden, and Judge.

## III.　Stellar's Financial Condition

47.　　Stellar is currently insolvent.  In fact, Stellar has likely been balance sheet insolvent since it was formed.  Attached hereto as *Exhibit C* is a document showing historical income statement and balance sheet data for Stellar.

48.　　Stellar's June 30, 2009 balance sheet (a copy of which is attached hereto as *Exhibit D*) reflects total assets of $22,982,020 and total liabilities of $176,865,151.  Stellar's profit and loss statement as of June 30, 2009 shows a loss of $4,388,623.  A copy of that statement is attached hereto as *Exhibit E*.

49.　　According to the Examiner's Final Report, as of December 31, 2008, Stellar's liabilities included:  (1) $13,028,792 owed to GCC on account of unpaid principal and interest on loans due and payable on September 30, 2008; (2) $28,460,463 owed to debtor DBSI 2008 Notes Corporation on account of unpaid principal and interest on loans due and payable on June 15, 2009; and (3) $127,651,652 owed to non-debtor DBSI Redemption Reserve ("DRR") on account of unpaid principal and interest on loans made by DRR to Stellar.  [Docket No. 4544]

50.　　DRR had no revenue-generating activities of its own.  DRR was funded by transfers from other DBSI-related entities.  All of the funds received by DRR from the various DBSI-related entities were commingled.

9

51.     According to the Examiner's Final Report, Stellar's books and records purport to reflect loans made by GCC to Stellar totaling approximately $41,258,403.  Of that amount, Stellar made principal payments to GCC in the total approximate amount of $32,649,891.  The Examiner found that Stellar used funds transferred from DRR to make $19,977,927 in principal payments to GCC.  The Examiner also found that Stellar used funds transferred from DRR to make $14,540,464 in interest payments to GCC.

52.     According to the Examiner's Final Report, as of December 31, 2008, DRR owed DBSI approximately $196,693,698.

53.     Upon information and belief, funds transferred from DBSI to DRR were then transferred to Stellar, which used those funds to partially satisfy its indebtedness to GCC.

**IV.     Investments and Stellar Attempt to Prevent DBSI from Exercising its Management Powers Under the Investments Agreement and the Stellar Agreement.**

54.     Judge served as Stellar's CEO and President and sat on its Management Board until October 12, 2009.  In that capacity, Judge recognized DBSI's ownership and control over Investments and Stellar and maintained an open line of communication with the Trustee and his representatives concerning Stellar's on-going business affairs.  That all changed, however, on October 12, 2009.

55.     On the afternoon of October 12, Stellar convened, without formal notice to, or any participation of, the Trustee, an emergency meeting of its Management Board.  At that meeting, the Management Board purported to resolve to terminate its outside counsel and to retain instead the firm of Belnap Law PLLC.  The Management Board did so over the objection of two managers, who observed that the Belnap firm possesses a conflict of interest in concurrently representing Stellar and "alpha" persons Gary Bringhurst, Mark Ellison, Hassard, Mayeron, and Reeve.  Hassard, Mayeron and Reeve each voted in favor of Belnap's retention.

10

56.     The Management Board also purported to resolve that all communications with the Trustee on behalf of Stellar must be passed through, and made by, the Belnap firm, personal counsel to the above-referenced "alpha" persons. Judge was specifically instructed that he was not authorized to speak to the Trustee or his representatives. Considering it inappropriate to, in effect, shut the Trustee out of Stellar's affairs, Judge tendered his resignation from Stellar and its Management Board. His resignation became effective on October 23, 2009.

57.     Before and since the October 12 meeting, the Trustee has advised Stellar's purported counsel that it is unlawful to preclude DBSI from exercising its management powers and rights over Investments, Stellar, iTerra and the other Technology Companies.

58.     The Individual Defendants have disagreed and purported to cause Investments and Stellar to disagree. They contend that DBSI's bankruptcy has resulted in its "dissociation" from Investments as Investments' Class B General Partner. As a result, in the Individual Defendants' view, DBSI no longer possesses the rights of a Class B General Partner but retains only its economic interests in Investments. The Individual Defendants then assert that they, in turn, can exercise their control rights over Investments and Stellar without the Trustee's participation.

59.     The Individual Defendants have purported to cause Stellar to take action consistent with that position, including an attempt to divert assets of the Debtors' estates to their own use and benefit, in violation of the automatic stay and to the detriment of the Debtors and the creditors of the estates represented by the Trustee.

11

**V.** **Stellar and iTerra Attempt to Divert Estate Assets for Their Own Use and Benefit.**

    **A.** **The Stellar Account**

60.     In or about June 2009, Stellar opened Active Assets Account # 140-054900-008 (the "Stellar Account") with Morgan Stanley Smith Barney ("Morgan Stanley"). Stellar caused its interest in GigOptix, Inc. (possessed as a result of the Lumera-GigOptix LLC merger) to be transmitted into the Stellar Account. Attached hereto as *Exhibit F* are documents attendant to that transmittal and the opening of the Stellar Account. As of September 30, 2009, 972,612 shares of GigOptix, Inc. common stock were held in the Stellar Account and possessed a market value of at least $3,384,689. A copy of an account statement issued by Morgan Stanley as of September 30, 2009 is attached hereto as *Exhibit G*.

61.     Stellar executed various documents dated June 1, 2005 that purport to evidence indebtedness owed by Stellar to GCC in the principal face amount of $27,127,658. Among those documents were a Term Loan Agreement, a "Security Agreement (iTerra)," and an Amended and Restated Promissory Note, which are attached hereto as *Exhibits H, I, and J*, respectively. Under the Security Agreement (iTerra), Stellar granted a broad security interest in its current and future assets, including but not limited to the iTerra membership units, "accounts," "investment property," "documents of title," and "deposit accounts," as well as any "replacements" and "proceeds" of such assets. Stellar covenanted that it would not pledge, transfer, or loan any assets, for its benefit or the benefit of any of its members or affiliates, without GCC's prior written consent.

62.     A UCC financing statement filed by GCC on or about July 13, 2005 (a copy of which is attached hereto as *Exhibit K*) is consistent with the security interest stated in the loan documents.

#1447952 v5
109401-67166

## B.    The iTerra Account

63.    In July 2007, as part of a so-called reorganization plan, iTerra formed GigOptix

LLC as a wholly-owned subsidiary.  iTerra then transferred all of its assets and liabilities—with

the exception of $45.8 million of debt and accrued interest due to iTerra's primary member (*i.e.*,

Stellar)—to GigOptix LLC.  As a result of iTerra's transfer of all of its assets to this newly-

formed subsidiary, the membership units in GigOptix LLC issued to iTerra constitute

"replacements" or "proceeds" of the iTerra membership units in which GCC possessed a security

interest under the June 2005 loan documents.

64.    A document dated November 13, 2008—three days after GCC filed its chapter 11

petition in this Court—states that GigOptix LLC agreed to sell 2,631,579 membership units of

GigOptix LLC to Arjesan I LLP for a purchase price of $1,000,000.00.

65.    According to public filings, on or about December 9, 2008, the merger between

Lumera Corporation and GigOptix LLC was consummated, with each entity becoming wholly-

owned subsidiaries of a Delaware corporation named GigOptix, Inc.  GigOptix, Inc. became the

successor public registrant to Lumera Corporation following the merger.  As a result of the

merger, Lumera shareholders received 57% of GigOptix, Inc.'s common stock, and GigOptix

LLC members (*i.e.*, iTerra) received 43% of GigOptix, Inc.'s common stock.

66.    In or about June 2009, iTerra opened Active Assets Account # 140-054896-008

(the "iTerra Account") with Morgan Stanley.  iTerra caused its interest in GigOptix, Inc.

(possessed as a result of the Lumera-GigOptix LLC merger) to be transmitted into the iTerra

Account.  Attached hereto as *Exhibit L* are documents attendant to that transmittal and the

opening of the iTerra Account.  As of September 30, 2009, 742,549 shares of GigOptix, Inc.

common stock were held in the iTerra Account and possessed a market value of approximately

#1447952 v5
109401-67166

$2,583,921.  A copy of an account statement issued by Morgan Stanley as of September 30, 2009 is attached hereto as *Exhibit M*.

**C.    DBSI is the beneficial owner of the assets held in the Stellar Account and the iTerra Account.**

67.    Several documents publicly-filed with the Securities and Exchange Commission ("SEC") expressly recognize that the GigOptix, Inc. stock held in the Stellar Account and the iTerra Account (together, the "Accounts") is beneficially owned by DBSI.

68.    For example, a Form S-4/A dated October 24, 2008 filed in connection with the prospective Lumera-GigOptix LLC merger states, at page 187, that DBSI was the beneficial owner of 80.5% of the membership units of GigOptix LLC.  DBSI's ownership was specifically noted to include 5.4 million GigOptix LLC membership units held by iTerra and more than 7 million GigOptix LLC membership units held by Stellar.  A copy of the Form S-4/A is attached hereto as *Exhibit N*.

69.    On or about December 11, 2008, Investments completed a Form ID Application Acknowledgment for submission to EDGAR that was executed by Swenson on behalf of Investments as "President of its General Partner, DBSI, Inc."  A copy of this document is attached hereto as *Exhibit O*.

70.    On or about December 18, 2008, DBSI filed with the SEC a Form 3 "Initial Statement of Beneficial Ownership of Securities."  In that document, DBSI stated that it is the beneficial owner of 742,550 shares of GigOptix, Inc. common stock held by iTerra and 972,613 shares of GigOptix, Inc. common stock held by Stellar.  DBSI also stated that Stellar holds warrants to purchase an additional 660,473 shares of GigOptix, Inc. stock.  According to this Form 3, the GigOptix, Inc. shares beneficially owned by DBSI total 2,375,636.  A copy of the Form 3 is attached hereto as *Exhibit P*.

14

71.     Consistent with the Form 3, on or about December 23, 2008, Swenson, DBSI, Investments, Stellar and iTerra filed a Schedule 13D with the SEC. The Schedule stated that DBSI and Investments each possessed shared voting and dispositive power over 2,375,636 shares of GigOptix, Inc. common stock. A copy of the Schedule 13D is attached hereto as *Exhibit Q*.

72.     Likewise, a Form 10-K/A filed May 1, 2009 by GigOptix, Inc. stated that 2,375,636 shares of GigOptix, Inc. common stock is beneficially owned by DBSI. The Form 10-K/A explained that these 2,375,636 shares include 972,613 shares held by Stellar and 742,550 shares held by iTerra. A copy of the Form 10-K/A is attached hereto as *Exhibit R*.

73.     All but one of the 972,613 GigOptix, Inc. shares held by Stellar reside in the Stellar Account. All but one of the 742,550 GigOptix, Inc. shares held by iTerra reside in the iTerra Account.

**D.     Stellar and iTerra, through their "alpha" person managers, take steps to use the Accounts for their own benefit without authority of the Trustee or the Bankruptcy Court.**

74.     The Individual Defendants caused Stellar and iTerra to open the Accounts in violation of the security agreements with GCC and the automatic stay. They did not arrange for a control agreement to be executed with Morgan Stanley recognizing GCC's security interests. Upon information and belief, Morgan Stanley was unaware of GCC's security interests when the Accounts were opened and the GigOptix, Inc. stock was deposited into them.

75.     The Trustee's representatives recently learned that Stellar's Management Board purported to cause Stellar and iTerra to advise Morgan Stanley that Judge should be removed as the sole signatory on the Accounts. The apparent purpose of this action by the Individual Defendants was to facilitate their access and control over the GigOptix, Inc. stock maintained in the Accounts in derogation of the interests of DBSI.

15

76.     Thereafter, on October 23, 2009, the Trustee requested that Stellar provide the Trustee with five (5) business-days notice of any transaction outside of the ordinary course of business in which Stellar intended to engage, including any disposition of assets.  On October 26, 2009, Stellar's Management Board purportedly met to consider the Trustee's request.  A copy of a Notice of Meeting of Stellar's Management Board is attached hereto as *Exhibit S.*

77.     On October 26, 2009, Monte Neil Stewart, Esq. of the Belnap firm advised counsel for the Trustee that Stellar had rejected the Trustee's request.  Mr. Stewart further advised that Stellar had resolved to take the following actions:  (1) retain the law firm of Smith Gambrell & Russell, LLP to serve as Stellar's lead counsel in any adversary proceedings that might be commenced against it; (2) retain the Belnap firm to serve as co-counsel with the Smith Gambrell firm; (3) retain Delaware counsel to serve as local counsel to the Belnap and Smith Gambrell firms; (4) execute a "brokerage account pledge agreement between Stellar and the three law firms"; and (5) execute "an account control agreement" between Stellar, the Smith Gambrell firm, and a broker.  A copy of Mr. Stewart's letter of October 26 is attached hereto as *Exhibit T*.

78.     According to Mr. Stewart, "[t]he purpose of the latter two agreements is to handle and make effective the law firms' security interest in Stellar-owned assets," the nature of which Mr. Stewart refused to disclose to the Trustee in the absence of an appropriate confidentiality agreement, notwithstanding DBSI's controlling interest in Stellar and the Trustee's authority to control DBSI's affairs.

79.     Mr. Stewart stated that the five agreements that Stellar resolved to enter would ***become effective on November 10, 2009 at 5:00 p.m. EST***.

16

80.     DBSI beneficially owns the GigOptix, Inc. stock maintained in the Accounts, which beneficial interest constitutes property of DBSI's bankruptcy estate.  Moreover, that stock has already been pledged to secure Stellar's debt to GCC of approximately $13,028,792 (*i.e.*, the stock represents GCC's collateral).  Yet Stellar and iTerra, by reason of the actions of the Individual Defendants, now purport to grant a security interest in the Accounts ***to their lawyers*** to secure payment to them of attorney's fees and costs incurred in defending against DBSI's right to the Accounts and to manage the affairs of Stellar, iTerra, and the other Technology Companies.

81.     In response to a letter sent on behalf of the Trustee concerning DBSI's and GCC's interests in the Accounts' assets, Morgan Stanley has advised that it has, for the time being, placed an administrative freeze on the Accounts.

## COUNT I
## (Declaratory Judgment)

82.     Plaintiff repeats and restates the allegations set forth in paragraphs 1 through 81 above as if fully set forth herein.

83.     DBSI's interests in Investments and Stellar constitute valuable property of its bankruptcy estate under 11 U.S.C. § 541(a).

84.     The Trustee has a fiduciary duty to ensure that property of the estate is preserved for the benefit of creditors.

85.     The Investments Agreement and the Stellar Agreement confer upon DBSI the power to manage and control the business affairs of Investments and Stellar.

86.     The Bankruptcy Code confers upon the Trustee the authority to exercise DBSI's management and control rights under the Investments Agreement and the Stellar Agreement.

#1447952 v5
109401-67166

87.     The Individual Defendants contend that by petitioning for bankruptcy protection, DBSI has been "dissociated" under state law from Investments and consequently has lost all but its economic rights under the Investments Agreement and the Stellar Agreement.

88.     The Investments Agreement does not, however, contain a provision effecting the dissociation of DBSI upon its bankruptcy filing.

89.     Under section 53-2-110 of the Idaho Limited Partnership Act, the Investments Agreement governs the relations among Investments' partners and between the partners and the partnership.

90.     Section 2.2 of the Investments Agreement announces that "it is the express intention of the Partners that this Agreement shall be the 'sole source' of agreement of the parties" and that the "Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule."

91.     Because the Investments Agreement does not expressly provide for the dissociation of a partner upon a bankruptcy filing, and because the Investments Agreement is the "sole source" of the rights and obligations of the partners, any dissociation provision found in state law is not applicable to Investments.

92.     Article 13.1.2 of the Investments Agreement accordingly prohibits the transfer, by operation of law, of the "Interest" of any Partner without the "Majority Approval" of the Class A and Class B General Partners.  Such "Majority Approval" has never been given.

93.     Moreover, Investments (and its partners) have either consented to DBSI's continuation as the Class B General Partner of Investments notwithstanding DBSI's bankruptcy filing or waived, by conduct, any right to claim that DBSI was dissociated as a partner as a result of its bankruptcy filing.

18

94.     Indeed, through the Form 3, Swenson, who controlled DBSI and therefore controlled Investments, informed the SEC on or about December 18, 2008—some five weeks after DBSI filed for chapter 11 protection—that DBSI was, at that time, "the general partner" of Investments.

95.     Similarly, a Stellar document reflects that as of December 31, 2008, DBSI remained the Class B General Partner of Investments. A copy of this document is attached hereto as *Exhibit U.*

96.     Indeed, a document prepared by the Belnap firm purporting to reflect "Ownership Interests in Various Non-Debtor Entities and Other Non-Debtor Interests" as of May 12, 2009 again identifies DBSI as the Class B General Partner of Investments. This document was provided via e-mail to counsel for the Creditor's Committee and then-counsel for DBSI. A copy of this document, and a covering e-mail, is attached hereto as *Exhibit V.*

97.     Likewise, a document dated June 18, 2009 and created by DBSI's then-counsel states, at page 32, that Investments is an "Active Limited Partnership" in which DBSI serves as its Class B General Partner. A copy of this document is attached hereto as *Exhibit W.*

98.     Swenson's (and DBSI's) statement in the Form 3 that DBSI remained "the general partner" of Investments is consistent with statements he made, prior to the Trustee's appointment, to the Bankruptcy Court concerning DBSI's continuing control over certain non-debtor companies.

99.     For example, Investments holds at least 80% of debtor DBSI/Western Technologies LLC ("Western Technologies"), which in turn holds at least 80.3% of non-debtor Western Electronics LLC ("Western Electronics"). On June 2, 2009, Western Technologies moved the Bankruptcy Court for authorization to exercise its controlling interest in Western

19

Electronics to approve a financing transaction with a third-party lender. Counsel for Western

Technologies, who also then served as counsel for DBSI, filed the motion. The operating

agreement of Western Electronics contains a provision that specifically states that a member is

dissociated upon bankruptcy. If DBSI and Swenson (through their control of Investments)

believed that the dissociation provision in the Western Electronics' operating agreement was

applicable and enforceable, and that Western Technologies was dissociated pursuant to that

provision, DBSI and Swenson would not have caused Western Technologies to seek the

Bankruptcy Court's permission to exercise DBSI's control rights over Western Electronics. But

neither DBSI, Investments, Western Technologies nor Western Electronics—all of which were

effectively controlled by Swenson—took that position. [Docket No. 3665]

      100.    As the above facts demonstrate, an actual controversy exists between the Trustee

on the one hand and the Individual Defendants (and Investments and Stellar by reason of the

improper actions of the Individual Defendants) on the other hand with respect to the scope of

DBSI's rights under the Investments Agreement and the Stellar Agreement, specifically, whether

DBSI still possesses the management and control rights set forth in those agreements and

whether the Trustee can exercise those rights.

      101.    The Trustee seeks a declaration that DBSI is not dissociated as the Class B

General Partner in Investments and that it therefore possesses, and the Trustee can exercise, all

of the managerial rights and powers conveyed in the Investments Agreement and the Stellar

Agreement.

**COUNT II**
**(Declaratory Judgment)**

      102.    Plaintiff repeats and restates the allegations set forth in paragraphs 1 through 101

above as if fully set forth herein.

20

103.     DBSI is an indirect beneficial owner of the GigOptix, Inc. stock maintained in the Accounts.

104.     DBSI's beneficial interest in the GigOptix, Inc. stock constitutes property of the estate under § 541 of the Bankruptcy Code.

105.     The Accounts' assets constitute collateral securing debts owed by Stellar to GCC and other Debtors.

106.     The security interest in such collateral constitutes property of the estate under § 541 of the Bankruptcy Code.

107.     The Individual Defendants have acted in a manner that would deprive DBSI of its rights as beneficial owner of the Accounts' assets.

108.     The Individual Defendants have acted in a manner that is entirely inconsistent with any security interest granted  in Stellar's assets and the Accounts' assets.

109.     The Individual Defendants have taken the position that they can dispose of the Accounts' assets without the approval of either DBSI, GCC, or the Trustee.

110.     Neither DBSI, GCC, nor the Trustee have consented to the Individual Defendants' actions.

111.     As the above facts demonstrate, an actual controversy exists between the Trustee on the one hand and the Individual Defendants (and Investments and Stellar by reason of the improper actions of the Individual Defendants) on the other hand with respect to the control and disposition of the Accounts.

112.     The Trustee seeks a declaration that the Individual Defendants have no authority to cause Stellar and iTerra to direct the disposition of the Accounts.

#1447952 v5
109401-67166

## COUNT III
## (Violation of 11 U.S.C. § 362(a))

113.    Plaintiff repeats and restates the allegations set forth in paragraphs 1 through 112 above as if fully set forth herein.

114.    Section 362(a)(3) of the Bankruptcy Code provides that the filing of a petition stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

115.    Section 362(k)(1) of the Bankruptcy Code provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

116.    The Individual Defendants have received actual notice and have actual knowledge of the commencement of the Debtors' chapter 11 cases.

117.    The Individual Defendants know that DBSI is an indirect beneficial owner of the GigOptix, Inc. stock maintained in the Accounts.

118.    The Individual Defendants know that the Accounts' assets constitute collateral securing debts owed by Stellar to GCC and other Debtors.

119.    The Individual Defendants have acted willfully in a manner that would deprive DBSI of its rights as beneficial owner of the Accounts' assets.

120.    The Individual Defendants have acted willfully in a manner that is entirely inconsistent with any security interest granted in the Accounts' assets.

121.    The Individual Defendants have taken the position that they can dispose of the Accounts' assets without the approval of either DBSI, GCC, or the Trustee.

122.    The Individual Defendants caused Stellar and iTerra to open the Accounts in violation of the security agreements with GCC.

22

123.    Stellar and iTerra, by reason of the actions of the Individual Defendants, have committed acts in an attempt to grant a security interest in the Accounts ***to their lawyers*** to secure payment to them of attorney's fees and costs incurred in defending against DBSI's right to the Accounts and to manage the affairs of Stellar, iTerra, and the other Technology Companies.

124.    Neither DBSI, GCC, nor the Trustee have consented to Defendants' actions.

125.    Defendants have neither sought nor been granted relief from the automatic stay to take any action relating to the Accounts.

126.    By opening the Accounts and taking action to grant a security interest in the Accounts, the Individual Defendants have acted willfully to obtain possession of, and exercise control over, property of the Debtors' estates in violation of the automatic stay.

127.    The Individual Defendants' willful actions in violation of the automatic stay entitle the Trustee to recover actual damages, including but not limited to the attorney's fees and costs incurred to preserve property of the Debtors' estates.

128.    The Individual Defendants' willful actions to obtain and exercise control over the Accounts, notwithstanding their actual knowledge of DBSI's and GCC's interests in the Accounts, constitute extraordinary circumstances warranting an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, the Trustee respectfully requests that the Court:

A.    Issue an Order temporarily restraining Investments, Stellar, and the Individual Defendants, and all persons acting in concert with them, from taking any action to effectuate or render effective the pledge and control agreements that would purport to create a security interest

#1447952 v5
109401-67166

in the Stellar Account and the iTerra Account in favor of the Belnap firm, the Smith Gambrell firm, or any other third party;

B.    Issue an Order directing Investments, Stellar, and the Individual Defendants, and all persons acting in concert with them, to take all necessary action to cancel, rescind, revoke, and void the pledge and control agreements that would purport to create a security interest in the Stellar Account and the iTerra Account in favor of the Belnap firm, the Smith Gambrell firm, or any other third party;

C.    Issue an Order temporarily restraining Investments, Stellar and the Individual Defendants from taking any action that is outside the ordinary course of its business, including but not limited, any sale, transfer, or other disposition of any asset or any of its holdings in any of the Technology Companies, without providing ten (10) business days' notice to the Trustee of its intention to take any such action;

D.    Enter a judgment declaring that DBSI is not dissociated from Investments, by operation of contract or by operation of law, and that the Trustee can therefore exercise all of the rights, powers, and authority conveyed to DBSI under the Investments Agreement and to Investments under the Stellar Agreement;

E.    Enter a judgment declaring that the Debtors' interests in the Accounts constitute property of the Debtors' estates, which is therefore subject to the protections of the automatic stay;

F.    Enter a judgment declaring that Defendants do not have any authority whatsoever to exercise control over the Accounts, including but not limited to directing the liquidation or other disposition of the Accounts' assets or pledging or otherwise encumbering the Accounts' assets;

24

G. Enter a judgment declaring null, void, and of no legal force and effect all actions taken by Defendants, and those persons acting in concert with them, in violation of the automatic stay imposed by § 362 of the Bankruptcy Code;

H. Enter a judgment against the Individual Defendants and awarding Plaintiff actual and punitive damages suffered as a result of the above violations of the automatic stay imposed by § 362 of the Bankruptcy Code;

I. Issue an Order preliminarily and permanently enjoining Defendants from taking any action whatsoever that could interfere, impair, injure, harm or prevent the Trustee from exercising all of the rights, powers, and authority conveyed to DBSI under the Investments Agreement and to Investments under the Stellar Agreement;

J. Issue an Order preliminarily and permanently enjoining Defendants from taking any action whatsoever that could interfere, impair, injure, or harm DBSI's beneficial ownership rights in the GigOptix, Inc. stock maintained in the Accounts;

K. Issue an Order preliminarily and permanently enjoining Defendants from taking any action whatsoever that could interfere, impair, injure, or harm any pre-existing security interests in Stellar's assets and the Accounts' assets; and

L. Any other and further relief that the Bankruptcy Court deems fair and equitable.

#1447952 v5
109401-67166

Dated: November 6, 2009          **GIBBONS P.C.**
      Wilmington, DE

By:   /s/ William R. Firth, III
          William R. Firth, III, Esq. (Bar No. 4356)
          1000 N. West Street, Suite 1200
          Wilmington, DE 19801-1058
          Telephone: (302) 295-4875
          Facsimile: (302) 295-4876
          E-mail: wfirth@gibbonslaw.com

          - and -

          Brian J. McMahon, Esq. (admitted *pro hac vice*)
          Anthony M. Gruppuso, Esq. (admitted *pro hac vice*)
          One Gateway Center
          Newark, NJ 07102-5310
          E-mail: bmcmahon@gibbonslaw.com
                    agruppuso@gibbonslaw.com

          *Counsel to James R. Zazzali, Chapter 11 Trustee*

#1447952 v5
109401-67166