# EXHIBIT B

AMENDED AND RESTATED

OPERATING AGREEMENT

OF

STELLAR TECHNOLOGIES LLC

(MANAGEMENT BOARD MANAGED)

# TABLE OF CONTENTS

**ARTICLE I - FORMATION** ................................................................................... 1
    1.1    Organization.......................................................................................... 1
    1.2    Agreement, Effect of Inconsistencies With Act ................................. 1
    1.3    Name .................................................................................................... 2
    1.4    Registered Office and Agent............................................................... 2
    1.5    Principal Office .................................................................................... 2
**ARTICLE II - DEFINITIONS** ............................................................................ 2
**ARTICLE III - NATURE OF BUSINESS**........................................................... 9
**ARTICLE IV - ACCOUNTING AND RECORDS** ............................................ 9
    4.1    Records to Be Maintained................................................................... 9
    4.2    Reports to Members .......................................................................... 10
    4.3    Accounts ............................................................................................ 10
    4.4    Audited Financial Statements ........................................................... 10
    4.5    Access to Books and Records............................................................ 10
**ARTICLE V - NAMES AND ADDRESSES OF MEMBERS AND BOARD MEMBERS** . 10
**ARTICLE VI - MEMBERSHIP INTERESTS AND RIGHTS AND DUTIES OF MEMBERS**............................................................................................................11
    6.1    Membership Units.............................................................................. 11
        6.1.1    Additional Units........................................................................ 11
        6.1.2    Series of Preferred Membership Units...................................... 11
        6.1.3    Preferences of Preferred Membership Units.............................. 11
    6.2    Voting of Membership Units ............................................................. 11
    6.3    Redemption of Membership Units..................................................... 12
    6.4    Unit Certificates ................................................................................ 12
    6.5    Management Rights ........................................................................... 12
        6.5.1    Actions Requiring Approval of the Majority of the Voting Members ................ 12
    6.6    Liability of Members ......................................................................... 13
    6.7    Indemnification.................................................................................. 13
    6.8    Representations and Warranties........................................................ 13
    6.9    Members Meetings and Decisions ..................................................... 13
        6.9.1    Regular Meeting......................................................................... 13
        6.9.2    Special Meetings ....................................................................... 14
        6.9.3    Notice of Meeting ..................................................................... 14
        6.9.4    Proxies....................................................................................... 14
        6.9.5    Quorum ...................................................................................... 14
        6.9.6    Telephonic Meeting .................................................................. 14
        6.9.7    Written Consent......................................................................... 14
    6.10    Conflicts of Interest........................................................................... 15
**ARTICLE VII - MANAGEMENT BOARD** ....................................................... 15
    7.2    Term of Board Members................................................................... 15
        7.2.1    Removal of Board Members...................................................... 15
        7.2.2    Replacement of Board Members ............................................... 15
    7.3    Executive Committee, Executive Officers, Directors, Principals and Other Agents.... 16
    7.4    Meetings and Actions of Board Members ........................................ 16

7.5     Authority of Management Board to Bind the Company ................................ 16
7.6     Compensation of Board Members ................................................................. 17
7.7     Board Members' Standard of Care ............................................................... 17
7.8     Management Personnel ................................................................................. 17

**ARTICLE VIII - CONTRIBUTIONS AND CAPITAL ACCOUNTS** ................................ 17
8.1     Initial Contributions ..................................................................................... 17
8.2     Additional Member Capital Contributions .................................................. 18
8.3     Enforcement of Commitments ...................................................................... 18
8.4     Maintenance of Capital Accounts ................................................................ 18
8.5     Distribution of Assets ................................................................................... 19
8.6     Sale of Exchange of Interest ........................................................................ 19
8.7     Revaluation of Company Property ............................................................... 19
8.8     Compliance With Section 704(b) of the Code .............................................. 19

**ARTICLE IX - ALLOCATIONS AND DISTRIBUTIONS** ................................................. 20
9.1     Allocations of Net Profits ............................................................................. 20
9.2     Allocation of Net Losses .............................................................................. 20
9.3     Allocation Rules ........................................................................................... 20
    9.3.1    Company Minimum Gain Chargeback ................................................ 20
    9.3.2    Member Minimum Gain Chargeback ................................................... 21
    9.3.3    Qualified Income Offset ...................................................................... 21
9.4     Priority Distributions ................................................................................... 22
9.5     Interim Distributions .................................................................................... 22
9.6     Tax Distributions ......................................................................................... 23
9.7     Limitations on Distributions ........................................................................ 23
9.8     Asset Sale or Transfer, Merger, Consolidation, or Reverse Merger ............................ 23

**ARTICLE X - TAXES** ........................................................................................................ 23
10.1    Elections ...................................................................................................... 23
10.2    Taxes of Taxing Jurisdictions ...................................................................... 24
10.3    Tax Matters Partner ..................................................................................... 24
10.4    Method of Accounting ................................................................................. 24

**ARTICLE XI - DISPOSITION OF MEMBERSHIP INTERESTS** ................................... 24
11.1    Disposition ................................................................................................... 24
11.2    Transfer to the Company .............................................................................. 25
11.3    Transfer to Permitted Transferee ................................................................. 25
11.4    Right of First Refusal ................................................................................... 25
11.3    Dispositions Not in Compliance With This Article Void ............................. 26

**ARTICLE XII - DISSOCIATION OF A MEMBER** ......................................................... 26
12.1    Dissociation ................................................................................................. 26
12.2    Purchase of Dissociated Member's Membership Interest ............................ 26
12.3    Purchase Price of Dissociated Member's Membership Interest .................... 27
12.4    Damages ...................................................................................................... 27

**ARTICLE XIII - ADMISSION OF ASSIGNEES AND ADDITIONAL MEMBERS** ......... 27
13.1    Rights of Assignees ..................................................................................... 27
13.2    Admission of Substitute Members ............................................................... 27
13.3    Admission of Permitted Transferees ........................................................... 27
13.4    Admission of Additional Members .............................................................. 28

**ARTICLE XIV - DISSOLUTION AND WINDING UP** ........................................................ 28
    14.1    Dissolution ........................................................................................................... 28
    14.2    Effect of Dissolution ............................................................................................ 28
    14.3    Distribution of Assets on Dissolution .................................................................. 28
    14.4    Winding Up and Certificate of Dissolution .......................................................... 29
**ARTICLE XV - AMENDMENT** ............................................................................................. 29
    15.1    Agreement May Be Modified ............................................................................... 29
    15.2    Amendment or Modification of Agreement ........................................................... 29
**ARTICLE XVI - MISCELLANEOUS PROVISIONS** .......................................................... 30
    16.1    Entire Agreement ................................................................................................. 30
    16.2    No Partnership Intended for Nontax Purposes ...................................................... 30
    16.3    Rights of Creditors and Third Parties Under Agreement ...................................... 30
    16.4    Headings .............................................................................................................. 30
    16.5    Counterparts ........................................................................................................ 30
    16.6    Governing Law .................................................................................................... 30
    16.7    Waiver ................................................................................................................. 31
    16.8    Dispute Resolution .............................................................................................. 31
    16.9    Severability ......................................................................................................... 31
    16.10   Parties in Interest ................................................................................................ 32

# AMENDED AND RESTATED

# OPERATING AGREEMENT

# OF

# STELLAR TECHNOLOGIES LLC

This Amended and Restated Operating Agreement of Stellar Technologies LLC, an Idaho limited liability company organized pursuant to the Act, is entered into and shall be effective as of April 1st, 2005 by and among the Company and the persons executing this Agreement as Members.

## RECITALS:

WHEREAS, the Members entered into that certain Operating Agreement of Stellar Technologies LLC effective March 1, 2000, the date the Articles were filed with the Secretary of State of Idaho (the "Initial Operating Agreement") for the purpose of specifying their respective rights with respect to the ownership and management of the Company; and

WHEREAS, the Members desire to replace the Initial Operating Agreement in its entirety with this Agreement in order to redefine their respective rights with respect to the ownership and management of the Company.

NOW, THEREFORE, in consideration of the covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I - FORMATION

1.1     Organization.   The Member hereby organizes the Company as an Idaho limited liability company pursuant to the provisions of the Act.

1.2     Agreement, Effect of Inconsistencies With Act.   The Members shall be subject to the terms and conditions of this Agreement, as it may from time to time be amended according to its terms.  It is the express intention of the Members that this Agreement shall be the sole source of agreement of the parties, and, except to the extent a provision of this Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Regulations or is expressly prohibited or ineffective under the Act, this Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule.  To the extent any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make the agreement

effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment. The Members agree that each Member shall be entitled to rely on the provisions of this Agreement, and no Member shall be liable to the Company or to any Member for any action or refusal to act taken in good faith reliance on the terms of this Agreement. The Members and the Company agree that the duties and obligations imposed on the Members of the Company as such shall be those set forth in this Agreement, which is intended to govern the relationship among the Company and the Members, notwithstanding any provision of the Act or common law to the contrary.

1.3　　Name.　The name of the Company is Stellar Technologies LLC, and all business of the Company shall be conducted under that name or under any other name, but in any case, only to the extent permitted by applicable law.

1.4　　Registered Agent and Office.　The registered agent for the service of process and the registered office shall be that Person and location reflected in the Articles as filed in the office of the Secretary of State. The Management Board, may, from time to time, change the registered agent or office through appropriate filings with the Secretary of State. If the registered agent ceases to act as such for any reason or the registered office shall change, the Management Board shall promptly designate a replacement registered agent or file a Notice of change of address as the case may be. If the Management Board shall fail to designate a replacement registered agent or change of address of the registered office, any Voting Member may designate a replacement registered agent or file a Notice of change of address.

1.5　　Principal Office.　The Principal Office of the Company shall be located at:

> 1550 South Tech Lane
> Meridian, Idaho 83642

## ARTICLE II - DEFINITIONS

For purposes of this Agreement, unless the context clearly indicates otherwise, the following terms shall have the following meanings:

2.1　　Act.　The Idaho Limited Liability Company Act and all amendments to the Act.

2.2　　Additional Member.　A Member who has acquired a Membership Interest from the Company.

2.3　　Admission Agreement.　The Agreement between an Additional Member and the Company described in Section 13.4.

2.4   Agreement.  This Operating Agreement including all amendments adopted in accordance with this Agreement and the Act.

2.5   Articles.  The Articles of Organization of the Company as properly adopted and amended from time to time by the Members and filed with the Secretary of State of the state of Idaho.

2.6   Assignee.  A Person to whom a Membership Interest has been transferred who has not been admitted as a Substitute Member.  The Assignee's only rights in the Company shall be the right to receive its proportionate share of distributions and allocations of the profits, losses, gains, deductions, and credits as provided in this Operating Agreement.

2.7   Bankrupt Member.  A Member who: (1) has become the subject of an Order for Relief under the United States Bankruptcy Code, (2) has initiated, either in an original Proceeding or by way of answer in any state insolvency or receivership Proceeding, an action for liquidation arrangement, composition, readjustment, dissolution, or similar relief.

2.8   Board Member.  Individual manager who serves on the Management Board pursuant to Section VII.

2.9   Book Adjustments.  Adjustments with respect to the Book Value of Company Property for depreciation, depletion, amortization, and gain or loss, as computed in accordance with section 1.704-1(b)(2)(iv)(g) of the Regulations.

2.10   Book Value.  With respect to Property Contributed to the Company, the fair market value of the Property at the time of Contribution as adjusted by Book Adjustments; with respect to Company Property which has been revalued, the fair market value of such Company Property as adjusted by Book Adjustments.

2.11   Business Day.  Any day other than Saturday, Sunday, or a legal holiday observed in the state of Idaho.

2.12   Capital Account.  The account maintained for a Member or Assignee determined in accordance with Article VIII.

2.13   Class A Unit.  A class of Units held by a Member or Assignee hereof, including any and all benefits to which the holder of such Class A Unit may be entitled as provided in this Agreement, and all obligations of the holder of such Class A Unit to comply with the terms and provisions of this Agreement.

2.14   Code.  The Internal Revenue Code of 1986 as amended from time to time.

2.15　Commitment.　The obligation of a Member or Assignee to make a Capital Contribution.

2.16　Company.　Stellar Technologies LLC, an Idaho limited liability company, and any successor.

2.17　Company Liability.　Any enforceable debt or obligation for which the Company is liable or which is secured by any Company Property.

2.18　Company Minimum Gain.　An amount determined by first computing for each Company Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that Liability for no consideration other than full satisfaction of the Liability, and then aggregating the separately computed gains.　The amount of Company Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument, only to the extent a Member is allocated a share of that minimum gain.　For any Taxable Year, the net increase or decrease in Company Minimum Gain is determined by comparing the Company Minimum Gain on the last day of the immediately preceding Taxable Year with the Minimum Gain on the last day of the current Taxable Year. Notwithstanding any provision to the contrary contained herein, Company Minimum Gain and increases and decreases in Company Minimum Gain are intended to be computed in accordance with Section 704 of the Code the Regulations issued thereunder, as the same may be issued and interpreted from time to time.　A Member's share of Company Minimum Gain at the end of any Taxable Year equals:　the sum of Nonrecourse Deductions allocated to that Member (and to that Member's predecessors in interest) up to that time and the distributions made to that Member (and to that Member's predecessors in interest) up to that time of proceeds of a Nonrecourse Liability allocable to an increase in Company Minimum Gain minus the sum of that Member's (and of that Member's predecessor in interest) aggregate share of the net decreases in Company Minimum Gain plus their aggregate share of decreases resulting from Revaluations of Company Property subject to one or more Company Nonrecourse Liabilities.

2.19　Company Nonrecourse Liability.　A Company Liability to the extent that no Member or Related Person bears the economic risk of loss (as defined in Section 1.752-2 of the Regulations) with respect to the Liability.

2.20　Company Property.　Any Property owned by the Company.

2.21　Contributing Members.　Members making Capital Contributions as a result of the failure of a Delinquent Unit Holder to perform a Commitment as described in Article VIII.

2.22　Contribution.　Any contribution of Property made by or on behalf of a new or existing Member or Assignee as consideration for a Membership Interest.

2.23　Current Ratio.　The ratio of total current assets to total current liabilities.

2.24    Damages.  Any loss, damage, injury, reduced value, liability, claim, demand, settlement, judgment, award, fine, penalty, tax, fee (including any legal fee, expert fee, accounting fee or advisory fee), charge, cost (including any cost of investigation or enforcement costs) or expense of any nature, net of insurance recoveries.

2.25    Default Interest Rate.  The higher of the legal rate or the then-current prime rate quoted by the largest commercial bank in the jurisdiction of the Principal Office plus three percent (3%).

2.26    Delinquent Unit Holder.  A Member or Assignee who has failed to meet the Commitment of that Member or Assignee.

2.27    Disposition (Dispose).  Any sale, assignment, transfer, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law).

2.28    Dissociation.  Any action that causes a Person to cease to be a Member as described in Article XII hereof.

2.29    Dissociated Member.  A Person who has ceased to be a Member as a result of Dissociation in Article XII hereof.

2.30    Distribution.  A transfer of Property to a Member on account of a Membership Interest as described in Article IX.

2.31    GAAP.  U.S. generally accepted accounting principles in effect from time to time.

2.32    Governmental Body.  Any (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or entity and any court or other tribunal).

2.33    Immediate Family.  A Member's Immediate Family includes the Member's spouse, children (including natural, adopted, and stepchildren), grandchildren, and parents.

2.34    Liquidating Distribution.  A Distribution made as consideration for a Membership Interest.

2.35    Majority of the Voting Members.  One or more Members whose Class A Units and Preferred Units with voting rights for the matter being voted upon, taken together, exceed

fifty percent (50%) of the outstanding aggregate of all the Members' Class A Units and Preferred Units with voting rights for the matter being voted upon.

2.36 <u>Management Board</u>. The board, appointed as provided in Section 7.2, which manages the business and affairs of the Company and which may exercise all such powers of the Company and take all lawful acts.

2.37 <u>Management Right</u>. The right of a Member to participate in the management of the Company as specified in this Agreement.

2.38 <u>Member</u>. Those Persons described on the Unit Ledger as Members who are initial Members, Substitute Members, or Additional Members.

2.39 <u>Member Minimum Gain</u>. An amount determined by first computing for each Member Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that Liability for no consideration other than full satisfaction of the Liability, and then aggregating the separately computed gains. The amount of Member Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument, only to the extent a Member is allocated a share of that minimum gain. For any Taxable Year, the net increase or decrease in Member Minimum Gain is determined by comparing the Member Minimum Gain on the last day of the immediately preceding Taxable Year with the Minimum Gain on the last day of the current Taxable Year. Notwithstanding any provision to the contrary contained herein, Member Minimum Gain and increases and decreases in Member Minimum Gain are intended to be computed in accordance with Section 704 of the Code the Regulations issued thereunder, as the same may be issued and interpreted from time to time.

2.40 <u>Member Nonrecourse Liability</u>. Any Company Liability to the extent the Liability is nonrecourse under state law, and on which a Member or Related Person bears the economic risk of loss under Section 1.752-2 of the Regulations because, for example, the Member or Related Person is the creditor or a guarantor.

2.41 <u>Membership Interest</u>. The respective rights of a Member or, in the case of an Assignee, the respective rights of the assigning Member in Distributions (liquidating or otherwise) and allocations of the profits, losses, gains, deductions, and credits of the Company as those rights are specified in this Agreement respectively for holders of Class A Units and Preferred Units.

2.42 <u>Money</u>. Cash or other legal tender of the United States, or any obligation that is immediately reducible to legal tender without delay or discount. Money shall be considered to have a fair market value equal to its face amount.

2.43  Net Losses.  The losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year employed under the method of accounting adopted by the Company and as reported separately or in the aggregate, as appropriate, on the tax return of the Company filed for federal income tax purposes.

2.44  Net Profits.  The income and gains of the Company determined in accordance with accounting principles consistently applied from year to year employed under the method of accounting adopted by the Company and as reported separately or in the aggregate, as appropriate, on the tax return of the Company filed for federal income tax purposes.  Net Profits includes taxable income, capital gain, and income exempt from taxation.

2.45  Nonrecourse Liabilities.  Company Nonrecourse Liabilities and Member Nonrecourse Liabilities.

2.46  Notice.  Notice shall be in writing.  Notice to the Company shall be considered given when mailed by first class mail, postage paid, addressed to the Management Board in care of the Company at the address of the Principal Office.  Notice to a Member shall be considered given when mailed by first class mail, postage prepaid, addressed to the Member at the address reflected in this Agreement unless the Member has given the Company a Notice of a different address.

2.47  Organization.  A Person other than a natural person.  Organization includes, without limitation, corporations (both non-profit and other corporations), partnerships (both limited and general), joint ventures, limited liability companies, and unincorporated associations, but the term does not include joint tenancies and tenancies by the entirety.

2.48  Organization Expenses.  Those expenses incurred in the organization of the Company including the costs of preparation of this Agreement and Articles.

2.49  Permitted Transferee.  Any member of the Member's Immediate Family, or an Organization controlled by such Member or by members of the Member's Immediate Family.

2.50  Person.  An individual, trust, estate, or any incorporated or unincorporated organization permitted to be a member of a limited liability company under the laws of Idaho.

2.51  Preferred Unit.  A class of Units held by a Member or Assignee hereof, including any and all benefits to which the holder of such Preferred Unit may be entitled as provided in this Agreement, and all obligations of the holder of such Preferred Unit to comply with the terms and provisions of this Agreement.

2.52  Proceeding.  Any judicial or administrative trial, hearing, or other activity, civil, criminal, or investigative, the result of which may be that a court, arbitrator, or governmental agency may enter a judgment, order, decree, or other determination which, if not appealed and

reversed, would be binding upon the Company, a Member or other Person subject to the jurisdiction of such court, arbitrator, or governmental agency.

2.53    Property.    Any property, real or personal, tangible or intangible (including goodwill), including Money and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

2.54    Regulations.    Except where the context indicates otherwise, the permanent, temporary, proposed, or proposed and temporary regulations of Department of the Treasury under the Code as such regulations may be lawfully changed from time to time.

2.55    Related Person.    A person having a relationship to a Member that is described in Section 1.752-4(b) of the Regulations.

2.56    Representatives.    Officers, directors, employees, agents, attorneys, accountants, advisors and representatives.

2.57    Reserved.

2.58    Revaluation.    The adjustment of the Book Value of Company Property as provided in Section 8.7 of this Agreement.

2.59    Revaluation Date.    The date on which a Revaluation Event occurs.

2.60    Revaluation Event.    (1) A Contribution (other than a *de minimis* amount), (2) a Liquidating Distribution (other than a *de minimis* amount), or (3) a Liquidation of the Company.

2.61    Sharing Ratio.    A fraction (expressed as a percentage), the numerator of which is the total of the Member's or Assignee's Units (for the particular class of Units or combined classes, as the Agreement may require) and the denominator is the total of all issued Units (for the particular class of Units or combined classes, as the Agreement may require) of all Members and Assignees as such totals exist from time to time.

2.62    Substitute Member.    An Assignee who has been admitted to all of the rights of membership pursuant to this Agreement.

2.63    Taxable Year.    The taxable year of the Company as determined pursuant to Section 706 of the Code.

2.64    Taxing Jurisdiction.    Any state, local, or foreign government that collects tax, interest, or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

2.65    Term.  The Company shall have perpetual existence unless the Company is dissolved in accordance with Section 14.1.

2.66    Unit.  An ownership interest in the Company that is used to calculate the Sharing Ratios and the voting percentage of the Members entitled to vote on Company matters.  There are two classes of Units:  Class A Units and Preferred Units.  The rights of each class of Units are detailed in this Agreement.

2.67    Unit Ledger.  Ledger to be maintained by the Company listing each Member and Assignee and their address, number of Units owned, Contributions and other relevant information.

2.68    Voting Members.  Those Members described in Section 6.2.2.

## ARTICLE III - NATURE OF BUSINESS

The Company may engage in any lawful business permitted by the Act or the laws of any jurisdiction in which the Company may do business.  The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as described in this Article III.  The Company exists only for the purpose specified in this Article III, and may not conduct any other business without the consent of the Majority of the Voting Members.

## ARTICLE IV - ACCOUNTING AND RECORDS

4.1    Records to Be Maintained.  The Management Board shall maintain the following records at the Principal Office:

4.1.1    A current list of the full name and last known business address of each Member, former Member, and other holder of a Membership Interest;

4.1.2    A copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which Articles have been executed;

4.1.3    Copies of the Company's federal, foreign, state, and local income tax returns and reports, if any, for the three most recent years;

4.1.4    Copies of this Agreement including all amendments thereto;

4.1.5    Any financial statements of the Company for the three most recent years;

4.1.6   A Unit Ledger showing the name, address, Contributions and number of Units of each Member and Assignee.

4.2   <u>Reports to Members</u>.   The Management Board shall provide to each Member a copy of the quarterly and annual financial statements of the Company (within thirty (30) days of the end of such quarter and ninety (90) days of the end of such year) and such other financial information as such Member may reasonably request.   The annual financial statements of the Company shall be prepared in accordance with GAAP and shall be accompanied by a statement of capital accounts for all Members.

4.3   <u>Accounts</u>.   The Company shall maintain a record of the Capital Account for each Member in accordance with Article VIII.

4.4   <u>Annual Financial Statements</u>.   Unless a Majority of the Voting Members require otherwise, the Company's annual financial statements shall be unaudited.

4.5   <u>Access to Books and Records</u>.   All Members shall have the right at all reasonable times during usual business hours to examine, and make copies of or extracts from, the books of account of the Company and the records required to be maintained hereunder.   Each Member shall bear all expenses incurred in any such examination made for such Member's account.

## ARTICLE V - NAMES AND ADDRESSES OF
## MEMBERS AND BOARD MEMBERS

The name and address of the Voting Members and Additional Members at the date of this Operating Agreement are as set forth in the attached Exhibit A.   Also included on Exhibit A are the names of the Members of the Management Board at the date of this Operating Agreement.

## ARTICLE VI - UNITS
## AND RIGHTS AND DUTIES OF MEMBERS

6.1    Units.   All Membership Interests of the Members in the Company shall be denominated in Units.  There shall be two classes of Units: Class A Units and Preferred Units.  The respective rights and obligations of each class of Units shall be as provided in this Agreement.  The Company hereby authorizes and may issue up to ten million (10,000,000) Class A Units, and up to five million (5,000,000) Preferred Units, which number of Units may be changed in the future with the approval of the Majority of the Voting Members.  No Units will be registered upon any national security exchange, foreign securities exchange, regional or local exchange or inter-dealer quotation system that regularly disseminates firm buy or sell quotations by brokers or dealers, without the approval of the Majority of the Voting Members.  Each Unit will have the rights and obligations set forth herein.  The Management Board may issue Units as required in Section 8.2 and/or as it deems advisable to secure and retain the services of new members or employees and to provide incentives for such persons to exert maximum efforts for the success of the Company and to raise outside capital for the Company's business.

6.1.1    Additional Units.   The Members, by the Majority of the Voting Members, may authorize the issuance of additional Class A Units and Preferred Units.

6.1.2    Series of Preferred Units.   The Management Board shall have the authority to divide the Preferred Units into as many series as it shall from time to time determine.  The Management Board shall determine the number of units comprising each series of Preferred Units, which number may, unless otherwise provided by the Management Board in creating such series, be increased from time to time by action of the Management Board.  Each series of Preferred Units shall be so designated as to distinguish such series from the units of each other series.

6.1.3    Preferences of Preferred Units.   The Management Board shall determine the preferences, voting rights, if any, limitations, and relative rights, including, without limitation, conversion rights, if any, into Class A Units, of any series of Preferred Units before the issuance of any units of that series.  Such determination shall supersede any preferences, limitation, and relative rights the holders of Preferred Units would otherwise have under this Agreement.

6.2    Voting of Units.   The voting powers of the classes of Units shall be as follows: Units

6.2.1    Each Voting Member shall be entitled to one (1) vote for each Class A Unit and one (1) vote for each Preferred Unit with voting rights held by such Voting Member on each matter for which the respective Units have voting rights.

6.2.2    Voting Members shall be:

6.2.2.1 Each holder of one million (1,000,000) or more of the Class A Units.

6.2.2.2 Eric Mott and Robert Spence as long as they hold two hundred thousand (200,000) or more Class A Units.

6.2.2.3 The holders of Preferred Units who have been provided rights to vote by the Management Board pursuant to Section 6.1.3 and then only to the extent of the specific voting rights provided by the Management Board.

6.3   Redemption of Units.  No Member or Assignee shall have any rights to require the redemption by the Company of any Units.

6.4   Unit Certificates.  The Management Board may cause the Units of the Company to be represented by certificates.  Certificates representing Units shall be in such form as shall be determined by the Management Board.  Such certificates shall be signed by the Chief Executive Officer of the Company or any member of the Management Board.  All certificates or Units shall be consecutively numbered or otherwise identified.  The name and addresses of the persons to whom the Units represented by each certificate are issued, with the number of Units, and the date of issue, shall be entered on the unit transfer book of the Company.  All certificates surrendered to the Company for transfer shall be canceled and no new certificates shall be issued until the former certificate of like number of Units shall have been surrendered and canceled, except in the case of lost, destroyed or mutilated certificate, a new one may be issued therefore on such terms and indemnity to the Company as the Management Board may prescribe.

6.5   Management Rights.  The management of the Company shall be conducted by the Management Board as provided in Article VII.  Notwithstanding Article VII, the consent or affirmative vote of the Majority of the Voting Members shall be necessary to take the action specified in this Section 6.5.

6.5.1   Actions Requiring Approval of the Majority of the Voting Members.  The consent or affirmative vote of the Majority of the Voting Members (or such greater percentage as may be specified in this Agreement) shall be necessary to take any of the following actions:

6.5.1.1   elect a Board Member pursuant to Section 7.2;

6.5.1.2   increase or decrease the number of Board Members pursuant to Section 7.1;

6.5.1.3   remove a Board Member pursuant to Section 7.2.1;

6.5.1.4   dissolve the Company pursuant to Section 14.1;

6.5.1.5    effect any merger, consolidation or other business combination of the Company with any other Person;

6.5.1.6    execute any contract with a Member or an Affiliate of a Member, or approve or take any action regarding any contract or transaction with a Member or an Affiliate of a Member, or in which a Member or an Affiliate of a Member has a direct economic interest;

6.5.1.7    authorize a Member to do any act on behalf of the Company that contravenes this Agreement;

6.5.1.8    take any action for which approval of the Members is otherwise required by this Agreement.

6.6    Liability of Members.  No Member shall be liable as either a Member or as a Board Member for the liabilities of the Company.  The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Members for liabilities of the Company.

6.7    Indemnification.  The Company shall indemnify the Members and agents for all costs, losses, liabilities, and damages paid or accrued by such Member (either as Member or as Board Member) or agent in connection with the business of the Company, to the fullest extent provided or allowed by the laws of the State of Idaho.

6.8    Representations and Warranties.    Each Member, and in the case of an organization, the person(s) executing this Agreement on behalf of the organization, represents and warrants to the Company and each other Member that: (a) if that Member is an organization, that it is duly organized, validly existing, and in good standing under the law of its state of organization and that it has full organizational power to execute and agree to this Agreement and to perform its obligations hereunder; (b) that the Member is acquiring its interest in the Company for the Member's own account as an investment and without an intent to distribute the interest; (c) the Member acknowledges that the interests have not been registered under the Securities Act of 1933 or any state securities laws, and may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirements.

6.9    Members Meetings and Decisions.

6.9.1    Regular Meeting.  A regular meeting of the Members may be held once a year or on a regular basis as determined by the Management Board at a location designated by the Management Board or on such other date as the Management Board determines.  The

Management Board shall prepare an agenda of matters to be considered by the Members entitled to vote at such meetings, including but not limited to the election of the Board Members.

6.9.2 <u>Special Meetings</u>. Special meetings of the Members entitled to vote, for any purposes described in the meeting notice, may be called by the Management Board or by Members holding 20 percent of the outstanding Units.

6.9.3 <u>Notice of Meeting</u>. Written or telephonic notice stating the place, day and hour of the meeting and, in case of a special meeting, the purposes for which the meeting is called, shall be delivered not less than three (3) days before the date of the meeting, either personally, by mail, by e-mail or by facsimile transmission, to each Member of record entitled to vote at such meeting.

6.9.4 <u>Proxies</u>. At all meetings of Members, a Member entitled to vote may vote by proxy executed in writing by the Member or by his duly authorized attorney-in-fact. Such proxy shall be filed with the Company before or at the time of the meeting. No proxy shall be valid after three months from date of execution, unless otherwise provided in the proxy.

6.9.5 <u>Quorum</u>. Members owning not less than one-half of the Units entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of Members.

6.9.6 <u>Telephonic Meeting</u>. Members of the Company entitled to vote may participate in any meeting of the Members by means of conference telephone or similar communications equipment if all Persons participating in such meeting can hear one another for the entire discussion of the matter(s) to be voted upon. Participation in a meeting pursuant to this Section 6.9.6 shall constitute presence in person at such meeting.

6.9.7 <u>Written Consent</u>. Any action required or which may be taken at a meeting of the Members may be taken without a meeting, without prior notice and without a vote, if one or more written consents, setting forth the action so taken, shall be signed by a Majority of the Members entitled to vote. Action taken in accordance with this Section 6.9.7 shall be effective when sufficient written consents have been delivered to the Company, unless the consent specifies an effective date. Prompt notice of the taking of any action without a meeting by less than unanimous written consent of the Members entitled to vote thereon shall be given by the Company to those Members who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of Members to take the action were delivered to the Company. Failure to give such notice as required shall not be grounds to invalidate and otherwise challenge the action taken by such consent.

6.10   <u>Conflicts of Interest</u>.

      6.10.1 A Member shall be entitled to enter into Transactions that may be considered to be competitive with, or a business opportunity that may be beneficial to, the Company, it being expressly understood that some of the Members may enter into Transactions that are similar to the Transactions into which the Company may enter. Notwithstanding the foregoing, Members shall account to the Company and hold as trustee for it any property, profit, or benefit derived by the Member, without the consent of the Management Board, in the conduct and winding up of the Company business or from a use or appropriation by the Member of Company Property including information developed exclusively for the Company and opportunities expressly offered to the Company.

      6.10.2 A Member does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest. A Member may lend Money to and transact other business with the Company. The rights and obligations of a Member who lends Money to or transacts business with the Company are the same as those of a person who is not a Member, subject to other applicable law. No transaction with the Company shall be voidable solely because a Member has a direct or indirect interest in the transaction if either the transaction is fair to the Company or the Management Board, in either case knowing the material facts of the transaction and the Member's interest, authorize, approve, or ratify the transaction.

## ARTICLE VII - MANAGEMENT BOARD

      7.1   <u>Number of Board Members</u>. The Management Board shall be composed of individual managers (each to be known as a "Board Member"), the number of which may range between four (4) and ten (10), and may be fixed or changed from time to time, within the minimum and maximum, by the vote of a Majority of the Voting Members.

      7.2   <u>Term of Board Members</u>. Board Members are elected by the vote of a Majority of the Voting Members once each year at a regular meeting of the Members. Each Board Member shall serve a term of one (1) year from the date elected to the Management Board and thereafter, despite the expiration of his term, until his successor is duly elected and qualifies, or until his earlier death, resignation or removal.

      7.2.1   <u>Removal of Board Members</u>. A Board Member may be removed, with or without cause, by vote or consent of the Majority of the Voting Members. .

      7.2.2   <u>Replacement of Board Members</u>. In the event that, for any reason whatsoever, a Board Member ceases to or is unable to continue to serve, on an indefinite or permanent basis, as a Board Member, a Majority of the Members shall designate a replacement Board Member to serve in the place of such Board Member.

7.3    Executive Committee, Executive Officers, Directors, Principals and Other Agents. The Management Board may appoint an Executive Committee, executive officers, directors, principals and other agents of the Company and delegate to any such Executive Committee members, officers, directors, principals or agents so much of its authority to manage the Company as the Management Board determines is appropriate. Except as otherwise provided in an Employment Agreement, any Executive Committee members, executive officers, directors, principals or other agents appointed by the Management Board may be removed by the Management Board, at any time with or without cause. The Company may pay any of the forementioned parties reasonable compensation for their services as fixed from time to time by the Management Board or as may be otherwise provided in a corresponding Employment Agreement.

7.4    Meetings and Actions of Board Members. Meetings and actions of the Management Board shall be as follows:

7.4.1    The Management Board shall meet (i) at least once each fiscal quarter of the Company at the Principal Offices of the Company or at such other place as may be agreed upon from time to time by the Management Board (unless such meeting shall be waived by all of the Board Members); (ii) at such other times as may be determined by the Management Board; or (iii) upon the request of at least a majority of the Management Board or the Chief Executive Officer upon two (2) days' notice to all Board Members for meetings held in person. Meetings may be held by telephone. Written notice stating the place, day and hour of the meeting shall be delivered not less than forty-eight (48) hours before the date of such telephonic meeting. If all the Board Members shall meet in person or telephonically at any time and place, and do not object to the holding of a meeting at such time and place, such meeting shall be valid without call or notice. The Management Board shall cause written minutes to be prepared of all actions taken by the Management Board and shall cause a copy thereof to be delivered to each Board Member within fifteen (15) days thereof.

7.4.2    No action may be taken at a meeting of the Management Board unless a quorum consisting of at least a simple majority of Board Members is present.

7.4.3    Each Board Member shall be entitled to cast one vote with respect to any decision made by the Management Board. Any action to be taken by the Management Board shall require affirmative votes from at least a majority of Board Members present in person or by proxy at a valid meeting. Approval or action by the Management Board shall constitute approval or action by the Company and shall be binding on the Members. A Board Member may grant a proxy entitling another Board Member to exercise his voting rights. Such proxy shall be in writing and shall specify a termination date. The other Board Members shall be entitled to inspect the proxy on demand.

7.5    Authority of Management Board to Bind the Company. Subject to Section 6.5 herein (matters reserved for the vote and approval of the Majority of the Voting Members), only

the Management Board and agents of the Company authorized by the Management Board shall manage the business and affairs of the Company. The Management Board shall possess all of the rights and powers that may be possessed by a manager under the Act, the Articles and this Agreement, including, without limitation, the right and power to cause the Company to exercise any or all of its powers under the Act. Only the Management Board and agents of the Company authorized by the Management Board shall have the authority to bind the Company. A Member who is not authorized as an agent shall not take any action to bind the Company, and each Member shall indemnify the Company for any costs or Damages incurred by the Company as a result of the unauthorized action of such Member. The Management Board has the power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company.

7.6     Compensation of Board Members. Each Board Member shall be reimbursed all reasonable expenses incurred in managing the Company and shall be entitled to compensation in an amount to be determined from time to time by the affirmative vote of a Majority of the Voting Members, and the Voting Members shall consider the terms of any Employment Agreements which Board Members may have with the Company or any Affiliates.

7.7     Board Members' Standard of Care. A Board Member's duty of care in the discharge of the Board Member's duties to the Company and the other Members is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law. In addition, Board Members shall not release any Company information, proprietary or otherwise, to outside persons or entities without the prior written consent of a Majority of the Management Board. In discharging its duties, a Board Member shall be fully protected in relying in good faith upon the records required to be maintained under Article IV and upon such information, opinions, reports, or statements by any of its other Members, or agents, or by any other Person, as to matters the Board Member reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports, or statements as to the value and amount of the assets, liabilities, profits, or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

7.8     Management Personnel. The day-to-day management of the Company shall be conducted by those persons designated by the Management Board from time to time and in the capacity and office designated by the Board.

### ARTICLE VIII - CONTRIBUTIONS AND CAPITAL ACCOUNTS

8.1     Initial Contributions. Each Member or Assignee shall make the Contribution described for that Member in the Unit Ledger at the time and on the terms specified in the Unit Ledger and shall perform that Member's or Assignee's Commitment and shall receive the number and type of Units described in the Unit Ledger. No interest shall accrue on any

Contribution and no Member or Assignee shall have the right to withdraw or be repaid any Contribution except as provided in this Agreement and in the Unit Ledger.

8.2     Additional Member Capital Contributions.   Each Additional Member shall make the Contribution and shall perform the Commitment described in their Admission Agreement as required by the Management Board pursuant to Section 13.4.   The value of the Additional Member's Contribution and the time for making such contribution shall be set forth in the Admission Agreement.

8.3     Enforcement of Commitments.   In the event any Member or Assignee fails to perform the Commitment, the Member's status shall change to that of a "Delinquent Unit Holder." The Management Board shall give the Delinquent Unit Holder a Notice of the failure to meet the Commitment.   If the Delinquent Unit Holder fails to perform the Commitment (including any costs associated with the failure to demand compliance with the Commitment and interest on such obligation at the Default Interest Rate) within ten (10) Business Days of the giving of Notice, the Management Board may take such action, including but not limited to enforcing the Commitment in the court of appropriate jurisdiction in the state in which the Principal Office is located or the state of the Delinquent Unit Holder's address.   Each Member expressly agrees to the jurisdiction of such courts but only for the enforcement of Commitments. The Management Board may elect to allow the other Members to contribute the amount of the Commitment in proportion to such Members' Sharing Ratios, with those Members who contribute (Contributing Members) to contribute additional amounts equal to any amount of the Commitment not contributed.   The Contributing Members shall be entitled to treat the amounts contributed pursuant to this section as a loan from the Contributing Members bearing interest at the Default Interest Rate secured by the Delinquent Unit Holder's interest in the Company.   Until they are fully repaid the Contributing Members shall be entitled to all Distributions to which the Delinquent Unit Holder would have been entitled.   Notwithstanding the foregoing, no Commitment or other obligation to make an additional contribution may be enforced by a creditor of the Company or other Person other than the Company unless the Member expressly consents to such enforcement or to the assignment of the obligation to such creditor.

8.4     Maintenance of Capital Accounts.   The Company shall establish and maintain a Capital Account for each Member and Assignee.   Each Member's Capital Account shall be increased by (1) the amount of any Money actually contributed by the Member to the capital of the Company, (2) the fair market value of any Property (other than Money) contributed, as determined by the Company and the Contributing Member at arm's length at the time of contribution (net of liabilities assumed by the Company or subject to which the Company takes such Property, within the meaning of Section 752 of the Code), and (3) the Member's share of the Net Profits and of any separately allocated items of income or gain except adjustments of the Code (including income and gain exempt from tax and adjustments to income and gain as a result of a Revaluation or in connection with Property Contributed in the manner described in Section 1.704-1(b)(2)(iv)(g) to reflect the difference between the Book Value and the adjusted basis of Company Property, but excluding allocations of income and gain described in Section

1.704-1(b)(4)(i) of the Regulations under which such difference is reflected for tax purposes). Each Member's Capital Account shall be decreased by (1) the amount of any Money distributed to the Member by the Company, (2) the fair market value of any Property distributed to the Member, as determined by the Company and the Member receiving the Distribution at arm's length at the time of Distribution (net of liabilities of the Company assumed by the Member or subject to which the Member takes such Property within the meaning of Section 752 of the Code), and (3) the Member's share of Net Losses and of any separately allocated items of Net Loss (including adjustments for depreciation, depletion, amortization, and loss as a result of a Revaluation or in connection with Property Contributed in the manner described in Section 1.704-1(b)(2)(iv)(g) to reflect the difference between the Book Value and the adjusted basis of Company Property, but excluding allocations of depreciation, depletion, amortization, and loss described in Section 1.704-1(b)(4)(i) of the Regulations under which such difference is reflected for tax purposes).

8.5 <u>Distribution of Assets</u>. If the Company at any time Distributes any of the Company Property (other than Money) in-kind to any Member, the Capital Account of each Member shall be adjusted to account for that Member's allocable share (as determined under Article IX below) of the Net Profits or Net Losses that would have been realized by the Company had it sold the assets that were distributed at their respective fair market values immediately prior to their Distribution.

8.6 <u>Sale or Exchange of Interest</u>. In the event of a sale or exchange of some or all of a Membership Interest, the Capital Account of the Transferring Member shall become the Capital Account of the Assignee, to the extent it relates to the portion of the Interest Transferred.

8.7 <u>Revaluation of Company Property</u>. The Capital Accounts of the Members shall be increased or decreased to reflect a revaluation of Company Property (including intangible assets such as goodwill) on the Company's books in connection with a Revaluation Event. Upon such Revaluation: (1) the Book Value of Company Property shall be adjusted based on the fair market value of Company Property (taking Section 7701(g) of the Code into account) on the Revaluation Date; (2) the unrealized income, gain, loss, or deduction inherent in such Company Property (that has not been reflected in the Capital Accounts previously) would be allocated among the Members as if there were a taxable Disposition of such Company Property for such fair market value on the Revaluation Date.

8.8 <u>Compliance With Section 704(b) of the Code</u>. The provisions of this Article VIII as they relate to the maintenance of Capital Accounts are intended, and shall be construed, and, if necessary, modified, and the Company's accountant is hereby authorized to make any such modifications, to cause the allocations of profits, losses, income, gain, and credit pursuant to Article IX to have substantial economic effect under the Regulations promulgated under Section 704(b) of the Code, in light of the Distributions made pursuant to Articles IX and XIV and the Contributions made pursuant to this Article VIII. Notwithstanding anything herein to the contrary, this Agreement shall not be construed as creating a deficit restoration obligation or

otherwise personally obligate any Member or Assignee to make a Contribution in excess of the Contribution, and Commitment of the Member or Assignee.

## ARTICLE IX - ALLOCATIONS AND DISTRIBUTIONS

9.1     Allocations of Net Profits . Except as may be required by Section 9.3, Net Profits and other items of income and gain shall be apportioned among the Members and Assignees as follows:

9.1.1     First, to the holders of Preferred Units if any such units are outstanding, in accordance with their respective Sharing Ratios, until the sum of the cumulative Net Profits allocated pursuant to this Section 9.1.1 for the current and all previous years equals the aggregate Net Losses allocated to such holders under Section 9.2.1 and the aggregate distributions to such holders made under Section 9.4,

9.1.2     Second, to each Member until the sum of the cumulative Net Profits allocated pursuant to this Section 9.1.2 for the current and all previous years equals the aggregate Net Losses allocated to such Members pursuant to Section 9.2.2.

9.1.3     Third, to the holders of Class A Units and holders of Preferred Units (to the extent any such Net Profits are specifically provided to the holders of Preferred Units by the Management Board pursuant to Section 6.1.3), in accordance with their combined respective Sharing Ratios, the balance of the Net Profits not allocated pursuant to Sections 9.1.1 and 9.1.2.

9.2     Allocation of Net Losses.  Except as may be required by Section 9.3, Net Loses, and items of loss, deduction, and credit shall be allocated as follows:

9.2.1     First, to the holders of Preferred Units, in accordance with their respective Sharing Ratios, any Net Losses specifically provided as a preference to such holder by the Management Board pursuant to Section 6.1.3.

9.2.2     Second, to the holders of Class A Units and holders of Preferred Units (to the extent any such Net Losses are specifically provided to the holders of Preferred Units by the Management board pursuant to Section 6.1.3), in accordance with their combined respective Sharing Ratios, the balance of the Net Losses not allocated pursuant to Section 9.2.1.

9.3     Allocation Rules.

9.3.1     Company Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain for a Taxable Year, each Member must be allocated items of income and gain for that Taxable Year equal to that Member's share of the net decrease in Company Minimum Gain.  A Member's Share of the net decrease in Company Minimum Gain is the amount of the total net decrease multiplied by the Member's percentage share of the Company Minimum Gain at the end of the immediately preceding Taxable Year.  A Member's share of any

decrease in Company Minimum Gain resulting from a Revaluation of Company Property equals the increase in the Member's Capital Account attributable to the Revaluation to the extent the reduction in minimum gain is caused by the Revaluation. A Member is not subject to the Company Minimum Gain Chargeback Requirement to the extent the Member's share of the net decrease in Company Minimum Gain is caused by a guarantee, refinancing, or other change in the debt instrument causing it to become partially or wholly a Recourse Liability or a Member Nonrecourse Liability, and the Member bears the economic risk of loss (within the meaning of Section 1.752-2 of the Regulations) for the newly guaranteed, refinanced, or otherwise changed Liability.

9.3.2 <u>Member Minimum Gain Chargeback</u>. If during a Taxable Year there is a net decrease in Member Minimum Gain, any Member with a share of that Member Minimum Gain ("partner minimum gain" as determined under Section 1.704-2(i)(5) of the Regulations) as of the beginning of that Taxable Year must be allocated items of income that Member's share of the net decrease in the Company Minimum Gain. A Member's share of the net decrease in Member Minimum Gain is determined in a manner consistent with the provisions of Section 1.704-2(g)(2) of the Regulations. A Member is not subject to this Member Minimum Gain Chargeback, however, to the extent the net decrease in Member Minimum Gain arises because the Liability ceases to be Member Nonrecourse Liability due to a conversion, refinancing, or other change in the debt instrument that causes it to become partially or wholly a Company Nonrecourse Liability. The amount that would otherwise be subject to the Member Minimum Gain Chargeback is added to the Member's share of the Company Minimum Gain. In addition, rules consistent with those applicable to Company Minimum Gain shall be applied to determine the shares of Member Minimum Gain and Member Minimum Gain Chargeback to the extent provided under the Regulations issued pursuant to Section 704(b) of the Code.

9.3.3 <u>Qualified Income Offset</u>. Notwithstanding any provision of this Agreement to the contrary (other than as specifically provided otherwise), in the event that a deficit in a Member's Capital Account is created or increased (taking into account any allocations, adjustments, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6)) in excess of such Member's share of Company Minimum Gain and Member Minimum Gain, plus any amount that the Member is obligated to restore to the Company, such Member may at the Company's option, be allocated items of income and gain (consisting of a pro rata portion of each item of income and gain for such year) in an amount and manner sufficient to offset such off settable Decrease as quickly as possible.

9.3.4 Except as otherwise provided in this Operating Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Net Profits and Net Losses for the fiscal year in question.

9.3.5 In accordance with Section 704(c) of the Code and the Treasury Regulations under that section, income, gain, loss and deduction with respect to any Property

contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such property to the Company for federal income tax purposes and the initial fair market value of the Property.

9.3.6  The Members intend that the allocation provisions set forth in this Operating Agreement are intended to comply with Section 704(b) of the Code and the Treasury Regulations issued under that section, and the provisions of this Operating Agreement are to be interpreted in a manner consistent with those Treasury Regulations and as previously addressed in Section 8.8.

9.4  Priority Distributions. If the Management Board has specified a distribution as a preference item for Preferred Units pursuant to Section 6.1.3, then a priority distribution in the amount so specified shall be made to the holders of the Preferred Units, in accordance with their respective Sharing Ratios.

9.5  Interim Distributions. From time to time, the Management Board shall determine in its reasonable judgment to what extent, if any, the Company's cash on hand exceeds the Company's current and anticipated needs, including, without limitation, needs for operating expenses, debt service, acquisitions, reserves, priority distributions and mandatory distributions, if any. To the extent such excess exists, the Management Board, in its sole discretion, may make distributions to the Members and Assignees as follows:

9.5.1  To the holders of Class A Units and the holders of Preferred Units (to the extent any such distributions are specifically provided to the holders of Preferred Units by the Management Board pursuant to Section 6.1.3), in accordance with their combined respective Sharing Ratios.

9.5.2  Notwithstanding Section 9.5.1, the Management Board in its sole discretion, can make a preferential distribution.

Such distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by the Management Board. All interim distributions which, when made, exceed the recipient Member's basis in that Member's Membership Interest shall be considered advances or drawings against the Member's distributive share of net income. To the extent it is determined at the end of the Taxable Year of the Company that the recipient Member has not been allocated net income that equals or exceeds the total of such advances or drawings for such year, the recipient Member shall be obligated to restore any such advances or drawings to the Company. Notwithstanding the foregoing sentence, the Member will not be required to restore such advances or drawings to the extent that, on the last day of the Taxable Year, the recipient Member's basis in the Member's interest in the Company has increased from the time of such advance or drawing.

9.6     <u>Tax Distributions</u>. No later than March 15th of each year, the Management Board shall review the Company's income that shall be considered taxable to the Members for the year just concluded and the Management Board shall make a good faith estimate of the amount of federal and state income taxes (using a combined average tax rate of 30%) which will be payable by all Members on account of such income. If the distributions pursuant to Sections 9.4 and 9.5 are not sufficient to cover the good faith estimate of taxes, and if the cash position of the Company is sufficient to allow a distribution of the amount of such estimated taxes, then the Company shall distribute, no later than April 15th, to the Members and Assignees an amount determined by the Management Board. Any such distribution shall be in proportion to the income that was allocated to the Members based on their respective Sharing Ratios.

9.7     <u>Limitations on Distributions</u>. No Distribution shall be declared and paid unless, after the Distribution is made, the assets of the Company are in excess of all liabilities of the Company, except liabilities to Members and Assignees on account of their Capital Accounts.

9.8     <u>Asset Sale or Transfer, Merger, Consolidation, or Reverse Merger</u>. An event of (i) sale, lease, transfer or other disposition of all or substantially all of the assets of the Company, (ii) merger or consolidation in which the Company is not the surviving company, or (iii) reverse merger in which the Company is the surviving company, shall be a considered Revaluation Event (thereby requiring the revaluation of the Company's Property in accordance with Section 8.7) if the Company's Units outstanding immediately preceding such event are converted into other securities (the "Converted Securities"). The fair market value of the Company's Property for purposes of Revaluation upon such an event shall be the fair market value of the Converted Securities. If the Company, upon the consent or affirmative vote of a Majority of the Voting Members, decides to distribute the Converted Securities to the Members, such distribution shall be done on the basis and in the order detailed in Section 14.3.

9.8.1     The Company shall, upon the occurrence of a Revaluation Event as described in Section 9.8, attempt to have the surviving company assume, transfer, or substitute similar rights to any outstanding option, warrant or other right to receive Units in the Company. If the surviving company refuses to assume, honor, or substitute such rights in the Company, then the vesting of such outstanding rights (and, if applicable, the time such rights can be exercised) shall be accelerated in full and the holder of such rights shall be given the opportunity to exercise those rights prior to the Revaluation Event. If any such outstanding rights are not exercised prior to the Revaluation Event, then such rights shall terminate.

## ARTICLE X - TAXES

10.1     <u>Elections</u>. The Management Board may make any tax elections for the Company allowed under the Code or the tax laws of any state or other jurisdiction having Taxing Jurisdiction over the Company.

10.2    Taxes of Taxing Jurisdictions.   To the extent that the laws of any Taxing Jurisdiction requires, each Member and Economic Interest Holder (or such Members as may be required by the Taxing Jurisdiction) will submit an agreement indicating that the Member will make timely income tax payments to the Taxing Jurisdiction and that the Member accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Member's income, interest, and penalties assessed on such income.   If the Member fails to provide such agreement, the Company may withhold and pay over to such Taxing Jurisdiction the amount of tax, penalty, and interest determined under the laws of the Taxing Jurisdiction with respect to such income.   Any such payments with respect to the income of a Member shall be treated as a Distribution for purposes of Article IX.

The Management Board may, where permitted by the rules of any Taxing Jurisdiction, file a composite, combined, or aggregate tax return reflecting the income of the Company and pay the tax, interest, and penalties of some or all of the Members on such income to the Taxing Jurisdiction, in which case the Company shall inform the Members of the amount of such tax, interest, and penalties so paid.

10.3    Tax Matters Partner.   The Management Board shall designate a tax matters partner of the Company pursuant to Section 6231(a)(7) of the Code.   Any Member designated as tax matters partner shall take such action as may be necessary to cause each other Member to become a notice partner within the meaning of Section 6223 of the Code.   Any Member who is designated tax matter partner may not take any action contemplated by Sections 6222 through 6232 of the Code without the consent of the Management Board.

10.4    Method of Accounting.   The records of the Company shall be maintained on the method of accounting determined by the Management Board.

## ARTICLE XI - DISPOSITION OF MEMBERSHIP INTERESTS

11.1    Disposition.   No Member or Assignee may Dispose of all or a portion of the Member's or Assignee's Membership Interest without compliance with this Article XI.   No Membership Interest shall be Disposed of:

11.1.1 If such disposition:   alone or when combined with other transactions, would result in a termination of the Company within the meaning of Section 708 of the Code;

11.1.2 Without an opinion of counsel satisfactory to the Management Board that such assignment is subject to an effective registration under, or exempt from the registration requirements of, the applicable state and federal securities laws;

11.1.3 Unless and until the Company receives from the Assignee the information and agreements that the Management Board may reasonably require, including but not limited to

any taxpayer identification number and any agreement that may be required by any Taxing Jurisdiction.

11.2   Transfer to the Company.   A Member or Assignee may transfer all or any portion of its Units to the Company on the terms and conditions agreed to between the Member or Assignee and the Management Board.

11.3   Transfer to Permitted Transferee.    A Voting Member may transfer all or any portion of its Units if the transfer occurs by reason of or incident to the death, dissolution, divorce, liquidation, merger, or termination of the transferor Member, or other such reason as the Management Board may determine acceptable.   Any such Permitted Transferee shall be an Assignee until such purchaser is admitted as a Substitute Member in accordance with section 13.2.

11.4   Right of First Refusal.   Except for transfers described in Sections 11.2 and 11.3, no Member may transfer all or any portion of its Units unless and until such Member extends to other Members the right to purchase such transferring Member's Units in conformity with the following procedure:

11.2.1 Any Member desiring to sell its Units shall give written notice (the "Notice") to all other Members indicating its desire to sell its Units or portion thereof, the price and terms at which it is willing to make such sale, the identity of the proposed purchaser or purchasers, and offering to sell the Units or portion thereof to the other Members on such terms (the "Offer").

11.2.2 At any time within 30 days after the delivery of the Notice by the transferring Member to the other Members, the other Members shall have the right to accept the Offer (in whole or in part) to purchase such Units at the price and upon the terms set forth in the Notice by delivering a written notice to that effect to the applicable transferring Member prior to the expiration of the aforementioned 30-day period.   If more than one other transferee Member elects to purchase such Units, each such electing transferee Member may purchase its pro rata share of Units.   The acquisition of the Units by the transferee Members shall close in accordance with the terms set forth in the Notice.

11.2.3 If the transferee Members do not agree to purchase the offered Units referred to in the Notice within the period prescribed herein, such transferring Member may sell the Units to one or more purchasers identified in the Notice (a "Third Party Purchaser") on the terms set forth in the Notice.   Any proposed sale (i) to a purchaser other than the Third Party Purchaser, (ii) on terms that differ from those in the Notice, or (iii) on a date that is more than 120 days after the date of the Notice cannot be consummated without again complying with this Section 11.2.

11.3 <u>Dispositions Not in Compliance With This Article Void</u>. Any attempted Disposition of a Membership Interest, or any part thereof, not in compliance with this Article XI shall be, and is declared to be, null and void *ab initio*.

## ARTICLE XII - DISSOCIATION OF A MEMBER

12.1 <u>Dissociation</u>. A Person shall cease to be a Member upon the happening of any of the following events:

12.1.1 The Member's becoming a Bankrupt Member;

12.1.2 In the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate or in the case of a natural person Member who is also an employee, cessation of employment;

12.1.3 In the case of a Member who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

12.1.4 In the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

12.1.5 In the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

12.1.6 In the case of an estate, the Distribution by the fiduciary of the estate's entire interest in the limited liability company.

12.2 <u>Purchase of Dissociated Member's Membership Interest</u>. Upon the Dissociation of a Member, a Majority of the Voting Members, shall, subject to the provisions of the Act, elect one of the two following provisions:

12.2.1 The Disassociated Member's Membership Interest shall be purchased by the Company for a purchase price equal to the aggregate fair market value of the Member's Interest determined according to the provisions of Section 12.3. The purchase price of such interest shall be paid by the Company to the Member in cash within 60 days of determination of the aggregate fair market value or, at the Company's option, said debt may be evidenced by a promissory note bearing interest at the Prime Rate, which shall be due and payable upon the earlier of (i) expiration of five years or (ii) the sale or other Disposition of all of the Property; or

12.2.2 The Dissociated Member, or Assignee of Dissociated Member's Interest, shall hold the Dissociated Member's Membership Interest as an Assignee.

12.3 <u>Purchase Price of Dissociated Member's Membership Interest</u>. The fair market value of a Member's Interest to be purchased by the Company pursuant to Section 12.2 shall be determined by agreement between the Dissociated Member (or the Assignee of the Dissociated Member's Membership Interest, as the case may be) and the Company, which agreement is subject to approval by a Majority of the Voting Members. For this purpose, the fair market value of the Dissociated Member's Membership Interest shall be computed as the amount which could reasonably be expected to be realized by such Member upon the sale of the Company Property in the Ordinary Course of Business at the time of Dissociation. If the Dissociated Member (or the Assignee of the Dissociated Member's Membership Interest, as the case may be) and the Company cannot agree upon the fair market value of such Membership Interest within 30 days, the fair market value thereof shall be determined by appraisal, the Company and the terminated Member each to choose one appraiser and the two appraisers so chosen to choose a third appraiser. The decision of a majority of the appraisers as to the fair market value of such Membership Interest shall be final and binding and may be enforced by legal proceedings. The Dissociated Member and the Company shall each compensate the appraiser appointed by it and the compensation of the third appraiser shall be borne equally by such parties.

12.4 <u>Damages</u>. The provision set forth herein shall not affect any claim for Damages the Company may have against the Dissociated Member if such Dissociation is in violation of this Agreement. The Company shall have the right to offset any payments due under this Article XII by any Damages that the Company may incur as a result of the Dissociation of a Member in contravention of this Agreement.

## ARTICLE XIII - ADMISSION OF ASSIGNEES AND ADDITIONAL MEMBERS

13.1 <u>Rights of Assignees</u>. The Assignee of a Membership Interest has no right to participate in the management of the business and affairs of the Company or to become a Member. The Assignee is only entitled to receive the Distribution and return of capital, and to be allocated the Net Profits and Net Losses attributable the Membership Interest.

13.2 <u>Admission of Substitute Members</u>. An Assignee of a Membership Interest may be admitted as a Substitute Member and admitted to all the rights of the Member who initially assigned the Membership Interest with the approval, which may be withheld in its sole and absolute discretion, of the Management Board, but an Assignee of a Restricted Membership Interest shall be so admitted only with the approval, which may be withheld in its sole and absolute discretion, of the Management Board. If so admitted, the Substitute Member has all the rights and powers and is subject to all the restrictions and liabilities of the Member originally assigning the Membership Interest. The admission of a Substitute Member, without more, shall not release the Member originally assigning the Membership Interest from any Liability to Company that may have existed prior to the approval.

13.3 <u>Admission of Permitted Transferees</u>. Notwithstanding Article XI hereof, the Membership Interest of any Member shall be transferable without the consent of the

Management Board if (i) the transfer occurs by reason of or incident to the death, dissolution, divorce, liquidation, merger, or termination of the transferor Member, and (ii) the Transferee is a Permitted Transferee.

13.4   Admission of Additional Members.  The Management Board shall be responsible for the admission of Additional Members and the determination of the Capital Contributions of such Additional Members. The terms and conditions pursuant to which an individual shall become an Additional Member shall be determined by the Management Board and shall set forth in an Admission Agreement between the Company and the Additional Member. The Admission Agreement must be in writing but may be in whatever form or type that is acceptable to the Management Board, including but not limited to the following:  Notice of Option Grant, Restricted Membership Unit Offer, Subscription Agreement, or Membership Unit Purchase Agreement. The Additional Member shall be a Member upon execution and performance of the obligations of such agreement.

## ARTICLE XIV - DISSOLUTION AND WINDING UP

14.1   Dissolution.  The Company shall be dissolved and its affairs wound up, upon the first to occur of the following events.

14.1.1   vote of the Majority of the Voting Members to dissolve;

14.1.2   withdrawal of the last Member;

14.1.3   judicial determination that an event has occurred that makes it unlawful, impossible, or impractical to carry on the business of the Company; or

14.1.4   sale of all or substantially all of the assets of the Company, unless the existence of the Company is continued by the approval of the Majority of the Voting Members.

14.2   Effect of Dissolution.  Upon dissolution, the Company shall cease carrying on as distinguished from the winding up of the Company business, but the Company is not terminated, but continues until the winding up of the affairs of the Company is completed and the Certificate of Dissolution has been issued by the Secretary of State of Idaho.

14.3   Distribution of Assets on Dissolution.  Upon the winding up of the Company, the Company Property shall be distributed:

14.3.1 First, to creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of Company Liabilities;

14.3.2 Second,to establish any reserves that the Management Board deems reasonably necessary for contingent and unforeseen obligations of the Company;

14.3.3 Third, to holders of Preferred Units in the amount of their Contribution as the Management Board has specifically provided as a preference in dissolution, if any, but only to the extent that the amount of such Contribution has not previously been distributed pursuant to Section 9.4 or 9.5.2.

14.3.4 Fourth, to Members (or Assignees, as applicable) in the amount of their Contribution of Money, but only to the extent that the amount of such Contribution of Money has not previously been distributed pursuant to Section 9.4, 9.5.2, or 14.3.3.

14.3.5 Fifth, to Members in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's Taxable Year in which the liquidation occurs. Liquidation proceeds shall be paid within 60 days of the end of the Company's Taxable Year or, if later, within 90 days after the date of liquidation. Such distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by the Management Board. If it is not possible to make distributions pursuant to this Section 14.3.5 so that the aggregate distributions to the Members and Assignees exactly equal their respective Capital Account balances, then they shall receive such distributions in proportion to their positive Capital Account balances pursuant to the requirement of Regulation Section 1.704-(b)(2)(ii)(b)(2).

14.4  Winding Up and Certificate of Dissolution.  The winding up of a limited liability company shall be completed when all debts, liabilities, and obligations of the limited liability company have been paid and discharged or reasonably adequate provision therefore has been made, and all of the remaining Property and assets of the limited liability company have been distributed to the Members. Upon the completion of winding up of the Company, a certificate of dissolution shall be delivered to the Secretary of State of Idaho for filing. The certificate of dissolution shall set forth the information required by the Act.

## ARTICLE XV - AMENDMENT

15.1  Agreement May Be Modified.  This Agreement may be modified as provided in this Article XV (as the same may, from time to time be amended).  No Member or Board Member shall have any vested rights in this Agreement which may not be modified through an amendment to this Agreement.

15.2  Amendment or Modification of Agreement.  This Agreement may be amended or modified from time to time only by a written instrument approved by a vote of a Majority of the Voting Members. Provided, however, that without the written consent of each Member adversely affected thereby (the Affected Member), no amendment of the Agreement shall be made that (i) increases the obligations of the Affected Member to make contributions, (ii) alters the manner of allocation to the Affected Member for tax purposes of any items of income, gain, loss, deduction, or credit, or (iii) alters the manner of computing the distributions of the Affected Member, unless

this Agreement has already provided for such amendment or modification or granted authority to the Management Board, Members, or others to make such amendment or modification.

## ARTICLE XVI - MISCELLANEOUS PROVISIONS

16.1  Entire Agreement.  This Agreement represents the entire agreement among all the Members and between the Members and the Company.

16.2  No Partnership Intended for Nontax Purposes.  The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the Idaho Uniform Partnership Act nor the Idaho Uniform Limited Partnership Act.  The Members do not intend to be partners one to another, or partners as to any third party.  To the extent any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal Liability by reason of such wrongful representation.

16.3  Rights of Creditors and Third Parties Under Agreement.  This Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assigns.  This Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person.  Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Agreement, Admission Agreement, or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

16.4  Headings.  The underlined and boldface headings contained in this Agreement are for convenience of reference only, shall not be deemed to be a part of this Agreement and shall not be referred to in connection with the construction or interpretation of this Agreement.

16.5  Counterparts.  This Agreement may be executed in several counterparts and transmitted by facsimile, each of which shall constitute an original and all of which, when taken together, shall constitute one agreement.

16.6  Governing Law.  This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Idaho (without giving effect to principles of conflicts of laws).

16.7    Waiver.

(a)    No failure on the part of any Person to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any Person in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

(b)    No Person shall be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such Person; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

16.8    Dispute Resolution.

16.8.1 The Members shall attempt in good faith to resolve any controversy or claim arising out of or relating to the Agreement, or the breach, termination, or validity thereof (a "Dispute") promptly by negotiation among the Members.

16.8.2 If a Dispute has not been resolved within 30 days by negotiation, the Members shall attempt to mediate the Dispute through the selection of a mutually agreeable mediator who shall conduct such mediation in confidence.

16.8.3 If a Dispute is not resolved by mediation, then the Dispute shall be settled by arbitration in accordance with the Center of Public Resources rules for Non-Administered Arbitration of Business Disputes by a sole arbitrator. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1-16, and judgment upon the award rendered by the arbitration may be entered by and court having jurisdiction thereof. The place of arbitration shall be Boise, Idaho.

16.8.4 Each Member shall be responsible for his own attorney fees incurred during any phase of dispute resolution.

16.9    Severability. In the event that any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by law.

16.10 <u>Parties in Interest</u>. None of the provisions of this Agreement are intended to provide any rights or remedies to any Person other than the parties hereto and their respective successors and assigns (if any).

IN WITNESS WHEREOF, the Members have signed this Agreement as of the date and year set forth above.

**MEMBERS:**

**DBSI Properties Company Limited Partnership,**
an Idaho Limited Partnership

By: _____
Douglas L. Swenson, President


_____
Gary Bringhurst


_____
Thomas V. Reeve


_____
John Wasden


_____
Robert Spence


_____
Eric Mott

16.10 <u>Parties in Interest</u>. None of the provisions of this Agreement are intended to provide any rights or remedies to any Person other than the parties hereto and their respective successors and assigns (if any).

IN WITNESS WHEREOF, the Members have signed this Agreement as of the date and year set forth above.

MEMBERS:

**DBSI Properties Company Limited Partnership,**
an Idaho Limited Partnership

By: _____
    Douglas L. Swenson, President


_____
Gary Bringhurst


_____
Thomas V. Reeve


_____
John Wasden


_____
Robert Spence


_____
Eric Mott

STELLAR TECHNOLOGIES LLC – AMENDED AND RESTATED OPERATING AGREEMENT - 32

16.10  Parties in Interest.  None of the provisions of this Agreement are intended to provide any rights or remedies to any Person other than the parties hereto and their respective successors and assigns (if any).

IN WITNESS WHEREOF, the Members have signed this Agreement as of the date and year set forth above.

MEMBERS:

**DBSI Properties Company Limited Partnership,** an Idaho Limited Partnership

By: _____
Douglas L. Swenson, President

_____
Gary Bringhurst

_____
Thomas V. Reeve

_____
John Wasden

_____
Robert Spence

_____
Eric Mott

**STELLAR TECHNOLOGIES LLC – AMENDED AND RESTATED OPERATING AGREEMENT - 32**

16.10  Parties in Interest.  None of the provisions of this Agreement are intended provide any rights or remedies to any Person other than the parties hereto and their respecti successors and assigns (if any).

IN WITNESS WHEREOF, the Members have signed this Agreement as of the date and year set forth above.

MEMBERS:

**DBSI Properties Company Limited Partnership**, an Idaho Limited Partnership

By: _____
Douglas L. Swenson, President

_____
Gary Bringhurst

_____
Thomas V. Reeve

_____
John Wasden

_____
Robert Spence

_____
Eric Mott

# EXHIBIT A

Voting Members:     **DBSI Properties Company Limited Partnership**, an Idaho
Limited Partnership
1550 S. Tech Lane
Meridian, Idaho 83642

Thomas V. Reeve

Gary Bringhurst
12426 W. Explorer Drive, Ste. 220
Boise, Idaho 83713

John Wasden
380 South Technology
Lindon, Utah 84042

Robert Spence
5193 S. Hayseed Way
Boise, Idaho 83716

Eric Mott
1550 S. Tech Lane
Meridian, Idaho 83642

Additional Members:     Lyle Jordan
1550 S. Tech Lane
Meridian, Idaho 83642

BioReaction, Inc.
Attn: Randy Thom
621 NW 11th Avenue
Portland, OR 97209

Members of
Management Board:     John D. Foster
Douglas L. Swenson
Walt E. Mott
Charles Hassard
Thomas V. Reeve
Gary Bringhurst

**EXHIBIT B**

# FIRST AMENDMENT TO
# AMENDED AND RESTATED
# OPERATING AGREEMENT OF
# STELLAR TECHNOLOGIES LLC

THIS FIRST AMENDMENT TO AMENDED AND RESTATED OPERATING AGREEMENT OF STELLAR TECHNOLOGIES LLC (this "Amendment"), is made and entered into effective as of the 1st day of August, 2005, by and among the Company and the persons executing this Amendment as Members.

## *RECITALS*

A.     The Members entered into that certain Operating Agreement of Stellar Technologies LLC, as amended, effective as of March 1, 2000, the date the Articles were filed with the Secretary of State of Idaho (the "Initial Operating Agreement") for the purpose of specifying their respective rights with respect to the ownership and management of the Company; and

B.     The Members entered into that certain Amended and Restated Operating Agreement of Stellar Technologies LLC, as amended, effective as of April 1, 2005 (the "Amended Operating Agreement") for the purpose of adjusting their rights with respect to the ownership and management of the Company; and

C.     The Members desire to amend the Amended Operating Agreement.

NOW THEREFORE, in consideration of the above recitals, which are incorporated herein, and the mutual promises herein contained, the parties hereto agree as follows:

1.     Section 6.1 of the Amended Operating Agreement shall be replaced in its entirety as follows:

6.1     Units.     All Membership Interests of the Members in the Company shall be denominated in Units. There shall be two classes of Units: Class A Units and Preferred Units. The respective rights and obligations of each class of Units shall be as provided in this Agreement. The Company hereby authorizes and may issue up to twelve million (12,000,000) Class A Units, and up to three million (3,000,000) Preferred Units, which number of Units may be changed in the future with the approval of the Majority of the Voting Members. No Units will be registered upon any national security exchange, foreign securities exchange, regional or local exchange or inter-dealer quotation system that regularly disseminates firm buy or sell quotations by brokers or dealers, without the approval of the Majority of the Voting Members. Each Unit will have the rights and obligations set forth herein. The Management Board may issue Units as required in Section 8.2 and/or as it deems advisable to secure and retain the services of new

members or employees and to provide incentives for such persons to exert maximum efforts for the success of the Company and to raise outside capital for the Company's business.

6.1.1    Additional Units.  The Members, by the Majority of the Voting Members, may authorize the issuance of additional Class A Units and Preferred Units.

6.1.2    Series of Preferred Units.  The Management Board shall have the authority to divide the Preferred Units into as many series as it shall from time to time determine.  The Management Board shall determine the number of units comprising each series of Preferred Units, which number may, unless otherwise provided by the Management Board in creating such series, be increased from time to time by action of the Management Board.  Each series of Preferred Units shall be so designated as to distinguish such series from the units of each other series.

6.1.3    Preferences of Preferred Units.  The Management Board shall determine the preferences, voting rights, if any, limitations, and relative rights, including, without limitation, conversion rights, if any, into Class A Units, of any series of Preferred Units before the issuance of any units of that series.  Such determination shall supersede any preferences, limitation, and relative rights the holders of Preferred Units would otherwise have under this Agreement.

2.    There are no other amendments to the Amended and Restated Operating Agreement and all other terms and conditions of the Amended and Restated Operating Agreement shall remain in full force and effect.

(Signatures on Next Page)

IN WITNESS WHEREOF, the parties have signed th [handwritten: 10/28 - Paul gave Var a copy of this to sign.]
first written above.

**INITIAL MEMBERS:**

**DBSI PROPERTIES COMPANY LIMITED PARTNERSHIP**
An Idaho limited partnership

By _____
    Douglas L. Swenson, A General Partner

_____
Gary Bringhurst

_____
Var Reeve

_____
John Wasden

_____
Robert Spence

_____
Eric Mott

IN WITNESS WHEREOF, the parties have signed this Amendment as of the date first written above.

**INITIAL MEMBERS:**

**DBSI PROPERTIES COMPANY LIMITED PARTNERSHIP,**
An Idaho limited partnership

By_____
    Douglas L. Swenson, A General Partner

_____
Gary Bringhurst

_____
Var Reeve

_____
John Wasden

_____
Robert Spence

_____
Eric Mott

IN WITNESS WHEREOF, the parties have signed this Amendment as of the date first written above.

**INITIAL MEMBERS:**

**DBSI PROPERTIES COMPANY LIMITED PARTNERSHIP**
An Idaho limited partnership

By _____
   Douglas L. Swenson, A General Partner


_____
Gary Bringhurst


_____
Var Reeve


_____
John Wasden


_____
Robert Spence


_____
Eric Mott

IN WITNESS WHEREOF, the parties have signed this Amendment as of the date first written above.

**INITIAL MEMBERS:**

**DBSI PROPERTIES COMPANY LIMITED PARTNERSHIP,**
An Idaho limited partnership

By_____
    Douglas L. Swenson, A General Partner


_____

Gary Bringhurst


_____

Var Reeve


_____

John Wasden

_____

Robert Spence


_____

Eric Mott

# EXHIBIT C

# Stellar Technologies LLC
## Income Statement
### Source: Tax Records

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | Pre-Tax Forecast 2008 |
|---|---|---|---|---|---|---|---|---|---|
| Income (Loss) from Passthrough Activity | ($1,477,118) | ($11,710,068) | ($13,477,712) | ($18,697,530) | ($16,577,691) | ($17,741,605) | ($18,220,496) | ($12,832,918) | $0 |
| Adjustments to Passthrough Activity | 427,112 | 654,150 | 1,267,374 | 609,827 | (152,422) | (165,788) | 4,294 | 3,969,313 | - |
| Net Passthrough Income (Loss) | (1,904,230) | (12,364,218) | (14,745,086) | (19,307,357) | (16,425,269) | (17,575,817) | (18,224,790) | (16,802,231) | - |
| Interest Income | 836 | 1,883 | 152,571 | 2,346 | 390 | 362 | 6,734,516 | 6,766,600 | 6,564,185 |
| Other Income (Loss) | - | (1,718) | - | (814,335) | (58,114) | (2,120,028) | (171,018) | (4,681) | 246,344 |
| Interest & Other Income (Loss) | 836 | 165 | 152,571 | (811,989) | (57,724) | (2,119,666) | 6,563,498 | 6,761,919 | 6,810,529 |
| Interest Expense | 33,396 | 172 | 1,333,799 | 3,701,492 | 3,168,824 | 3,619,638 | 10,760,755 | 12,484,954 | 13,579,603 |
| Professional Fees: Legal & Consulting | - | 632,770 | 67,548 | 81,869 | 97,549 | 129,613 | 275,484 | 150,679 | 81,626 |
| Marketing & Advertising | - | 6,947 | 1,685 | 31,991 | 74,048 | 30,490 | - | - | - |
| Payroll, Benefits & Tax | 109,679 | 304,474 | 529,104 | 397,982 | 435,410 | 651,150 | 368,300 | 488,080 | 227,045 |
| Travel & Entertainment | - | 59,819 | 68,840 | 40,668 | 14,308 | 38,646 | 9,640 | 39,249 | 6,479 |
| Other Administrative Expense | 125,770 | 81,090 | 33,199 | 89,356 | 58,916 | 43,979 | 71,199 | 19,549 | 295,743 |
| Taxes & Licenses | - | 20,473 | 38,131 | 38,253 | 35,556 | 49,619 | 26,745 | 38,928 | 3,853 |
| Guaranteed Payments to Partners | - | - | - | - | - | - | 323,824 | 7,272 | 4,588 |
| Depreciation & Amortization Expense | 1,515 | 2,580 | 29,794 | 543,409 | 600,338 | 594,334 | 593,691 | 591,990 | 565,971 |
| Operating Expenses | 270,360 | 1,108,325 | 2,102,100 | 4,925,020 | 4,484,949 | 5,157,469 | 12,429,638 | 13,820,701 | 14,764,909 |
| Net Income | ($2,173,754) | ($13,472,378) | ($16,694,615) | ($25,044,366) | ($20,967,942) | ($24,852,952) | ($24,090,930) | ($23,861,013) | ($7,954,380) |

# Stellar Technologies LLC
## Balance Sheet
Source: Tax Records

| | As of 12/31/2000 | As of 12/31/2001 | As of 12/31/2002 | As of 12/31/2003 | As of 12/31/2004 | As of 12/31/2005 | As of 12/31/2006 | As of 12/31/2007 | Pre-Tax Forecast As of 12/31/2008 |
|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | |
| **CURRENT ASSETS** | | | | | | | | | |
| Cash | - | - | 8,787 | 16,033 | 22,858 | 1 | 3,017 | 215,662 | 2,503 |
| Accounts Receivable | - | - | - | - | 9,882 | 10,026 | - | - | 363,988 |
| Other Current Assets | 600 | - | - | 15,360 | 5,362 | 320 | 46,187 | 18,570 | (331,355) |
| Total Current Assets | 600 | - | 8,787 | 31,393 | 38,102 | 10,347 | 49,204 | 234,232 | 35,136 |
| Fixed Assets | 7,482 | 10,159 | 9,217 | 9,169 | 9,156 | 11,064 | 4,621 | 12,306 | - |
| Intangible Assets | 7,734 | 5,949 | 1,900,031 | 2,983,011 | 2,390,791 | 1,799,760 | 1,209,324 | 618,888 | 55,021 |
| **Investments** | | | | | | | | | |
| Investments in GigOptix | 733,927 | (993,208) | (2,995,829) | 1,505,775 | (1,387,458) | (1,938,508) | (3,306,402) | (5,544,343) | 11,488,712 |
| Investments in BioReaction | 416,977 | 1,896,572 | 2,756,760 | (1,207,724) | (5,665,228) | (8,234,697) | (9,151,150) | - | (252,467) |
| Investments in EmergeCore | 42,557 | 1,257,868 | (6,256,014) | (12,886,871) | (19,796,866) | (29,029,606) | (39,523,204) | (49,434,495) | (49,434,495) |
| Investments in Terra | - | - | - | 76,665 | 67,558 | 54,728 | 4,004 | 31 | (0) |
| Investments in UltraDesign | - | - | - | - | - | - | - | - | - |
| Investments in Wavetronix | 412,635 | 1,514,065 | (1,914,717) | (5,249,744) | (9,205,815) | (16,459,684) | (22,022,772) | (24,768,073) | (24,768,073) |
| Investments in BioMatrix | - | (12,275) | - | - | - | - | - | - | - |
| Investments in Transit Dynamics | - | 8,304 | 9,204 | - | - | - | - | - | - |
| **Notes Receivable** | | | | | | | | | |
| Notes Receivable-GigOptix | - | - | - | - | - | - | - | 2,105,000 | - |
| Notes Receivable-BioReaction | - | - | - | - | 3,756,000 | 3,898,000 | 3,898,000 | 3,898,000 | - |
| Notes Receivable-EmergeCore | - | - | - | - | 5,551,143 | 7,626,904 | 8,260,276 | - | - |
| Notes Receivable-Terra | - | - | - | 14,212,268 | 19,984,268 | 27,141,548 | 33,982,790 | 37,717,827 | 35,277,082 |
| Notes Receivable-Wavetronix | - | - | - | 7,616,594 | 11,332,872 | 16,020,121 | 20,683,479 | 22,163,216 | 21,198,268 |
| **Interest Receivable** | | | | | | | | | |
| Interest Receivable-GigOptix | - | - | - | - | - | - | - | 35,038 | - |
| Interest Receivable-BioReaction | - | - | - | - | 295,661 | 422,192 | 851,386 | 1,294,615 | - |
| Interest Receivable-EmergeCore | - | - | - | - | 449,925 | 1,074,652 | 1,964,072 | - | - |
| Interest Receivable-Terra | - | - | - | 752,527 | 3,400,173 | 3,810,356 | 7,095,901 | 10,256,253 | 16,596,246 |
| Interest Receivable-Wavetronix | - | - | - | 1,580,440 | 1,647,184 | 2,383,740 | 4,433,933 | 6,490,852 | 9,791,964 |
| **Total Assets** | 1,621,912 | 3,687,434 | (6,482,561) | 9,423,503 | 12,867,466 | 8,590,917 | 8,433,462 | 5,079,346 | 19,987,393 |

| LIABILITIES AND MEMBERS EQUITY | As of: 12/31/2000 | As of: 12/31/2001 | As of: 12/31/2002 | As of: 12/31/2003 | As of: 12/31/2004 | As of: 12/31/2005 | As of: 12/31/2006 | As of: 12/31/2007 | As of: 12/31/2008 |
|---|---|---|---|---|---|---|---|---|---|
| **CURRENT LIABILITIES** | | | | | | | | | |
| Accounts Payable | 66,382 | 104,409 | 317,451 | 26,234 | 56,891 | 29,584 | 36,781 | 19,905 | 83,588 |
| Interest Payable | - | - | 246,737 | 6,170,419 | - | 17,319,426 | 25,436,540 | 3,928,352 | 15,735,211 |
| Affiliated Company Payable | - | - | - | 153,805 | - | - | - | - | 14,289 |
| Payroll & Payroll Tax Liabilities | - | 15,108 | 17,211 | 3,999 | 72,726 | 34,381 | 27,622 | 31,147 | 24,835 |
| Total Current Liabilities | 66,382 | 119,517 | 581,399 | 6,354,457 | 129,617 | 17,383,391 | 25,500,943 | 3,979,404 | 15,857,923 |
| Stock Subscription Payable | - | 674,665 | - | - | - | - | - | - | - |
| Notes Payable | - | 14,873,100 | 21,868,203 | 50,386,025 | 81,268,165 | 84,794,964 | 100,310,887 | 142,519,323 | 153,623,431 |
| Total Liabilities | 66,382 | 15,667,282 | 22,449,602 | 56,740,482 | 81,397,782 | 102,178,355 | 125,811,830 | 146,498,727 | 169,481,363 |
| **MEMBER EQUITY** | | | | | | | | | |
| Capital | 3,778,438 | 3,778,438 | 3,778,438 | 10,997,773 | 10,997,773 | 10,997,773 | 11,477,773 | 11,477,773 | 11,477,773 |
| Member Distributions | (49,154) | (112,154) | (369,854) | (929,639) | (1,175,034) | (1,379,204) | (1,559,204) | (1,739,204) | (1,859,403) |
| Retained Earnings | - | (2,173,754) | (15,646,132) | (32,340,747) | (57,385,113) | (78,353,055) | (103,206,007) | (127,296,937) | (151,157,950) |
| Net Income | (2,173,754) | (13,472,378) | (16,694,615) | (25,044,366) | (20,967,942) | (24,852,952) | (24,090,930) | (23,861,013) | (7,964,380) |
| Total Members Equity | 1,555,530 | (11,979,848) | (28,932,163) | (47,316,979) | (68,530,316) | (93,587,438) | (117,378,368) | (141,419,381) | (149,493,960) |
| Total Liabilities & Members Equity | 1,621,912 | 3,687,434 | (6,482,561) | 9,423,503 | 12,867,466 | 8,590,917 | 8,433,462 | 5,079,346 | 19,987,393 |

# EXHIBIT D

# Stellar Technologies LLC
# Balance Sheet
## As of June 30, 2009

|  | Jun 30, 09 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Checking - Operating | 7,391.02 |
| **Total Checking/Savings** | 7,391.02 |
| | |
| **Accounts Receivable** | |
| Accounts Receivable | 357,987.57 |
| **Total Accounts Receivable** | 357,987.57 |
| | |
| **Other Current Assets** | |
| Bad Debt Allowance | -357,987.57 |
| Prepaid Deposits | 27,948.00 |
| Inventory Asset | 1,233,911.99 |
| Inventory Reserve | -1,233,911.99 |
| Intercompany Reimbursables | |
| BioReaction Reimbursables | 1,520.39 |
| iTerra Reimbursables | 24,148.79 |
| Wavetronix Reimbursables | 202.51 |
| **Total Intercompany Reimbursables** | 25,871.69 |
| | |
| **Total Other Current Assets** | -304,167.88 |
| | |
| **Total Current Assets** | 61,210.71 |
| | |
| **Other Assets** | |
| **Intangible Assets** | |
| A/A Intellectual Property | -4,833.36 |
| A/A Loan Fees | -3,513,854.71 |
| Intellectual Property | 10,000.00 |
| Loan Fees | 3,538,614.99 |
| **Total Intangible Assets** | 29,926.92 |
| | |
| **Investments** | |
| Investment in GigOptix | 11,488,712.00 |
| Investment in BioReaction | |
| Contributions to BRI - ST1 | 5,304,248.63 |
| Contributions to BRI - ST2 | 3,018,662.00 |
| Contributions to BRI - ST3 | 6,100,102.50 |
| K-1 Allocation - BioReaction | -15,875,480.14 |
| Investment in BioReaction - Other | 1,200,000.00 |
| **Total Investment in BioReaction** | -252,467.01 |
| | |
| Investment in iTerra | |
| Contributions to ITC - ST1 | 4,000,008.00 |
| K-1 Allocation - iTerra | -53,434,502.65 |

# Stellar Technologies LLC
## Balance Sheet
### As of June 30, 2009

|                                          | Jun 30, 09      |
|------------------------------------------|-----------------|
| **Total Investment in iTerra**           | -49,434,494.65  |
|                                          |                 |
| **Investment in Ultra Design**           |                 |
| K-1 Allocation - Ultra                   | -684,644.00     |
| Contributions to Ultra Design            | 684,643.58      |
| **Total Investment in Ultra Design**     | -0.42           |
|                                          |                 |
| **Investment in Wavetronix**             |                 |
| Contributions to WAV - ST1               | 2,000,000.00    |
| K-1 Allocation - Wavetronix              | -26,768,073.00  |
| **Total Investment in Wavetronix**       | -24,768,073.00  |
|                                          |                 |
| **Total Investments**                    | -62,966,323.08  |
|                                          |                 |
| **Notes Receivable**                     |                 |
| **Notes Rec - 08 Notes**                 |                 |
| Notes Receivable-08 Notes-WAV            | 3,766,402.00    |
| Notes Rec - 08 Notes - ITC               | 4,148,446.00    |
| **Total Notes Rec - 08 Notes**           | 7,914,848.00    |
|                                          |                 |
| **Notes Rec - GCC Funds ST2**            |                 |
| Notes Rec (GCC) - ITC ST2                | 6,573,512.00    |
| **Total Notes Rec - GCC Funds ST2**      | 6,573,512.00    |
|                                          |                 |
| **Notes Rec - RR Funds ST3**             |                 |
| Notes Rec (RR) - ITC ST3                 | 24,555,123.83   |
| Notes Rec (RR) - WAV ST3                 | 17,431,865.61   |
| **Total Notes Rec - RR Funds ST3**       | 41,986,989.44   |
|                                          |                 |
| **Total Notes Receivable**               | 56,475,349.44   |
|                                          |                 |
| **Interest Receivable**                  |                 |
| **Int Rec - 08 Notes**                   |                 |
| Int Rec (08) - WAV                       | 1,824,680.61    |
| Int Rec (08) - ITC                       | 486,334.26      |
| **Total Int Rec - 08 Notes**             | 2,311,014.87    |
|                                          |                 |
| **Int Rec - RR Funds ST1/ST3**           |                 |
| Int Rec (RR) - ITC ST1/ST3               | 12,953,906.83   |
| Int Rec (RR) - WAV ST1/ST3               | 9,042,470.78    |
| **Total Int Rec - RR Funds ST1/ST3**     | 21,996,377.61   |
|                                          |                 |
| **Int Rec GCC Funds ST2**                |                 |
| Int Rec (GCC) - ITC ST2                  | 5,074,463.68    |
| **Total Int Rec GCC Funds ST2**          | 5,074,463.68    |

# Stellar Technologies LLC
## Balance Sheet
### As of June 30, 2009

| | Jun 30, 09 |
|---|---|
| **Total Interest Receivable** | 29,381,856.16 |
| | |
| **Total Other Assets** | 22,920,809.44 |
| | |
| **TOTAL ASSETS** | **22,982,020.15** |

**LIABILITIES & EQUITY**

| | |
|---|---|
| Liabilities | |
| Current Liabilities | |
| Accounts Payable | |
| Accounts Payable | 89,128.89 |
| **Total Accounts Payable** | 89,128.89 |
| | |
| Other Current Liabilities | |
| Accrued Expenses | 14,289.35 |
| Payroll Liabilities | |
| Accrued Payroll | 10,145.48 |
| Accrued PTO | 17,963.47 |
| 401 (k) EE Liability | -1,916.02 |
| FSA Payable | 1,149.91 |
| Medical Premiums Payable | 182.72 |
| **Total Payroll Liabilities** | 27,525.56 |
| | |
| Payroll Tax Liabilities | |
| FICA EE Withholding | 0.02 |
| FICA ER Withholding | -683.92 |
| **Total Payroll Tax Liabilities** | -683.90 |
| | |
| **Total Other Current Liabilities** | 41,131.01 |
| | |
| **Total Current Liabilities** | 130,259.90 |
| | |
| Long Term Liabilities | |
| Notes Payable | |
| N/P 08 Note (to Subsidiaries) | 10,933,510.00 |
| N/P 08 Note-STE (to Stellar) | 16,359,990.10 |
| N/P GCC (to Stellar) | 2,035,000.00 |
| N/P GCC (to Subsidiaries) | 6,573,512.00 |
| N/P RR-ST3 (to Subsidiaries) | 90,839,489.91 |
| N/P RR-ST3 (to Stellar) | 37,029,895.49 |
| **Total Notes Payable** | 163,771,397.50 |
| | |
| Accrued Interest | |
| Acc Int - 08 Note (to Subs) | 1,343,504.78 |
| Acc Int - 08 Note (to Stellar) | 1,376,639.00 |

# Stellar Technologies LLC
## Balance Sheet
### As of June 30, 2009

|  | Jun 30, 09 |
|---|---|
| Acc Int GCC (to Stellar) | 208,668.10 |
| Acc Int GCC (to Subsidiaries) | 4,676,606.68 |
| Acc Int - RR ST3 (to Stellar) | 1,551,653.90 |
| Acc Int - RR ST3 (to Subs) | 3,806,422.11 |
| **Total Accrued Interest** | 12,963,494.57 |
|  |  |
| **Total Long Term Liabilities** | 176,734,892.07 |
|  |  |
| **Total Liabilities** | 176,865,151.97 |
|  |  |
| **Equity** |  |
| Capital | 9,639,787.58 |
| LP Distributions | -311,860.33 |
| Retained Earnings | -158,822,435.21 |
| Net Income | -4,388,623.86 |
| **Total Equity** | -153,883,131.82 |
|  |  |
| **TOTAL LIABILITIES & EQUITY** | 22,982,020.15 |

# EXHIBIT E

# Stellar Technologies LLC
# Profit & Loss
## January through June 2009

|  | Jan - Jun 09 |
|---|---:|
| **Ordinary Income/Expense** | |
|   **Expense** | |
|     Unemployment expense | 402.61 |
|     Bad Debt Expense | 900.00 |
|     Storage Rent | 700.00 |
|     401(k) Expense | 2,526.14 |
|     Amortization Expense | 25,093.63 |
|     Bank Service Charges | 325.26 |
|     Computer/Office Equip Exp | 338.13 |
|     Consulting Fees | 6,431.25 |
|     Insurance | |
|       Health Claims and Premiums | 582.00 |
|     Total Insurance | 582.00 |
|     Interest Expense | 7,376,250.85 |
|     Legal Expenses | 2,052.00 |
|     Life Insurance Expense | 241.50 |
|     Other Taxes & Fees | -1,618.08 |
|     Payroll Tax Expenses | |
|       FICA ER Expense | 6,285.20 |
|       FUTA Expense | 56.00 |
|     Total Payroll Tax Expenses | 6,341.20 |
|     Postage and Delivery | 42.95 |
|     Salary/Wage Expense | 107,539.76 |
|     Travel & Ent | |
|       Airfare | 235.45 |
|       Auto - Rental/Gas | 53.62 |
|       Meals & Entertainment | 193.65 |
|     Total Travel & Ent | 482.72 |
|     Workers Compensation Exp | 304.96 |
|   **Total Expense** | 7,528,936.88 |
|   **Net Ordinary Income** | -7,528,936.88 |
| **Other Income/Expense** | |
|   **Other Income** | |
|     Interest Income | 3,073,646.02 |
|     Other Income | 66,667.00 |
|   **Total Other Income** | 3,140,313.02 |
|   **Net Other Income** | 3,140,313.02 |
| **Net Income** | **-4,388,623.86** |