# EXHIBIT I

# SECURITY AGREEMENT
## (iTerra)

This Security Agreement is made this 1st day of June, 2005, by Stellar Technologies LLC, an Idaho limited liability company (hereinafter, "***Borrower***") in consideration of a loan by DBSI Guaranteed Capital Corporation (the "***Secured Party***") documented by that certain Term Loan Agreement and Amended and Restated Promissory Note of even date and secured by the Collateral hereinafter described, in addition to other property, assignments and interests.

**1.     Grant of Security Interest.**

The Borrower hereby grants to Secured Party, its successors and assigns, a security interest in the following goods and other property heretofore or hereafter acquired, together with all replacements thereof and accessories, parts, additions and accessions now or hereafter affixed or used in connection therewith, and proceeds thereof (hereinafter called the "***Collateral***"):

1.1     <u>Accounts</u>. All accounts, accounts receivable, contract rights, security deposits, rents, issues, general intangibles related to or arising from any account, or other forms of obligations of receivables arising from the sale or lease of inventory by the Borrowers in the ordinary course of its business and otherwise (collectively, the "***Accounts***").

1.2     <u>Goods</u>. All goods, inventory, and equipment in all forms and wherever located, including leased items.

1.3     <u>Instruments</u>. All documents, documents of title, guarantees, deposits, chattel paper (whether tangible or electronic), proceeds of insurance, and promissory notes, including, but not limited to the promissory notes and limited liability company membership units described on Schedule I attached hereto and incorporated herein.

1.4     <u>Investment Property</u>. All investment property, all interest, dividends or distributions accrued or to accrue thereon, whether or not due.

1.5     <u>Deposit Accounts</u>. All deposit accounts, money, interest, dividends and distributions accrued or to accrue thereon, whether or not due.

1.6     <u>Intangibles</u>. All general intangibles and all documentation and supporting information related thereto, payment intangibles, software, letter-of-credit rights, intellectual property, supporting obligations, permits, licenses, and franchises.

**2.     Secured Obligations.**

The security interest granted hereby is to secure payment and performance of the liabilities and obligations of Borrower to the Secured Party of every kind and description, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising

(hereinafter, the "*Obligations*") as detailed in this agreement and the Term Loan Agreement and the Amended and Restated Promissory Note.

### 3. Borrower's Covenants, Representations and Warranties.

Borrower hereby warrants, represents and covenants:

3.1 Borrower is now or, by using the proceeds of a loan from the Secured Party, will become the owner of the Collateral subject only to those prior liens described in Exhibit A (the "*Permitted Encumbrances*").

3.2 The Collateral is and will be used strictly for business purposes.

3.3 The Borrower is an Idaho entity and will promptly notify Secured Party of any change of its state of organization.

3.4 Borrower maintains its principal place of business in Meridian, Idaho.

3.5 Stellar Technologies LLC is the correct legal name of the Borrower indicated on the public records for the states in which the Borrower is organized and registered to do business.

3.6 Other than the sale of goods in the ordinary course of business, Borrower will not sell or offer to sell or otherwise transfer the Collateral or any interest therein without the written consent of Secured Party. By claiming proceeds or products of the Collateral in any financing statement prepared in conjunction with the perfection of this security interest, the Secured Party shall not be deemed to have given Borrower an implied power to sell or otherwise transfer the Collateral or any interest therein.

3.7 Borrower will keep the Collateral free from any adverse or prior lien, security interest or encumbrance, except the Permitted Encumbrances. Borrower will keep the Collateral in good order and repair and will not waste or destroy the Collateral or any part thereof. Borrower will not use or permit anyone to use, the Collateral in violation of any state or local ordinance or state or federal law or regulation. Secured Party may examine and inspect the Collateral at any reasonable time wherever located.

3.8 Borrower shall collect the Accounts and sell inventory and equipment only in the ordinary course of business.

3.9 Borrower shall keep accurate and complete records of the Collateral.

3.10 Borrower shall, when requested by Secured Party, notify account debtors that their Accounts have been assigned to Secured Party and must be paid directly to Secured Party.

3.11 Borrower shall pay promptly all taxes and assessments with respect to the Collateral except those taxes being contested in good faith and appropriate proceedings.



3.12    Borrower shall notify Secured Party of any Event of Default (as hereinafter defined).

### 4.    Purchase Money.

To the extent the proceeds of any Obligation with Security Party shall be used to acquire any Collateral, Secured Party shall have a purchase money security interest therein. Borrower hereby authorizes Secured Party to disburse proceeds to the seller of any Collateral acquired or to be acquired thereby.

### 5.    Financing Statements; Further Assurances.

Borrower hereby authorizes and directs Secured Party to do all acts and things which Secured Party deems necessary to perfect and continue to perfect the interests created by this Security Agreement, including but not limited to filing UCC financing statements and continuation statements and obtaining the approval of any governmental agencies. Without limiting the foregoing, Borrower shall from time to time execute financing statements, certificates of title, and other documents in form satisfactory to the Secured Party and perform such other acts as Secured Party may request to perfect and maintain a perfected security interest in the Collateral. Secured Party is hereby irrevocably appointed Borrower's attorney-in-fact, at Secured Party's option and Borrower's expense, to do all acts and things that Secured Party may deem necessary to perfect, continue to perfect, and foreclose upon the security interest created by this Agreement or to protect the Collateral.

### 6.    Protection of Collateral.

At its option, but without obligation to Borrower, Secured Party may discharge taxes, liens, or security interests or other encumbrances at any time levied or placed on the Collateral, may place and pay for insurance thereon, may order and pay for the repair, maintenance and preservation thereof and may pay any necessary filing or recording fees. Borrower agrees to reimburse Secured Party on demand for payment made or any expense incurred by Secured Party pursuant to the foregoing authorization together with interest thereon at the rate of 10% per annum. Any such payments made by Secured Party shall constitute indebtedness of Borrower to Secured Party secured by the Collateral as provided herein.

### 7.    Default.

Time is of the essence of this Security Agreement, and Borrower shall be in default under this agreement upon the happening of any of the following events or conditions (each, an *"Event of Default"*):

7.1    Default in the payment or performance of any obligation, covenant, or liability contained or referred to herein or in any note, including the Amended and Restated Promissory Note, evidencing the same.

7.2    Any warranty, representation or statement made or furnished to Secured Party by or on behalf of Borrower becomes or proves to have been false in any material respect when made or furnished.

7.3    Any event that results in the acceleration of the maturity of the indebtedness of Borrower to others under any indenture or undertaking.

7.4    The occurrence of any material uninsured loss, theft, damage, destruction, or encumbrance to or of any of the Collateral, or the making of any material levy, seizure or attachment thereof or thereon, or the sale, hypothecation or transfer of the Collateral or any portion thereof or interest therein.

7.5    Borrower shall be unable, or admit in writing its inability, to pay its debts, or shall not pay its debts, or shall not pay its debts generally as they come due, or shall make any assignment for the benefit of creditors.

7.6    Dissolution, termination of existence, liquidation, cessation of the conduct of any substantial part of Borrower's business in the ordinary course, insolvency, business failure, appointment of a receiver of any part of the property of assignment for the benefit of creditors by, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against, Borrower or any guarantor or surety for Borrower, or entry of any judgment against them, or failure of any guarantor or surety for debtor to provide Secured Party with financial information promptly when requested by Secured Party.

## 8.    Remedies.

Upon the occurrence of any Event of Default hereunder and at any time thereafter, the Secured Party may without notice or demand declare immediately due and payable all amounts secured hereby and shall have the remedies of a secured party under applicable law, and without limiting the generality of the foregoing, but subject only to the rights of prior creditors listed in Exhibit A:

8.1    Enter upon Borrower's premises at any reasonable time to take possession of or to complete the processing of any Collateral preparatory to its disposition, and for these purposes, Secured Party may require Borrower to assemble the Collateral and make it available to Secured Party at a place designated by Secured Party which is reasonably convenient. Secured Party may enter upon the premises of Borrower without being liable for damages and take possession of the Collateral without judicial process and may use and occupy the premises for purposes of preservation or preparation for disposition of any Collateral.

8.2    Secured Party shall have the right at any time in its own name or in the name of Borrower to notify or require Borrower to notify any and all account debtors to make payment directly to Secured Party, to take possession of any Collateral or proceeds therefrom in the possession of Borrower, to demand, collect, receive, receipt for, sue for, compound, and give acquittance for any or all amounts due or to become due on any or all Accounts, to endorse in the name of Borrower, commercial paper given in payment or party payment thereof, and in its discussion to file any claim or take any other action or proceeding which Secured Party may

deem necessary or appropriate to protect and preserve and realize upon the security interest of Secured Party in the Collateral.

8.3     Borrower agrees that any notice or other communication by Secured Party to Borrower shall be deemed given and effective when given in the manner provided in the Term Loan Agreement of even date between the parties; and

8.4     Any notice of sale, disposition or other intended action by Secured Party, sent to Borrower at the address specified in the Term Loan Agreement, or such other address of Borrower as may from time to time be shown on Secured Party's records, at least 5 days prior to such action, shall constitute reasonable notice to Borrower for purposes of the Idaho Commercial Code, Article 9. Expenses of retaking, holding, preparing for sale, selling or the like shall include Secured Party's reasonable attorneys' fees and legal expenses incurred in connection therewith, in connection with collecting amounts owed by Borrower to Secured Party under the Note, or in exercising any rights under this Agreement, and the same, together with all advances made by Secured Party on behalf of Borrower, shall be part of the obligations secured hereby. After sale or other disposition of the Collateral, Borrower shall be liable to Secured Party for any deficiency.

8.5     Secured Party shall have the right immediately and without further action by it, to set off against the obligations of Borrower all money owed by Secured Party in any capacity to Borrower, whether or not due, and Secured Party shall be deemed to have exercised such right of set off and to have made a charge against any such money immediately upon occurrence of an Event of Default even though such charge is made or entered on the books of Secured Party subsequent thereto.

## 9.     General Provisions.

Any provision of this agreement found to be invalid shall not invalidate any other provision hereof. All Secured Party's rights and remedies, whether evidenced hereby or by any other writing shall be cumulative and may be exercised singularly or concurrently. This agreement and all rights and liabilities hereunder and in and to any and all obligations secured hereby, and in and to all Collateral described above, shall inure to the benefit of the Secured Party and its successors and assigns, and shall be binding upon the Borrower and its successors and assigns. No waiver by Secured Party of any default shall operate as a waiver of any other default or of the same default on a future occasion. This instrument is to be governed by the laws of the State of Idaho. If this instrument is signed by more than one Borrower, the obligations of each Borrower shall be joint and several. All words used herein shall be construed to be of such gender and number as the circumstances require and all references to Borrower shall include all other persons primarily or secondarily liable hereunder. This agreement, together with the Term Loan Agreement and the Amended and Restated Promissory Note, constitutes the entire agreement between the parties with respect to the subject matter covered by it, superseding all other discussions, understandings and agreements, whether written or verbal. This agreement shall not be amended except in writing, signed by the party or parties to be bound. Unless the context requires otherwise, all terms used herein that are defined in the Idaho Commercial Code, shall have the meaning therein stated.

Signed and delivered to Secured Party on the day and year first above written.

**BORROWER:**

**Stellar Technologies LLC**

By: Douglas L. Swenson
Title: Authorized Management Board Member


**SECURED PARTY:**

**DBSI Guaranteed Capital Corporation**

By: Charles E. Hassard
Title: Vice President

# EXHIBIT A

**Permitted Liens**

None

## SCHEDULE I

### Promissory Notes and Membership Units

Promissory Note executed by iTerra Communications LLC dated June 1, 2005 in the original principal amount of $11,313,833 payable to Stellar Technologies LLC

Certificate No. 1 for 5,500,000 membership units of iTerra Communications LLC

# EXHIBIT J

## AMENDED AND RESTATED PROMISSORY NOTE

**THIS AMENDED AND RESTATED PROMISSORY NOTE AMENDS AND RESTATES THAT CERTAIN FIXED INTEREST RATE PROMISSORY NOTE DATED OCTOBER 1, 2002, FROM STELLAR TECHNOLOGIES LLC AS MAKER PAYABLE TO THE ORDER OF DBSI GUARANTEED CAPITAL CORPORATION AS LENDER IN THE ORIGINAL PRINCIPAL AMOUNT OF $4,000,000.00.**

$27,127,658.00

June 1, 2005
Meridian, Idaho

For value received, **STELLAR TECHNOLOGIES LLC**, an Idaho limited liability company, promises to pay to the order of **DBSI GUARANTEED CAPITAL CORPORATION**, an Idaho corporation, c/o DBSI Housing Inc., 1550 South Tech Lane, Meridian, Idaho 83642, or such other address of which Maker may be notified, the lesser of the principal sum of <u>Twenty Seven Million One Hundred Twenty Seven Thousand, Six Hundred Fifty Eight and No/100 Dollars ($27,127,658.00)</u> with accrued interest at the rate hereinafter specified, in accordance with the payment schedule described below.

1.    **Definitions.**

As used in this Note, the following capitalized terms shall have the meanings ascribed to them below:

A.    "Borrower" means STELLAR TECHNOLOGIES LLC, an Idaho limited liability company, and its successors, representatives and assigns.

B.    "Lender" means DBSI Guaranteed Capital Corporation, and its successors and assigns, any servicer of the Loan, and the holder of this note, or any of them, as the context or circumstances require or permit.

C.    "Loan" means the indebtedness evidenced by the Loan Documents.

D.    "Loan Balance" means the outstanding balance of unpaid principal, at any time during the term of the Loan.

E.    "Loan Documents" means this Note, and any and all other documents evidencing, securing or guaranteeing the Borrower's obligations (now existing or hereafter arising) to the Lender or the holder hereof.

F. "Maturity Date" means January 15, 2008, unless the sums owing hereunder have been accelerated by the holder.

G. "Monthly Payment Date" means the first day of each month of the term of the Loan, commencing July 1, 2005.

H. "Stated Interest Rate" means a simple interest rate of Eleven Percent (11%) per annum.

I. "Term Loan Agreement" means that certain Term Loan Agreement between Borrower and Lender executed concurrently herewith.

2.   **Payment Schedule.**

A. Borrower shall pay to Lender or to Lender's order monthly payments of interest only at the Stated Interest Rate in the amount calculated on the then outstanding principal balance of this Note on each Monthly Payment Date.

B. On the Maturity Date, if not sooner paid, Borrower shall pay to the Lender the Loan Balance plus all accrued and unpaid interest.

C. All interest payable hereunder shall be computed for the actual number of days elapsed on the basis of a three hundred sixty-five (365) day year.

3.   **Application of Payments.**

All payments received on account of the Loan shall be applied to the payment of the following obligations in the following order: (1) to indebtedness (including accrued and unpaid interest due thereon) secured by any Loan Document, other than the Loan Balance and the accrued interest due thereon; (2) to payment of late charges described in Section 7 hereof; (3) to any interest due at the Default Rate as defined in Section 6 hereof; (4) to interest at the Stated Interest Rate; and (5) the remainder (if any) shall be applied to any portion of the original loan amount remaining unpaid hereunder. Notwithstanding the foregoing, any such payments that may be received during any period of time that Borrower is in default under the Loan Documents and following acceleration of the Maturity Date shall be applied in such manner as the Lender may determine in its sole discretion.

4. **Security.**

Payment  As provided in Article III of the Term Loan Agreement this Note shall be secured the Collateral as defined in the Term Loan Agreement.  Any such security documents subsequently executed and delivered shall be considered part of the Loan Documents.  Any default under any Loan Document shall be deemed to be a default under this Note.

5. **Method and Place of Payment.**

All such payments of principal and interest are to be paid in lawful money of the United States of America and shall be made at such place as the Lender may from time to time in writing appoint, and in the absence of such appointment, 1550 South Tech Lane, Meridian, Idaho 83642.

6. **Default.**

If a default is made in the payment of any interest herein provided for, or the principal sums evidenced hereby, or any part thereof, or if there is a breach of Section 13 hereof, or a breach of Section 7.01(d) of the Term Loan Agreement, at the option of the Lender, the Loan Balance, together with all interest accrued thereon, shall immediately become due and payable without further notice, and any liens given to secure the payment of this Note may be foreclosed. If any other default under any Loan Document is made or occurs, the Loan Balance, together with all interest accrued thereon, shall become due and payable, and any liens given to secure the payment of this Note may be foreclosed ten (10) days after the Lender gives the Borrower notice of such default unless the same is fully and absolutely cured within said ten (10) day period. As to any default that can be cured within such 10-day period or as to any default that cannot be cured within such 10-day period, the Borrower shall provide evidence satisfactory to the Lender, in its sole discretion, that the Borrower is diligently proceeding to cure the default and the same is likely to be cured, as determined by the Lender, in its sole discretion, without increasing the Lender's risk. From and after the Maturity Date of this Note, either according to its terms or as the result of acceleration upon default, the Loan Balance shall bear interest from such due date at a default interest rate (herein referred to as the "Default Rate") equal to twenty percent (20%) per annum or the highest lawful rate, whichever is less.

7. **Late Charge.**

A late charge of four percent (4%) of any installment past due more than five (5) days shall be paid to the Lender as a penalty and in order to defray costs of collection. Such late charge shall be due and payable on the day after any such installment payment is due. The payment of any such late charge will not affect the rights of the Lender to pursue any remedies available to it.

8. **Costs of Enforcement.**

In the event that this Note is placed in the hands of an attorney for collection after maturity, or upon default, or in the event that proceedings at law, in equity, or bankruptcy, receivership or if other legal proceedings are instituted or threatened in connection herewith, or if the Lender is made a party to any such proceeding, or in the event that this Note is placed in the hands of an attorney to enforce any of the rights or requirements contained in any Loan Document, Borrower hereby agrees to pay all reasonable costs of collecting or attempting to collect this Note, and any costs of protecting or enforcing such rights, including, without limitation, reasonable attorneys' fees (whether or not suit is brought), in addition to all principal, interest and other amounts payable hereunder, all of which shall be secured by the Loan Documents.

9. **Interest Limitation.**

Notwithstanding any other agreement to the contrary, in the event the several interest provisions hereof or any exactions provided for herein or in any other Loan Documents shall result, at any time during the life of the Loan, in an effective rate of interest that, for any month, exceeds the limit of the usury or any other law applicable to the Loan, all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice between or by any party hereto, be applied upon principal immediately upon receipt of such monies by the Lender, with the same force and effect as though the Borrower had specifically designated such extra sums to be so applied to principal and the Lender had agreed to accept the same on that basis.

10. **Waiver.**

To the extent permitted by law, Borrower and all endorsers, guarantors and all persons liable or to become liable on this Note consent to any and all renewals and extensions in the time of payment and waive: (i) presentment, protest and demand, notice of protest, demand and dishonor and nonpayment of this Note; and (ii) all applicable appraisement, valuation and exemption rights.

11. **Lender's Actions.**

The remedies of the Lender as provided in the Loan Documents shall be cumulative and concurrent, and may be pursued singularly, successively or together, at the sole discretion of the Lender, and may be exercised as often as occasion therefor shall arise. Failure of the Lender, for any period of time or on more than one occasion, to exercise its option to accelerate the Maturity Date of this Note shall not constitute a waiver of the right to exercise the same at any time thereafter or in the event of any subsequent default. No act of omission or commission of the Lender, including specifically any failure to exercise any right, remedy or recourse, shall be deemed to be a waiver or release of the same and any such waiver or release of the same is to be effected only through a written document executed by the Lender and then only to the extent specifically recited therein. A waiver or release with reference to any one event

shall not be construed as a waiver or release of any subsequent event or as a bar to any subsequent exercise of the Lender's rights or remedies hereunder. Except as otherwise specifically required herein, notice of the exercise of any right or remedy granted to the Lender by this Note is not required to be given.

### 12. Disbursement and Receipt of Funds.

Funds representing the proceeds of the indebtedness evidenced hereby and disbursed for any purpose permitted hereunder by the Lender by mail, wire transfer or other delivery to Borrower, to escrows or otherwise for the benefit of Borrower, for all purposes, shall be deemed outstanding hereunder and to have been received by Borrower as of the date of such mailing, wire transfer or other delivery, and interest shall accrue and be payable upon such funds from and after the date of such wire transfer, mailing or delivery and until repaid, notwithstanding the fact that such funds may not at any time have been remitted by such escrows to Borrower or for his benefit. Funds paid hereunder by or on behalf of Borrower shall be deemed received by the Lender on the next business day if not received by 5:00 p.m. local time at the location where payments hereunder are to be made.

### 13. Business Loan.

Borrower acknowledges and agrees that the proceeds of the Loan evidenced by this Note will be used for business purposes and the interest rate or rates to be charged hereunder are not usurious under the laws of the State of Idaho.

### 14. Prepayment.

The Borrower may prepay, upon thirty (30) days advance written notice, any principal amount by paying a premium equal to the costs of redeeming any underlying bonds. The Lender shall have no obligation to advance sums prepaid and prepaid amounts will not delay the due date of the next scheduled installment, nor alter the amount thereof. Prepayments will be applied to the last scheduled payment at maturity and then to installments preceding such maturity payment in inverse chronological order. Prepayment premiums are due and payable, without notice or demand, with the payment or payments that give rise to them. The Lender's acceptance of a prepayment without the premium due shall not amount to a waiver thereof, but the same shall be added to the Loan Balance, secured by the Loan Documents, and failure to pay the same on demand shall constitute a default hereof, immediately giving rise to the right of acceleration of the Loan Balance and all other rights and remedies hereunder and under the Loan Documents.

Prepayment shall mean any event whereby the Loan is fully or partially satisfied in any manner, other than by making monthly payments, prepayment premiums, insurance and tax reserves required hereunder or otherwise as provided in the Loan Documents, whether voluntarily or involuntarily, prior to the Maturity Date (excluding the receipt of insurance or condemnation proceeds) including, but not limited to, any payments after default, payments after the Maturity Date is accelerated, payments by any lender secured by a subordinate interest in the

property secured by the Loan Documents, payments by any sale under court order or deed in lieu thereof, or payments by sale or other method under any bankruptcy or insolvency proceeding.

15. **Notices.**

All notices required or permitted to be given hereunder shall be deemed given when personally served or when deposited in the United States mail, postage prepaid, if to the Lender, by certified or registered mail, return receipt requested, as follows:

if to the Borrower, as follows:

> Stellar Technologies LLC
> 1550 South Tech Lane
> Meridian, ID 83642

and if to the Lender, by certified or registered mail, return receipt requested, addressed to:

> DBSI Guaranteed Capital Corporation
> 1550 South Tech Lane
> Meridian, Idaho 83642
> Attention: Charles Hassard

or to such other address as either party may notify the other in writing.

16. **Time.**

Time is of the essence of this Note and each of the provisions hereof.

17. **Captions.**

The captions to the Sections of this Note are for convenience only and shall not be deemed part of the text of the respective Sections and shall not vary, by implication or otherwise, any of the provisions of this Note.

18. **Governing Law.**

This Note has been executed and delivered in, is payable in and shall be governed by the laws of the State of Idaho.

19. **Invalid Provisions.**

The parties hereto intend and believe that each provision in this Note comports with all applicable local, state and federal laws and judicial decisions. However, if any provision of this Note, or any of the Loan Documents is found by a court of law to be in violation of any applicable local, state or federal ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such provision to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such provision shall be given force to the fullest possible extent that it is legal, valid and enforceable, that the remainder of this Note and the Loan Documents shall be construed as if such illegal, invalid, unlawful, void or unenforceable provision were not contained therein, and that all other rights, obligations, and interest of Borrower and Lender shall continue in full force and effect.

20. **Assignment.**

This Note is freely assignable in whole or in part, from time to time, by the Lender and the Lender may grant participation interests herein. Without limiting the foregoing, the Borrower understands and agrees that the Lender may sell, pledge, grant a security interest in, assign, transfer, deliver or otherwise dispose of this Note and Borrower's other Loan Documents (or any interest therein, or its rights and powers thereunder). The Borrower may not assign this Note and the rights and obligations under this Note without the prior written consent of the Lender. This Note shall be binding upon Borrower, its heirs, devises, administrators, executives, personal representatives, successors, receivers, trustees, and permitted assignees, including all successors in interest of the Borrower, and shall inure to the benefit of the Lender, and the successors and assignees of the Lender.

IN WITNESS WHEREOF, the Borrower has executed and delivered this Note on the date first above written.

STELLAR TECHNOLOGIES LLC

By_____
    Douglas L. Swenson
    Authorized Management Board Member

# EXHIBIT K

# UCC FINANCING STATEMENT

ELECTRONIC FILING*

A. NAME, PHONE, EMAIL, FAX OF CONTACT AT FILER:
THERESA HOWE  |  208-955-9903  |  thowe@dbsigroup.com  |  208-955-9834

B. SEND ACKNOWLEDGMENT TO: (Name and Address)
DBSI GROUP OF COMPANIES
1550 S. TECH LANE
MERIDIAN, ID 83642

IDAHO SECRETARY OF STATE
7/13/2005 17:15:23
$3.00
Filing Number:
B 2005-0989001-9
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME: - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

1a. ORGANIZATION'S NAME:
STELLAR TECHNOLOGIES LLC

| 1b. LAST NAME: | FIRST NAME: | MIDDLE NAME: | SUFFIX: |
|---|---|---|---|

| 1c. MAILING ADDRESS: 1550 S. TECH LN | CITY: MERIDIAN | STATE: ID | POSTAL CODE: 83642 | COUNTRY: USA |
|---|---|---|---|---|

| 1d. TAX ID #: SSN OR TIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORG: LIMITED LIABILITY COMPANY | 1f. JURISDICTION OF ORG: IDAHO | 1g. ORGANIZATIONAL ID #: (if any) W11254 |
|---|---|---|---|---|

3. SECURED PARTY'S NAME: (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) -- insert only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME:
DBSI GUARANTEED CAPITAL CORPORATION

| 3b. LAST NAME: | FIRST NAME: | MIDDLE NAME: | SUFFIX: |
|---|---|---|---|

| 3c. MAILING ADDRESS: 1550 S. TECH LN. | CITY: MERIDIAN | STATE: ID | POSTAL CODE: 83642 | COUNTRY: USA |
|---|---|---|---|---|

4. This FINANCING STATEMENT covers the following collateral:

EXHIBIT A

ALL OF BORROWER'S RIGHT TITLE AND INTEREST IN ACCOUNTS, ACCOUNTS RECEIVABLE, CONTRACT RIGHTS, SECURITY DEPOSITS, RENTS, ISSUES, GENERAL INTANGIBLES RELATED TO OR ARISING FROM ANY ACCOUNT, OR OTHER FORMS OF OBLIGATIONS OF RECEIVABLES ARISING FROM THE SALE OR LEASE OF INVENTORY BY THE BORROWER IN THE ORDINARY COURSE OF ITS BUSINESS AND OTHERWISE; ALL GOODS, INVENTORY, AND EQUIPMENT IN ALL FORMS AND WHEREVER LOCATED, INCLUDING LEASED ITEMS; ALL DOCUMENTS, DOCUMENTS OF TITLE, GUARANTEES, DEPOSITS, CHATTEL PAPER (WHETHER TANGIBLE OR ELECTRONIC), PROCEEDS OF INSURANCE, AND PROMISSORY NOTES, INCLUDING, BUT NOT LIMITED TO THE PROMISSORY NOTES AND LIMITED LIABILITY COMPANY MEMBERSHIP UNITS DESCRIBED BELOW; ALL INVESTMENT PROPERTY, ALL INTEREST, DIVIDENDS OR DISTRIBUTIONS ACCRUED OR TO ACCRUE THEREON, WHETHER OR NOT DUE; ALL DEPOSIT ACCOUNTS, MONEY, INTEREST, DIVIDENDS AND DISTRIBUTIONS ACCRUED OR TO ACCRUE THEREON, WHETHER OR NOT DUE; ALL GENERAL INTANGIBLES AND ALL DOCUMENTATION AND SUPPORTING INFORMATION RELATED THERETO, PAYMENT INTANGIBLES, SOFTWARE, LETTER-OF-CREDIT RIGHTS, INTELLECTUAL PROPERTY, SUPPORTING OBLIGATIONS, PERMITS, LICENSES, AND FRANCHISES; HERETOFORE OR HEREAFTER ACQUIRED TOGETHER WITH ALL REPLACEMENTS THEREOF AND ACCESSORIES, PARTS, ADDITIONS AND ACCESSIONS NOW OR HEREAFTER AFFIXED OR USED IN CONNECTION THEREWITH, AND PROCEEDS THEREOF.

PROMISSORY NOTES AND LIMITED LIABILITY COMPANY INTERESTS:

PROMISSORY NOTE EXECUTED BY ITERRA COMMUNICATIONS LLC DATED JUNE 1, 2005 IN THE ORIGINAL PRINCIPAL AMOUNT OF $11,313,833 PAYABLE TO STELLAR TECHNOLOGIES LLC

CERTIFICATE NO. 1 FOR 5,500,000 MEMBERSHIP UNITS OF ITERRA COMMUNICATIONS LLC

5. ALTERNATIVE DESIGNATION (if applicable):
[  ] LESSEE/LESSOR  [  ] CONSIGNEE/CONSIGNOR  [  ] BAILEE/BAILOR  [  ] SELLER/BUYER

6. [  ] This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum  (if applicable)

7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) (ADDITIONAL FEE) (optional)  [  ] All Debtors  [  ] Debtor 1  [  ] Debtor 2

8. OPTIONAL FILER REFERENCE DATA:
ITERRA

*Electronically generated from original XML Document

# EXHIBIT L



**AMERICAN STOCK**
TRANSFER & TRUST COMPANY, LLC

**LETTER OF TRANSMITTAL**

877-248-6417 (toll free) or 718-921-8317
www.amstock.com  info@amstock.com

**WHERE TO FORWARD YOUR TRANSMITTAL**
The method of delivery of certificate(s) and all other required documents is at the election and risk of the owner. If you elect to send them by mail, it is recommended that you send them by certified or registered mail with return receipt requested. Delivery will be deemed effective only when received by AST.

**By hand or Overnight courier:** American Stock Transfer & Trust Company, LLC, Operations Center, Attn: Reorganization Department, 6201 15th Avenue, Brooklyn, New York 11219

**By mail:** American Stock Transfer & Trust Company, LLC, Operations Center, Attn: Reorganization Department, P.O. Box 2042, New York, New York 10272-2042

| COMPANY NAME: | | CUSIP | COMPANY # | ACCOUNT NUMBER |
|---|---|---|---|---|
| GIGOPTIX INC LLC UNITS | | | 16108 | 9000000001 |

**❶ ACCOUNT REGISTRATION:**

ITERRA COMMUNICATIONS LLC
1550 S TECH LANE
MERIDIAN ID 83642

**❷ CERTIFICATE INFORMATION:**

| Certificate No | Shares | Certificate No | Shares |
|---|---|---|---|

Shares from other certificates held: 0.000

| ❸ Certificated shares: | 0.000 |
|---|---|
| Book-Entry Shares: | 5400000.000 |
| Plan Shares: | 0.000 |
| Total Shares: | 5400000.000 |

You must submit your original certificates with this Letter of Transmittal. If you are not in possession of your certificates, please see Instruction # 2 on the back of this form. You do not need to sign the back of the certificates. Shares held in Book-entry and Plan form are un-certificated and need not be submitted (although this Letter of Transmittal must still be completed).

**❹ SUBSTITUTE FORM W-9**
REQUEST FOR TAXPAYER IDENTIFICATION NUMBER AND CERTIFICATION

**THIS SUBSTITUTE FORM W-9 MUST BE FILLED OUT AND SIGNED**

PRINT YOUR TAXPAYER ID OR SOCIAL SECURITY NUMBER HERE

8 Z D 5 Z 6 6 3 3

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct Taxpayer Identification Number; (2) I am not subject to backup withholding either because I am exempt from backup withholding, I have not been notified by the Internal Revenue Service ("IRS") that I am subject to backup withholding as a result of failure to report all interest or dividends, or the IRS has notified me that I am not subject to backup withholding; and (3) I am a U.S. Person (or a U.S. resident alien).

Certification Instructions — You must cross out Item (2) above if you have been notified by the IRS that you are subject to backup withholding because of underreporting interest or dividends on your tax return. However, if after being notified by the IRS that you were subject to backup withholding you received another notification from the IRS stating that you are no longer subject to backup withholding, do not cross out item (2).

SIGNATURE: _____ DATE: 6/4/09

NOTE: Certain stockholders (including, among others, all corporations and certain foreign individuals) are not subject to these backup withholding and reporting requirements. In order to satisfy the Exchange/Paying Agent that a foreign individual qualifies as an exempt recipient, such stockholder must submit a statement, signed under penalties of perjury, attesting to that individual's exempt status, on the appropriate and properly completed Form W-8, or successor form. Such statements can be obtained from the Exchange/Paying Agent.

**❺ THIS LETTER OF TRANSMITTAL MUST BE SIGNED BY ALL REGISTERED OWNERS**

Each registered owner must sign here exactly as the name(s) appear(s) in the account registration. If all registered owners have signed this Letter of Transmittal, no endorsements of certificates or separate stock powers are required.

If signature is by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or other acting in a fiduciary or representative capacity, it must be so indicated and proper evidence of authority, satisfactory to AST, must be submitted.

THE UNDERSIGNED REPRESENTS THAT I (WE) HAVE FULL AUTHORITY TO SURRENDER WITHOUT RESTRICTION THE CERTIFICATE(S) ENCLOSED HEREIN.

SIGNATURE: _____

SIGNATURE: _____

DATE: 6/4/09

Telephone number (required): (208) 489-2604

Email address: pjrhge@stellartlc.com

IF YOU ARE AWAITING A TAXPAYER IDENTIFICATION NUMBER, WRITE "APPLIED FOR" IN THE SUBSTITUTE FORM W-9 ABOVE, AND COMPLETE AND SIGN BOTH THIS CERTIFICATION AND THE SUBSTITUTE FORM W-9. FOR FURTHER INFORMATION, PLEASE SEE THE ENCLOSED GUIDELINES.

I certify under penalties of perjury that a taxpayer identification number has not been issued to me, and either (a) I have mailed or delivered an application to receive a taxpayer identification number to the appropriate Internal Revenue Service Center or Social Security Administration Office or (b) I intend to mail or deliver an application in the near future. I understand that if I do not provide a taxpayer identification number by the time of payment, percentage (currently 28 percent) of all reportable cash payments made to me will be withheld until I provide a number and such retained amounts will be remitted to the Internal Revenue Service as backup withholding.

Signature: _____ Date: _____

SIGNATURE(S) GUARANTEED/MEDALLION GUARANTEED
MORGAN STANLEY & CO. INCORPORATED

MS644
AUTHORIZED SIGNATURE
NYSE, INC. MEDALLION SIGNATURE PROGRAM

2-0-0-0-0-5-0-5

**PLEASE REFER TO THE BACK OF THIS FORM FOR ADDITIONAL IMPORTANT INFORMATION AND INSTRUCTIONS ON COMPLETING THIS LETTER OF TRANSMITTAL**

<u>INSTRUCTIONS FOR COMPLETING THE LETTER OF TRANSMITTAL</u>

**❶** THIS SECTION CONTAINS YOUR CURRENT NAME AND ADDRESS AS THEY ARE REFLECTED ON OUR RECORDS. IF YOU NOW RESIDE AT A DIFFERENT ADDRESS, PLEASE FILL OUT BOX 7, AND CHECK OFF THE BOX INDICATING A PERMANENT ADDRESS CHANGE. NO MEDALLION GUARANTEE WILL BE REQUIRED.

**❷** THIS SECTION INDICATES THE CERTIFICATE NUMBERS AND RESPECTIVE AMOUNT OF SHARES AS THEY ARE REFLECTED ON OUR RECORDS. IF THE CERTIFICATES IN YOUR POSESSION HAVE DIFFERENT CERTIFICATE NUMBERS, PLEASE CONTACT OUR SHAREHOLDER SERVICES UNIT AT 718-921-8317 OR TOLL-FREE AT 877-248-6417 TO CONFIRM THE LEGITIMACY OF YOUR CERTIFICATES PRIOR TO REMITTING THE TRANSMITTAL MATERIAL. IF YOU ARE NOT IN POSSESSION OF SOME OR ALL OF YOUR STOCK CERTIFICATES, YOU MUST WRITE TO AST AT THE ADDRESS ON THE REVERSE SIDE OR REPORT THE LOSS BY ACCESSING YOUR ACCOUNT AT HTTP://WWW.AMSTOCK.COM. YOU WILL BE REQUIRED TO SUBMIT THE NECESSARY FORMS AND A CHECK FOR THE POSTING OF A SURETY BOND, THE DETAILS OF WHICH WILL BE PROVIDED BY AST. PLEASE NOTE THAT THIS FORM STILL MUST BE COMPLETED AND REMITTED ALONG WITH YOUR REPLACEMENT FORMS, BOND FEE, AND ANY ADDITIONAL CERTIFICATES THAT MAY BE IN YOUR POSSESSION.

**❸** THIS SECTION SHOWS THE TOTAL AMOUNT OF SHARES OWNED BY YOU.

**❹** CERTIFICATION OF YOUR TAX ID NUMBER IS REQUIRED IN ORDER TO PREVENT WITHHOLDING FROM YOUR ENTITLEMENT PROCEEDS. YOU MUST FILL OUT, SIGN, AND DATE THIS FORM W-9 (OR SUBMIT A FORM W-8, AS APPLICABLE), OTHERWISE YOUR TRANSMITTAL AND ACCOMPANYING DOCUMENTS WILL BE REJECTED BACK TO YOU.

**❺** THIS SECTION MUST BE SIGNED AND DATED BY ALL REGISTERED OWNERS, OTHERWISE YOUR TRANSMITTAL AND ACCOMPANYING DOCUMENTS WILL BE REJECTED BACK TO YOU.

**❻** THIS SECTION SHOULD BE COMPLETED AND SIGNED IF YOU WANT YOUR ENTITLEMENT TO BE ISSUED IN ANOTHER NAME. A MEDALLION SIGNATURE GUARANTEE WILL BE REQUIRED (I.E. SIGNATURE IS GUARANTEED BY A BANK, BROKER OR OTHER FINANCIAL INSTITUTION THAT IS A MEMBER OF A SECURITIES TRANSFER ASSOCIATION-APPROVED MEDALLION PROGRAM SUCH AS STAMP, SEMP OR MSP).

**❼** THIS SECTION SHOULD BE COMPLETED AND SIGNED IF YOU WANT YOUR ENTITLEMENT TO BE MAILED TO AN ALTERNATE ADDRESS THAT IS DIFFERENT THAN YOUR ADDRESS IN THE "ACCOUNT REGISTRATION" SECTION. A MEDALLION SIGNATURE GUARANTEE WILL BE REQUIRED (I.E. SIGNATURE IS GUARANTEED BY A BANK, BROKER OR OTHER FINANCIAL INSTITUTION THAT IS A MEMBER OF A SECURITIES TRANSFER ASSOCIATION-APPROVED MEDALLION PROGRAM SUCH AS STAMP, SEMP OR MSP).

| **❻** SPECIAL ISSUANCE/PAYMENT INSTRUCTIONS | **❼** SPECIAL DELIVERY INSTRUCTIONS |
|---|---|
| To be completed ONLY if issuance/payment is to be made in a name other than that shown in the Account Registration section on the reverse side of this form. <u>Please note, an appropriate Form W-9 or Form W-8, as applicable, must also be completed for the person receiving the issuance/payment.</u> You may obtain such forms by contacting the agent at the number listed on the reverse side or by accessing either http://www.amstock.com/shareholder/sh_downloads.asp or www.irs.gov.<br><br>If you have completed this section, your signature on the face this Letter of Transmittal must be guaranteed by a bank, broker or other financial institution that is a member of a Securities Transfer Association-approved medallion program such as STAMP, SEMP or MSP.<br><br><u>ISSUE TO:</u><br>NAME: _iTera Communications LLC_<br>Address: _1242b W. Explorer Dr._<br>_Ste 200_<br>_Boise, ID 83713_<br><br>SOCIAL SECURITY OR TAXPAYER ID NUMBER OF RECIPIENT:<br>_82-0526633_ | To be completed ONLY if delivery is to be made to someone other than the registered holder(s), or to such registered holder(s) at an address other than that shown above.<br><br>If you have completed this section, your signature on the face this Letter of Transmittal must be guaranteed by a bank, broker or other financial institution that is a member of a Securities Transfer Association-approved medallion program such as STAMP, SEMP or MSP.<br><br>MAIL TO:<br>NAME: _iTera Communications LLC_<br>Address: _1242b W. Explorer Dr._<br>_Ste 200_<br>_Boise, ID 83713_<br><br>☑ PLEASE CHECK THIS BOX IF THIS IS A PERMANENT CHANGE OF ADRESS<br><br>(SEE INSTRUCTION 1) |

All questions as to the validity, form and eligibility of any surrender of certificates will be determined by AST or the issuer and such determination shall be final and binding. AST or the issuer reserves the right to waive any irregularities or defects in the surrender of any certificates. A surrender will not be deemed to have been made until all irregularities have been cured or waived.

If your certificates are registered in different names, a separate Letter of Transmittal must be submitted for each registration. Additional Letters of Transmittal can be obtained by accessing http://www.amstock.com/shareholder/sh_downloads.asp or by contacting American Stock Transfer & Trust Company, LLC ("AST") at the numbers listed above.

If payment for securities is to be made to any person other than the registered holder, or if surrendered certificates are registered in the name of any person other than the person(s) signing the letter of transmittal, any stock transfer taxes payable as a result of the transfer to such person (whether imposed on the registered holder or such person) shall be paid prior to the submission of this letter of transmittal. AST reserves the right to deduct the amount of such taxes from the payment, if satisfactory evidence of the payment of such taxes, or exemption therefrom, is not submitted.

If the Letter of Transmittal is signed by a person other than the registered owner (e.g., where the shares have been assigned), the Letter of Transmittal must be accompanied by a stock power guaranteed by a bank, broker or other financial institution that is a member of a Securities Transfer Association-approved medallion program such as STAMP, SEMP or MSP.



June 4, 2009

American Stock Transfer and Trust Company
Operations Center
Attn: Reorganization Department
6201 15th Avenue
Brooklyn, NY 11219

RE: Method of Transmittal for account 9000000001, company 16108

To Whom It May Concern:

This letter accompanies the Letter of Transmittal for iTerra Communications LLC
request to receive all shares of GigOptix Inc LLC. When sending the certificate to the
address below, as indicated on the letter in the Special Delivery Instructions, please send
it via a method of delivery with a tracking option, such as certified mail or overnight
delivery.

iTerra Communications LLC
c/o Morgan Stanley Smith Barney
1087 W. River St. Ste. 300
Boise, ID 83702

Thank you for your attention to this request.

Paul Judge, Manager
iTerra Communications LLC
208-489-2604



# Limited Liability Company (LLC) or
# Limited Liability Partnership (LLP)
# Certification of Investment Powers

Account Number
*For Morgan Stanley Smith Barney use only*

140-054896-008

In consideration of Morgan Stanley Smith Barney LLC ("Morgan Stanley Smith Barney") opening and/or maintaining one or more accounts for the LLC or LLP (the "Client") named below, I/we, the undersigned Manager(s)/Member(s) or Partners, hereby certify as follows:

**1. General Information**

1.  The full legal name of the Client to which this Certification applies is:

   ## iTerra Communications LLC

2.  ☑ If the Client is an LLC that is run by one or more Managers—The Manager(s) is/are:

   ## Paul Judge

   (IF THE LLC IS RUN BY ONE OR MORE MANAGERS, ONLY THE MANAGER(S) NEED TO COMPLETE THIS CERTIFICATION.)

   ☐ If the Client is an LLC that is run by one or more Members—The Member(s) is/are:

   ☐ If the Client is an LLP, the Partners are:

**2. Authorized Individuals**

Morgan Stanley Smith Barney is hereby authorized to accept investment orders and other instructions from those individuals or entities listed below, unless their authority is expressly limited on this Certification. If any individual or entity listed below is NOT listed in Section 1 above, I/we, the undersigned Manager(s)/Member(s) or Partners, hereby certify that I/we am/are authorized under the governing instrument and/or applicable law to delegate trading authority to such individual or entity. In addition, all check-signing and withdrawal privileges have been indicated below; these privileges include, but are not limited to, the authority to make distributions (e.g., of cash or securities) and transfers by check or otherwise to members or partners, including the undersigned Manager(s)/Member(s) or Partners.

(ALL AUTHORIZED INDIVIDUALS MUST COMPLETE THIS SECTION 2, EVEN IF ALSO SIGNING IN SECTION 8.)

| Paul Judge | 2907 S Whitehaven Place Eagle, ID 83616 | | |
|---|---|---|---|
| NAME | PRIMARY RESIDENCE: ADDRESS | | |
| *(signature)* | 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 | 04 / 23 / 1966 | Manager |
| SIGNATURE | SOCIAL SECURITY NUMBER | DATE OF BIRTH | RELATIONSHIP TO CLIENT |

Check-signing privileges: ☑ Yes   ☐ No
Other withdrawal privileges: ☑ Unrestricted   ☑ Wire/Journal to Same-Name Account   ☐ None
Trading Authority: ☑ Yes   ☐ No (Managers/Members or Partners have trading authority regardless of which box is checked.)

NAME        PRIMARY RESIDENCE: ADDRESS

SIGNATURE        SOCIAL SECURITY NUMBER     DATE OF BIRTH     RELATIONSHIP TO CLIENT

Check-signing privileges:    ☐ Yes     ☐ No

Other withdrawal privileges:    ☐ Unrestricted    ☐ Wire/Journal to Same-Name Account    ☐ None

Trading Authority:    ☐ Yes     ☐ No (Managers/Members or Partners have trading authority regardless of which box is checked.)

---

NAME        PRIMARY RESIDENCE: ADDRESS

SIGNATURE        SOCIAL SECURITY NUMBER     DATE OF BIRTH     RELATIONSHIP TO CLIENT

Check-signing privileges:    ☐ Yes     ☐ No

Other withdrawal privileges:    ☐ Unrestricted    ☐ Wire/Journal to Same-Name Account    ☐ None

Trading Authority:    ☐ Yes     ☐ No (Managers/Members or Partners have trading authority regardless of which box is checked.)

Note: If more than one Authorized Individual is named above, all the Managers/Members or Partners, by signing below, certify to Morgan Stanley Smith Barney that the Authorized Individuals have agreed that any action in connection with the account shall require the authorization of only one Authorized Individual.

Subject to Morgan Stanley Smith Barney's policies, if Morgan Stanley Smith Barney receives conflicting instructions from different Authorized Individuals, or reasonably believes instructions from one Authorized Individual might conflict with the wishes of another Authorized Individual, Morgan Stanley Smith Barney may do any of the following: (a) choose which instructions to follow and which to disregard; (b) suspend all activity in the account until written instructions signed by all Authorized Individuals are received; (c) close the account and deliver all securities and other property, net of debits or liabilities, to the address of record; and/or (d) take other legal action.

## 3. Delegation

I/we, the undersigned Manager(s)/Member(s) or Partners, hereby covenant that if I/we sign and deliver to Morgan Stanley Smith Barney any document which effectuates a delegation of investment management, I/we am/are authorized under the governing instrument and/or applicable law to delegate investment management, and that Morgan Stanley Smith Barney shall have no independent duty to verify my/our authority to delegate investment management.

## 4. Borrowing/Pledging/Guaranteeing

I/we, the undersigned Manager(s)/Member(s) or Partners, hereby certify that I/we am/are authorized under the governing instrument and/or applicable law to enter into transactions of the types specified below *(check all types of transactions that are permitted)*:

☐ Borrowing and Pledging Client Assets as Security

☐ Guaranteeing Loans to Members or Partners

☐ Guaranteeing Loans to Others

## 5. Option Transactions

I/we, the undersigned Manager(s)/Member(s) or Partners, hereby certify that I/we am/are authorized under the governing instrument and/or applicable law to enter into option transactions, both purchase and sales, of the types specified below *(check all types of investments that are permitted)*:

☐ Covered Call Writing     ☐ Buying Puts to Hedge     ☐ Buying Puts/Calls

☐ Spreads     ☐ Writing Uncovered Puts/Calls     ☐ All of the Above

## 6. Other Permitted Investments

I/we, the undersigned Manager(s)/Member(s) or Partners, hereby covenant that I/we and any Authorized Individual given trading authority in Section 2 am/are authorized under the governing instrument and/or applicable law to make any other investments, both purchase and sales, of the types specified in any instructions that I/we will give to Morgan Stanley Smith Barney, and that Morgan Stanley Smith Barney shall have no independent duty to verify my/our authority to make such investments.

## 7. Other Matters

1. The undersigned Manager(s)/Member(s) or Partners hereby acknowledge receiving and reviewing all pertinent account documentation and agreements.

2. The undersigned Manager(s)/Member(s) or Partners hereby jointly and severally indemnify Morgan Stanley Smith Barney, Morgan Stanley & Co. Incorporated and their subsidiaries, affiliates, successors and assigns and its employees and hold each of them harmless from any and all claims, liabilities, and expenses which may arise from any acts or omissions (including, but not limited to, instructions related to investments, withdrawals, distributions and transfers) from Authorized Individuals or which may arise from continued reliance on this Certification. The provisions of this paragraph shall survive the termination of either the Client or the account.

3. The undersigned Manager(s)/Member(s) or Partners hereby agree to notify Morgan Stanley Smith Barney in writing of any amendment to the Client, any change in the composition of the Managers/Members or Partners, or the Authorized Individuals, or any other event which could materially alter the representations made in this Certification. Morgan Stanley Smith Barney may rely on the continued validity of this Certification indefinitely, absent actual receipt of such written notice.

4. I/we agree that Morgan Stanley Smith Barney may apply this form to any accounts in the name of the entity listed in Section 1 above. I/we further agree that all of the terms, conditions, authorizations and representations shall apply to such accounts.

## 8. Managers/Members or Partners

The undersigned Manager(s)/Member(s) or Partners hereby certify that the undersigned are all of the Manager(s)/Member(s) or Partners:

| | |
|---|---|
| Paul Judge | 2907 S Whitehaven Place Eagle, ID 83616 |
| NAME | ADDRESS |
| 06/04/2009 | |
| DATE | SIGNATURE |
| | |
| NAME | ADDRESS |
| | |
| DATE | SIGNATURE |

| NAME | ADDRESS |
|------|---------|
| DATE | SIGNATURE |

| NAME | ADDRESS |
|------|---------|
| DATE | SIGNATURE |

| NAME | ADDRESS |
|------|---------|
| DATE | SIGNATURE |

| NAME | ADDRESS |
|------|---------|
| DATE | SIGNATURE |

| NAME | ADDRESS |
|------|---------|
| DATE | SIGNATURE |

## 9. USA Patriot Act

**Important information about procedures for opening a new account or establishing a new customer relationship.**

To help the government fight the funding of terrorism and money-laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each individual or institution that opens an account or establishes a customer relationship with Morgan Stanley Smith Barney.

**What this means:** If you enter into a new customer relationship with Morgan Stanley Smith Barney, Morgan Stanley Smith Barney will ask for your name, address, date of birth (as applicable) and other identification information. This information will be used to verify your identity. As appropriate, Morgan Stanley Smith Barney may, in its discretion, ask for additional documentation or information. If all required documentation or information is not provided, Morgan Stanley Smith Barney may be unable to open an account or maintain a relationship with you.

© 2009 Morgan Stanley Smith Barney

NY CS 5772986 J06/09

140-054896-008

Branch Manager Approval

*Sharon Jones*

**MorganStanley
SmithBarney
ⓒCOPY**

# BUSINESS ACTIVE ASSETS ACCOUNT℠ APPLICATION

**Financial Advisor**—Submit this completed application to:
Morgan Stanley Smith Barney, National New Accounts 2711 LBJ Freeway, Ste. 400 Dallas, TX 75234
Attn: Business Active Assets Account—New Accounts

To open a Business Active Assets Account with Morgan Stanley Smith Barney LLC ("Morgan Stanley Smith Barney"), complete this application on behalf of your business entity (the "Business") and return it to your Financial Advisor. The *Business Active Assets Account Agreement* ("Agreement") and the accompanying *Account and Service Fees Schedule* ("Fee Schedule") set forth the terms and conditions of the Account and provide important information about Account services and fees. Certain capitalized terms not otherwise defined in this Application are defined in the Agreement. If the Business is not a U.S. Person, this application must be accompanied by a Morgan Stanley Smith Barney *International Client Letter of Eligibility*.

Please note that you are automatically requesting margin privileges unless you check the "NO MARGIN" box in Section 9 of this Application.

Please review, sign and return this Application as soon as possible. Should paperwork not be received by Morgan Stanley Smith Barney within 60 days from receipt of this material, your account may become subject to various restrictions and possible closure.

We respect your privacy and will maintain the confidentiality of your personal financial information. For more details, please see our U.S. Privacy Policy.

Morgan Stanley Smith Barney has entered into an agreement with Morgan Stanley & Co. Incorporated ("Morgan Stanley") to execute and clear all brokerage transactions and maintain client accounts. Morgan Stanley may provide additional services as well, including making accessible to you certain banking products and services, which may be provided to you through Morgan Stanley Smith Barney, as applicable. Where appropriate, Morgan Stanley Smith Barney and Morgan Stanley have entered into arrangements with licensed banks and other third parties to assist in offering certain services. Unless otherwise specifically disclosed to you in writing, investments and services offered through Morgan Stanley Smith Barney, and accounts carried by Morgan Stanley & Co. Incorporated, members SIPC, are not insured by the FDIC, are not deposits or other obligations of, or guaranteed by, banks, and involve investment risks, including possible loss of principal amount invested.

## 1. Account Information

iTerra Communications LLC
LEGAL NAME OF BUSINESS

82-D5Z6533
SOCIAL SECURITY NUMBER OR TAX ID NUMBER (REQUIRED)

(208) 489-2604
BUSINESS PHONE NUMBER

TRADE NAME OR DBA "DOING BUSINESS AS" (IF APPLICABLE)

1242L West Explorer Dr. STE200
LEGAL BUSINESS ADDRESS: STREET ADDRESS (CANNOT BE A P.O. BOX)

Boise, ID 83713
CITY, STATE AND ZIP OR POSTAL CODE (AND COUNTRY IF OUTSIDE THE UNITED STATES)

STATEMENT MAILING ADDRESS (IF DIFFERENT FROM ABOVE): STREET ADDRESS

CITY, STATE AND ZIP OR POSTAL CODE (AND COUNTRY IF OUTSIDE THE UNITED STATES)

Paul Judge
PRIMARY CONTACT

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
SOCIAL SECURITY NUMBER OR TAX ID NUMBER (REQUIRED)

(208) 939-9582
HOME PHONE NUMBER

2907 S. Whitehaven Place
HOME ADDRESS: STREET ADDRESS

Eagle ID 83616
CITY, STATE AND ZIP OR POSTAL CODE (AND COUNTRY IF OUTSIDE THE UNITED STATES)

NON-U.S. CITIZEN: PASSPORT NUMBER          DATE OF EXPIRATION (MM/DD/YYYY)          PASSPORT ISSUED BY (COUNTRY)
(PLEASE ATTACH THE PASSPORT/NATIONAL IDENTITY CARD FORM (NON-RESIDENT ALIENS) ALONG WITH A PHOTOCOPY OF YOUR PASSPORT TO THIS APPLICATION)

SECONDARY CONTACT

_____

SOCIAL SECURITY NUMBER OR TAX ID NUMBER (REQUIRED)          HOME PHONE NUMBER

_____

HOME ADDRESS: STREET ADDRESS          CITY, STATE AND ZIP OR POSTAL CODE (AND COUNTRY IF OUTSIDE THE UNITED STATES)

_____/_____/_____

NON-U.S. CITIZEN: PASSPORT NUMBER     DATE OF EXPIRATION (MM/DD/YYYY)     PASSPORT ISSUED BY (COUNTRY)

## 2. Organization Type

Please place a check next to the organization type that applies (check one only)

☐ **Sole Proprietorship**
(Please complete the Sole Proprietorship Certification form)

☐ **Corporation** (includes incorporated non-profit)
(Please complete the Authorized Individuals and Enabling Resolutions for Corporations form)

☐ **Unincorporated Entities and Other Organizations**
(Please complete the Authorized Individuals and Enabling Resolutions for Municipalities and Certain Other Organizations form)

☐ **Partnership** (includes limited partnership)
(Please complete the General Partnership or Limited Partnership ("LP") Certification of Investment Powers form)

☒ **Limited Liability Partnership/Company**
(Please complete the Limited Liability Company ("LLC") or Limited Liability Partnership ("LLP") Certification of Investment Powers form)

Enter the tax classification: __P__
(D=Disregarded Entity, C=Corporation, P=Partnership):

## 3. Investment Objective and Financial Information

Your investment objective is an important aspect of your investment strategy. Choose one primary investment objective for the Account. Then, select between one to three other investment objectives from the remaining investment objectives for the Account.

**Primary Investment Objective** *(Select one)*

| Income | Aggressive Income | Capital Appreciation | Speculation |
|--------|-------------------|----------------------|-------------|
| ☒ | ☐ | ☐ | ☐ |

**Income**—for investors seeking regular income with low to moderate risk to principal

**Aggressive Income**—for investors seeking higher returns either as growth or as income with greater risk to principal

**Other Investment Objectives** *(Select at least one, or up to three, of the other remaining investment objectives)*

| ☒ | ☒ | ☒ | ☒ |
|---|---|---|---|

**Capital Appreciation**—for investors seeking capital appreciation with moderate to high risk to principal

**Speculation**—for investors seeking high profits or quick returns with considerable possibility of losing most or all of their investment

Indicate year you started investing per the following:
- For a Trust or Estate Account, indicate the investment experience of the trustee or executor, respectively.

Indicate financial information, including annual income, net worth, liquid net worth and U.S. tax bracket per the following:
- For a Trust, Estate, Sole Proprietorship Account, indicate the financial information associated with the entity (i.e., trust, estate, etc.), not the individuals authorized on the Account.

| Indicate the year you started investing in: | Annual Income from all sources *(Financials should be entered in USD)* | Estimated Net Worth *(assets minus liabilities, excluding residence)* | Estimated Liquid Net Worth *(assets readily convertible to cash)* | U.S. Tax Bracket |
|---|---|---|---|---|
| Equities _2000_ (yyyy) | $ _0_ | $_300,000_ | $_1,300,000_ | ☐ 10%   ☒ 28% |
| Options _____ (yyyy) | | | | ☐ 15%   ☐ 33% |
| Futures _____ (yyyy) | | | | ☐ 25%   ☐ 35% |

## 4. Form W-9

(For any U.S. person that, for the purpose of this Section 4 of the Application, is defined in Section 7701 (a) (30) of the Internal Revenue Code.)

If you are not a U.S. person, do not complete this section; instead, you must supply an appropriate Form W-8 in order to confirm non-resident alien or foreign entity status. Morgan Stanley Smith Barney may be required by law to withhold a percentage of dividends, interest and gross proceeds of sales of securities for any account which has not filed a Form W-9 or an appropriate Form W-8.

BUSINESS ACTIVE ASSETS ACCOUNT APPLICATION

If you are a U.S. person, including sole proprietorships, partnerships and limited liability companies/partnerships, you certify under penalties of perjury that:

1. The Social Security Number or Taxpayer Identification Number ("TIN") shown in Section 1 of this Application is correct (or you are waiting for a TIN to be issued).

2. You are not subject to backup withholding because (a) you are exempt from backup withholding or (b) you have not been notified by the Internal Revenue Service ("IRS") that you are subject to backup withholding as a result of a failure to report all interest or dividends or (c) the IRS has notified you that you are no longer subject to backup withholding.

3. You are a U.S. Person (including a U.S. resident alien).

You must cross out item #2 if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.

## 5. Cash Management Services

Please check the Business Active Assets Account services that you would like. Detailed information about the account, its services and any fees may be found in the Business Active Assets Account Agreement and other documentation applicable to the services you have selected. Please read them carefully.

**Note:** If the Business is not a U.S. Person, please contact your Financial Advisor to determine your eligibility to sweep into the Bank Deposit Program and for the banking and other account services in Sections 5, 6, 7, 8, 9 and 10 of this application.

☐ Checkwriting Privileges
Please complete Section 8 below.

☐ Check Imaging Service
Annual Fee $30

☑ Online Access
Speak to your Financial Advisor if you do not want Internet access to your account.

☑ Year-End Summary (Date _____/_____ Fiscal Year-End)
mm/dd
Fiscal Year-End date will default to 12/31 if no other date is indicated.

## 6. Portfolio Loan Accounts

A line of credit, offered by Morgan Stanley Bank, N.A., may be established to provide liquidity for nearly any purpose except to purchase securities or repay margin debt. Secured by eligible assets held in your Morgan Stanley Smith Barney accounts, a Portfolio Loan Account ("PLA") can be established with no up front fees. Typical uses for PLA loans include, but are not limited to, real estate purchases, home renovations, financing business needs, or general liquidity. For more information on the PLA, including how to apply, contact your Financial Advisor. Please note that approval of a PLA is at the sole discretion of Morgan Stanley Bank, N.A.

## 7. Automatic Cash Sweep

The Bank Deposit Program will be your sweep investment unless you choose another sweep investment or are otherwise ineligible to participate in the Bank Deposit Program (e.g., certain persons residing outside the U.S.). The Program and available FDIC coverage are described in the Bank Deposit Disclosure Statement in your account opening materials. If you want to select a different sweep investment or are otherwise ineligible to participate in the Bank Deposit Program, please select one of the money market funds below and review the applicable prospectus for details.

☒ **Bank Deposit Program**
☐ Active Assets Tax-Free Trust
☐ Active Assets California Tax-Free Trust
☐ Active Assets New York Tax-Free Trust ($1 million minimum household assets balance)
☐ Active Assets Institutional Money Trust ($5 million minimum initial investment; $2 million minimum balance)
☐ Active Assets Institutional Government Trust ($5 million minimum initial investment; $2 million minimum balance)
☐ SIC AV U.S. Dollar Liquidity Fund Offshore Money Market Fund (available only if you are not a U.S. Person[1])

In addition to fund minimums, Morgan Stanley Smith Barney may require a minimum initial investment to activate some or all of the sweep investments. If you do not meet the applicable minimum initial investment, to the extent eligible, your Free Credit Balances will be invested in the Bank Deposit Program. Please consider the investment objectives, risks, charges and expenses of any fund carefully before investing. The prospectus contains this and other information about each fund. Please read the prospectus carefully before investing. For more information, contact your Financial Advisor.

## 8. Checkwriting Information

Please print name(s) and address as you wish them to appear on your checks. (Trust accounts: Please enter TTEE after each Trustee's name.) You may include additional information, such as telephone numbers, on the last line.

*NO CHECKS*

If you would like your checks delivered to an address other than the one above, enter the mailing address on the lines below.

**Check No.:** Enter first check number 101 or higher

## 9. Automatic Margin Privileges

Please note that you are automatically requesting margin privileges[3] unless you check the "NO MARGIN" box:

☒ NO MARGIN

Margin privileges may not be available in certain jurisdictions.

Note that if you have more than one account with Margin privileges held by Morgan Stanley, the value of marginable securities in such accounts held in the same client name and capacity will be aggregated to determine your cumulative margin credit.[4]

For more information on margin privileges, please read Section 14 of this Application and the Margin Disclosure Statement which has been provided to you. The Margin Disclosure Statement is also available through your Financial Advisor or online at www.morganstanleyindividual.com/customerservice/disclosures. See the Margin Interest Rate Schedule for margin interest rates.

## 10. Debit Card Information

Please Note: A maximum of two cards will be issued per account. No card will be issued in the Business's name only.

Number of standard debit cards requested: ☐ 1 ☐ 2 ☒ I do not want any debit cards.

**Cardholder 1**

FULL NAME (ONLY 21 CHARACTERS WILL BE EMBOSSED ON CARD)

SIGNATURE                                                          HOME TELEPHONE NUMBER

NAME OF BUSINESS (UP TO 24 CHARACTERS)

**Cardholder 2**

[ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ]

FULL NAME (ONLY 21 CHARACTERS WILL BE EMBOSSED ON CARD)

_____     _____
SIGNATURE                                             HOME TELEPHONE NUMBER

[ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ]

NAME OF BUSINESS (UP TO 24 CHARACTERS)

## 11. Disclosure of Beneficial Ownership

SEC rules require us to disclose to an issuer, upon the issuer's request, your name, address and the number of shares of the issuer's securities that we hold for you in "street" name, unless you have objected to such disclosure. The issuer would be permitted to use this information for shareholder communications only.

☐ If you object to us providing this information to issuers, please check this box.

## 12. Choice Select[SM]

If you are a moderate or active trader, you may want to consider enrolling in Choice Select—a pricing alternative for equities and options[5] trades in a brokerage account. With traditional brokerage pricing, clients are charged commissions on a trade-by-trade basis. In Choice Select, clients are charged commissions quarterly in arrears based on a sliding scale commission schedule that resets annually. The more you trade, the lower your marginal commission rate. You can also place trades anytime, online, only with Choice Select Online.[SM] Any investment advice is solely incidental to Morgan Stanley Smith Barney's business as a broker-dealer. Clients do not pay for, nor do they receive, a level of advice different from that provided to other full-service brokerage clients who pay on a per-trade basis. Contact your Financial Advisor for more information regarding Choice Select.

## 13. USA PATRIOT Act Notice[6]

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each organization that opens an account or establishes a customer relationship with Morgan Stanley Smith Barney.

What this means is that if you enter a new customer relationship, Morgan Stanley Smith Barney, Morgan Stanley Smith Barney will ask for your name, address, date of birth (as applicable) and other identification information. This information will be used to verify your identity. As appropriate, Morgan Stanley Smith Barney may, in its discretion, ask for additional documentation or information. If all required documentation or information is not provided, Morgan Stanley Smith Barney may be unable to open an account or establish a relationship with you.

## 14. Signatures

A. The Business represents that no person that has an ownership interest in the Account or has authority over the Account is or has been a senior foreign political figure[7] or immediate family member[8] or close associate[9] of a senior foreign political figure within the meaning of the U.S. Department of Treasury's Guidance on Enhanced Scrutiny for Transactions That May Involve the Proceeds of Foreign Official Corruption[10] and as referenced in the USA PATRIOT Act of 2001 (the "PATRIOT Act")[5]. If any owner of the Account or person with authority over the Account is, or has been, such a figure, the Business shall disclose such to Morgan Stanley Smith Barney and provide the information required by U.S. law to open and/or to service the Account. Except to the extent prohibited by law, regulation or sanction program, by signing this Application the Business agrees that this Account will not be used for any transactions with, or for the benefit, directly or indirectly, of any person, entity or government subject to sanctions administered by the U.S. Department of Treasury.

B. As required by IRS regulations, the Business certifies that the correct Tax ID number of the Business has been provided.

C. The Business acknowledges receipt of the Agreement and agrees to abide by its terms and conditions as currently in effect or as they may be amended from time to time.

D. The Business confirms receipt of the Active Assets trust prospectus or the Bank Deposit Program disclosure statement, as applicable. If the Business is selecting the Bank Deposit Program as its Daily Sweep Selection, the Business agrees to the terms and conditions of the Bank Deposit Program as set forth in the Bank Deposit Program disclosure statement, as it may be amended and as otherwise disclosed to the Business from time to time.

The following applies only to Business clients who request and are approved for margin privileges, which are not available within the same account with a commercial line of credit:

The Business authorizes Morgan Stanley to lend to itself or to others, either separately or in common, any holding in the Business's account that Morgan Stanley may be carrying for the Business on margin. It is understood that the Business may borrow against the Business's account at the rates and terms explained in the Agreement.

E. Additional certifications for clients who are not U.S. Persons!

    a) The Business certifies that it does not qualify as a U.S. Person under U.S. securities laws. The Business understands that certain investments may have other or additional restrictions and that it will be responsible for any violations of such restrictions. The Business affirms, as applicable, that any photocopies are true and accurate copies of current and valid passports or national identity cards. The Business agrees to notify Morgan Stanley immediately in the event it becomes a U.S. Person.

    b) For clients selecting the offshore SICAV money market mutual fund sweep: The Business confirms that it was not in the United States at the time it signed this application (and was not solicited to select this mutual fund in the United States).

F. Unless the Business has checked "No Margin" in Section 9 of this Application, the Business understands that margin loans may be extended to you from time to time for purposes of purchasing securities or otherwise. Please see the section entitled "Margin Privileges" in the Agreement, which includes a description of the risks associated with margin borrowing and read the Margin Disclosure Statement (also available at: www.morganstanleyindividual.com/customerservice/disclosures). By signing below, you acknowledge that the Business securities may be loaned to Morgan Stanley or to others.

G. Your signature below and the certifications related to this Application extend to the Agreement, and the other disclosures and agreements applicable to your Account, including, without limitation, those applicable to the services you selected (including the fees related to your Account), which are incorporated by reference herein. Morgan Stanley Smith Barney may use this Application and the certifications in connection herewith, including certain authorization forms, to establish additional Business Active Assets Accounts. You understand and agree that, subject to any information you provide relating to such additional Accounts, the terms of this Application, the Agreement (as amended) and all certifications in connection herewith shall apply to such additional Accounts.

H. You confirm that the information provided in this Application is correct and that you will promptly advise Morgan Stanley Smith Barney of any changes to your financial status, investment objectives, name, address, or any other material information provided to Morgan Stanley Smith Barney.

I. If you decline to participate in any of our services today, but elect to do so in the future, you agree to be bound by the applicable terms in this Application, the Agreement, and any other agreements relating to such service at that time.

J. If you transmit an executed copy of this Agreement or other required documentation either by facsimile or via portable document format ("PDF"), you agree that such electronic version will be binding on all parties.

K. You further acknowledge that you can obtain this or any other executed agreement by contacting your Financial Advisor or the Client Interaction Center at 800-869-3326 or by logging into ClientServ.

By signing below, you acknowledge and agree to the terms of the Business Active Assets Account Agreement dated June 2009 or later, as amended periodically, and the Fee Schedule which are incorporated by reference herein and which you hereby acknowledge receipt. You further acknowledge that you can obtain this or any other executed agreement by contacting your Financial Advisor or the Client Interaction Center at (800) 869-3326 or by accessing ClientServ and clicking on the account documents tab under records.

---

**The Business understands that this account is governed by a Predispute Arbitration clause located at Section IV on page 18 of the Business Active Assets Account Agreement. The Business acknowledges that it has received a copy of the Agreement, including the Predispute Arbitration clause and you agree in advance to arbitrate any controversies that may arise in connection with these Accounts with Morgan Stanley Smith Barney, Morgan Stanley and their respective employees. For clients who are not U.S. Persons, the Business understands that any award rendered through an arbitration proceeding under these provisions may not be recoverable in its country of residence.**

**You understand that the Internal Revenue Service does not require your consent to any provision of this Application other than the certifications required to avoid backup withholding set forth in Section 4.**

---

iTerra Communications LLC
LEGAL NAME OF BUSINESS

Paul Judge
NAME OF PRIMARY CONTACT

_[signature]_
SIGNATURE

Manager
TITLE

June 6, 2009
DATE

If you have any questions regarding this application, please call your Financial Advisor.

1 In this regard, a U.S. Person means any U.S. Person as defined in Regulation S under the U.S. Securities Act of 1933, as amended.

2 If you reside outside the U.S. and are not eligible for the Bank Deposit Program, the Active Assets Money Trust may be your default sweep investment unless you elect otherwise.

3 Morgan Stanley Smith Barney reserves the right to approve margin privileges at its discretion.

4 Marginable securities on accounts held by clients of Financial Advisors or call centers that were previously or are otherwise deemed to be associated with Smith Barney prior to May 31, 2009, shall not be aggregated for these purposes.

5 Options are not suitable for all investors.

6 The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56 (2001).

7 A "senior foreign political figure" is a senior official in the executive, legislative, administrative, military or judicial branch of a foreign government (whether elected or not) or a major foreign political party, a senior executive of a foreign government-owned corporation, or a corporation, business or other entity formed by, or for the benefit of, such a figure.

8 "Immediate family" includes, but is not limited to, parents, siblings, spouse, children and in-laws.

9 "Close associate" means a person who is widely and publicly known to maintain an unusually close relationship with a senior foreign political figure, including a person in a position to conduct substantial domestic and international financial transactions on behalf of such a figure.

10 For a fuller discussion of the preceding terms and definitions, see http://www.federalreserve.gov/boarddocs/srletters/2001/sr0103a1.pdf.

Investments and services offered through Morgan Stanley Smith Barney LLC, and accounts carried by Morgan Stanley & Co. Incorporated; members SIPC.

© 2009 Morgan Stanley Smith Barney

NY CS 5997847 J06/09

# BUSINESS ACTIVE ASSETS ACCOUNT

**2009 Account and Service Fees Schedule**

The table below provides an overview of Morgan Stanley Smith Barney's account and service fees.

| Account or Service | Standard Fee |
| --- | --- |
| **Account Fees** | |
| Business Active Assets Account | $150 per year |
| **Service Fees** | |
| Checkwriting | 1 free per month; $1 thereafter |
| Check Imaging Service for Statements | $30 per year |
| Check Imaging Service through ClientServ | Free |
| Check—Canceled Copy | First three per year are free; $5 per check thereafter |
| Check—Certified | First two per year are free; $20 per check thereafter |
| Stop Payment | $30 per stop payment |
| Returned Item Includes: Check (Insufficient Funds), Deposited Check, Paid Check, Rejected ACH | $30 per transaction |
| Deposits | Free |
| MasterCard® Business Card—Daily Debit | Free (two card maximum) |
| Automated Teller Machine ("ATM") Withdrawal | 100 free per year; $1 thereafter (local fees may apply) |
| Wire Transfer (USD)—Outgoing | $30 per wire transfer |
| Wire Transfer (Non-USD)—Outgoing | $50 per wire transfer |
| Priority Wire Transfer—Outgoing | $40 per wire transfer |
| Incoming Wire | Free |
| Check Orders | Morgan Stanley Smith Barney Active Assets Account check styles available—clients can also order custom checks directly from vendor |
| Retrieval of Check Copies | First three per year are free; $5 per check thereafter |
| Dividend Reinvestment | Free (A $10 minimum dividend reinvestment per transaction applies) |
| Processing Fee[1] | $5.25 per transaction |

Not all fees are listed. Fees are subject to change.

[1] The processing fee will be applied to certain executed orders including, but not limited to, equities, fixed-income products, exchange-traded funds, mutual funds, Strategic Equity Portfolios ("STEPs"), transactional futures and unit-investment trust transactions. This fee does not apply to the managed-account programs, including Morgan Stanley Fund Solution℠ 529 Plans and Choice Select.

Investments and services offered through Morgan Stanley Smith Barney LLC, and accounts carried by Morgan Stanley & Co. Incorporated; members SIPC.

© 2009 Morgan Stanley Smith Barney

# MARGIN INTEREST RATE SCHEDULE

June 2009

Your interest rate is determined by the size of your margin loan (or debit) in your margin account on a daily basis. We charge a base lending rate plus an additional percentage that varies based on your daily close of business net settled debit balance. Our base lending rate reflects the broker call rate, the prime rate, the federal funds rate and other commercially recognized interest rates.

The base lending rate, and therefore the total interest rate you are charged, may change without notice; the current rate is posted on our website at www.morganstanleyindividual.com/customerservice/disclosures/#5.

The current percentage that is added to our base lending rate is as follows:

| Daily Close of Business Net Settled Debit Balance | Percentage Added to Base Lending Rate |
| --- | --- |
| $10,000,000+ | −1.500% |
| $5,000,000–$9,999,999 | −1.250% |
| $1,000,000–$4,999,999 | −0.250% |
| $500,000–$999,999 | +0.625% |
| $100,000–$499,999 | +0.875% |
| $50,000–$99,999 | +2.125% |
| $25,000–$49,999 | +2.250% |
| $10,000–$24,999 | +3.250% |
| $0–$9,999 | +3.375% |

If the total interest rate charged to you changes for any reason other than an increase to the base lending rate, we will give you at least 30 days advance written notice. We reserve the right to charge a different (i.e., higher or lower) interest rate based on factors determined by us in our sole discretion, including, but not limited to, a high concentration of a security or a business sector, low-priced or speculative securities, account activity or your reason for borrowing.

Investments and services offered through Morgan Stanley Smith Barney LLC, and accounts carried by Morgan Stanley & Co. Incorporated; members SIPC.

© 2009 Morgan Stanley Smith Barney

NY CS 5997847 J06/09

# MARGIN DISCLOSURE STATEMENT

Morgan Stanley Smith Barney and/or Morgan Stanley, as applicable ("we," "us" or "our") are furnishing this document to provide some basic facts about purchasing securities on margin and to alert you to the risks involved with trading securities in a margin account. Before trading stocks in a margin account, you should carefully review this document and the margin agreement that we provided to you. In the event of a conflict between this document and any other agreements you may have with Morgan Stanley Smith Barney or Morgan Stanley the other agreements will govern. If you have any questions or concerns, please contact your Financial Advisor. When you purchase securities, you may pay for the securities in full or you may borrow part of the purchase price from us. If you choose to borrow funds from us, you will open a margin account with us. The securities purchased are our collateral for the loan to you. If the securities in your account decline in value, so does the value of the collateral supporting your loan, and, as a result, we can take action, such as issue a margin call and/or sell securities or other assets in any of your accounts held with us, in order to maintain the required equity in the account. It is important that you understand fully the risks involved in trading securities on margin, which include but are not limited to the following:

## You can lose more funds than you deposit in the margin account.

A decline in the value of securities purchased on margin may require you to provide additional funds to Morgan Stanley Smith Barney to avoid the forced sale of those or other securities or assets in your Account.

## We can force the sale of securities or other assets in your Accounts.

If the equity in your account falls below the NYSE margin maintenance requirements or Morgan Stanley Smith Barney's higher "house" requirements, we can sell the securities or other assets in any of your Accounts held at Morgan Stanley to cover the margin deficiency. You also will be responsible for any shortfall in the account after such a sale.

## We can sell your securities or other assets without contacting you.

Some investors mistakenly believe that their brokerage firm must contact them for a margin call to be valid and that their firm cannot liquidate securities or other assets in their accounts to meet the call unless the firm has contacted them first. This is not the case. Although, we may attempt to notify you of margin calls, we are not required to do so. Furthermore, even if we contacted you and provided a specific date by which to meet a margin call, we can still take the steps necessary to protect our financial interests, including selling the securities immediately without notice to you.

## You are not entitled to choose which securities or other assets in your Account are to be liquidated or sold to meet a margin call.

Because the securities are collateral for the margin loan, we have the right to decide which security to sell in order to protect their interests. We can increase our "house" margin maintenance requirements at any time and are not required to provide you advance written notice. These changes in policy often take effect immediately and may result in the issuance of a margin maintenance call. Your failure to satisfy the call may require us to liquidate or sell securities in your Accounts.

## You are not entitled to an extension of time on a margin call.

While an extension of time to meet margin requirements may be available to you under certain conditions, you do not have a right to the extension.

## We may rehypothecate the securities in your account.

We may borrow money to lend to you or other margin clients and pledge your securities as collateral for such loans. You authorize us to lend any security in the margin credit portion of your Account, together with all attendant rights of ownership, either separately or together with the assets of other margin clients, to us or to others without notice to you. In connection with such loans, and securities loans made to you to facilitate short sales, we are authorized to receive and retain certain benefits, including interest on your collateral posted for such loans, to which you may not be entitled. In addition, we may receive compensation in connection with such loans. In some circumstances, such loans may limit your ability to exercise voting rights of the securities lent, either in whole or in part.

The Jobs and Growth Tax Relief Reconciliation Act of 2003 (the "Act") reduced the maximum U.S. federal income tax rate on qualifying dividends to 15%. However, receipt of payment in lieu of dividends (i.e., substitute dividends) will not be eligible for the reduced 15% tax rate. Since assets held in margin accounts held with us are generally subject to rehypothecation, substitute (rather than actual) dividends may be received by margin account customers. Under the Act, such dividends will not qualify for the lower rates on dividends.

Investments and services are offered through Morgan Stanley Smith Barney LLC, and accounts carried by Morgan Stanley & Co. Incorporated; members SIPC.

© 2009 Morgan Stanley Smith Barney

NY CS 5997847  J06/09